**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In Re: NETWORK ENGINES INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) **CA NO. 03-12529-JLT** <br> **JURY TRIAL DEMANDED** |

## AMENDED CONSOLIDATED COMPLAINT

Plaintiffs have alleged the following based upon the investigation of their counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Network Engines, Inc. ("Network Engines" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, interviews with former employees of the Company and media reports about the Company, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the securities of Network Engines between November 6, 2003 and December 10, 2003, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

5. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6. (a) Lead Plaintiffs Wing Kam Yu, Blake Kunkel and Thomas Cunningham, as set forth in their respective certifications, which have been previously filed with the Court and are incorporated by reference herein, purchased the securities of Network Engines at artificially inflated prices during the Class Period and have been damaged thereby.

(b) Plaintiff Sergio Guerra, as set forth in his certification, which has been previously filed with the Court and is incorporated by reference herein, purchased the securities of Network Engines at artificially inflated prices during the Class Period and has been damaged thereby.

    (c) Plaintiff Ricardo Guerrera, as set forth in his certification, which has been previously filed with the Court and is incorporated by reference herein, purchased the securities of Network Engines at artificially inflated prices during the Class Period and has been damaged thereby.

    7. Defendant Network Engines is a Delaware corporation with its principal place of business located at 25 Dan Road, Canton, MA 02021. The Company is a provider of server appliance hardware and custom integration services. Network Engines is focused on partnering with independent software vendors ("ISVs") and original equipment manufacturers ("OEMs") to provide these strategic partners with server appliance hardware, integration services and appliance development, deployment and support to allow these strategic partners to deliver turnkey solutions to their end user customers.

    8. (a) Defendant John Curtis ("Curtis") was, at all relevant times, Network Engines's President and Chief Executive Officer ("CEO").

    (b) Defendant Douglas G. Bryant ("Bryant") was, at all relevant times, Network Engines's Chief Financial Officer ("CFO") and Vice President, Finance and Administration.

    (c) Defendant Lawrence A. Genovesi ("Genovesi") was, at all relevant times, a founder of Network Engines and the Chairman of its Board of Directors. He also previously served as the Company's President, CEO and Chief Technology Officer ("CTO").

    (d) Defendants Curtis, Bryant and Genovesi are collectively referred to herein as the "Individual Defendants."

    9. By virtue of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects <u>via</u>

access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings, and committees thereof, and via reports and other information provided to them in connection therewith.

10. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Network Engines, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth,

operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein, and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and further were aware of their materially false and misleading nature. By virtue of their Board membership and/or executive and managerial positions with Network Engines, each of the Individual Defendants had access to the adverse undisclosed information about Network Engines's business prospects and financial condition and performance as particularized herein and knew, or recklessly disregarded, that these adverse facts rendered the positive representations made by or about Network Engines and its business, issued or adopted by the Company, materially false and misleading.

13. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Network Engines securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme:  (i) deceived the investing public regarding Network Engines's business, operations, management and the intrinsic value of Network Engines securities; (ii) enabled Defendant Genovesi to sell 75,000 shares of his personally-held stock at artificially inflated prices for gross proceeds of $783,300 and (iii) caused Plaintiffs and other members of the Class to purchase Network Engines securities at artificially inflated prices.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

15.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Network Engines between November 6, 2003 and December 10, 2003, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the common shares of Network Engines were actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Network Engines or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Network Engines; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

20. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **SUBSTANTIVE ALLEGATIONS**

### The Company And Its
### Relationship With EMC

21.     Defendant Network Engines is a provider of server appliance hardware and custom integration services.  The Company provides ISV's and OEM's with server appliance hardware, integration services and appliance development, deployment and support to allow these strategic partners to deliver turnkey solutions to their end user customers.

22.     The Company went public in mid-2000.  Shortly thereafter, with the bursting of the Internet bubble, Network Engines suffered a decline in a substantial portion of its business.  In late 2001, Network Engines entered into a manufacturing deal with EMC Corporation ("EMC") to build its Centera product.  Centera was designed for storing fixed content, such as medical records and e-mail messages.  The product was introduced just as health care and security regulations increased, igniting strong demand for such a data storage platform.

23.     Before long, the Centera contract accounted for half of the Company's revenue.  By September, 2002, as a result of the Centera line of business, EMC accounted for 83% of Network Engines's net revenues.

24.     In November, 2002, Network Engines acquired TidalWire, Inc. ("TidalWire"), a company engaged in the distribution of storage networking products, including Host Bus Adapters ("HBAs").  HBAs are cards that connect data storage systems to computer networks.  TidalWire was, and is, an EMC-approved distributor of HBAs for use in EMC storage systems.  In addition, EMC generates reference sales for TidalWire, meaning that EMC refers its customers to TidalWire (or another approved distributor) to purchase products that are authorized for use in EMC data storage networks.  The TidalWire acquisition thus further cemented the importance of EMC to Network Engines.

25.   Unbeknownst to investors, though, in the months preceding the start of the Class Period, EMC and TidalWire were locked in intense price negotiations.  Historically, TidalWire had been provided with extremely favorable pricing by EMC, which had enabled it to generate high gross margins.  However, as detailed herein, according to numerous former employees of the Company, for months before the Class Period, EMC pushed for a steep price increase, which would have the obvious and unavoidable consequence of significantly eroding TidalWire's gross margins on sales of EMC products.  Negotiations between the companies were ongoing throughout 2002, and by the start of the Class Period, it was clear to each and every defendant that TidalWire would have to pay increased prices to EMC to continue to sell EMC-approved products.

26.   According to numerous former employees of Network Engines, negotiations between Network Engines and EMC were ongoing throughout 2002 and it was generally understood at the Company that there would be a price increase in the TidalWire contract.  For example:

(a)  A former employee of Network Engines who was employed as a TidalWire Territory Manager from July 2000 until late November 2003 ("the Former Territory Manager") confirmed that Network Engines and EMC were in negotiations prior to the Class Period and that the "negotiations weren't going well."  The Former Territory Manager said that EMC called an "emergency meeting" in October or November of 2003, and that EMC's calling such a meeting "was not a good sign."  The Former Territory Manager reported directly to the Vice President of Sales for the Company and was responsible for managing a major geographic region of the United States.  As such, the Former Territory Manager was in a position to have knowledge

9

about the EMC negotiations. The Former Territory Manager said that the October/November time frame was when "the sh*t hit the fan" in the EMC negotiations.

(b) A former employee of Network Engines who worked as TidalWire's Director of Channel Marketing from April 2003 to December 2003 ("the Former Director of Channel Marketing") also confirmed that Network Engines and EMC were in negotiations prior to the Class Period and that, as part of those negotiations, EMC was seeking a price increase of as much as 50%. The Former Director of Channel Marketing said that "the [C]ompany knew what was happening with EMC well before the sh*t hit the fan with EMC." The source of the Former Director of Channel Marketing's information was a Company Vice President, from whom the Former Director of Channel Marketing "heard directly." The Company Vice President, in turn, received information from the Company's Vice President of Marketing, Mike Riley, whom the Former Director of Channel Marketing said sat "on the executive team" and was "the right hand man" to defendant Curtis. Among other things, the Company Vice President told the Former Director of Channel Marketing that EMC was the "lifeline" of the Company's business, and that the Company could not rely on them 100% percent because there were going to be price increases from EMC. The Former Director of Channel Marketing also confirmed that "emergency meetings" were held in early November 2003 concerning the EMC situation that involved the entire Network Engines executive team.

**Materially False and Misleading
Statements Made During the Class Period**

27.     The Class Period begins on November 6, 2003. On that date, Network Engines issued a press release announcing its financial results for the fourth quarter and full year of fiscal 2003. Defendant Curtis commented on the Company's "solid" performance, stating, in pertinent part, as follows:

> The results for our fiscal year 2003 reflect a dramatic turnaround for Network Engines. Our results reflect the continuing success of our business strategy. We are seeing increasing acceptance of our unique value proposition by our customers and software partners. We recently announced new application partners, including KVS, Inc., Computer Associates International, Inc. and CommVault Systems, Inc., that we will work with to develop and distribute server appliances into our customer base of over 400 channel customers in the growing storage and security networking markets. (Emphasis added.)

The press release also commented on the Company's relationship with its current customer base, stating, in part, as follows:

> Additionally, the Company continued to develop its relationships with new partners and strengthen relationships with existing partners. (Emphasis added.)

28.     The statements referenced above in ¶ 27 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts, among others, which were known to defendants or recklessly disregarded by them:

(a) that the Company was in the process of renegotiating its distribution contract with EMC and that the negotiations between the companies had been on-going for an extended period of time without a fruitful resolution;

(b) that EMC was insisting on a dramatic increase to the prices it charged TidalWire of as much as 50%.

(c) that the price increases which EMC was insisting upon would substantially reduce the Company's gross margins and would have a significant negative impact on the Company's future financial performance; and

(d) given the foregoing, that the Company was overstating the financial strength and condition of TidalWire while failing to disclose that TidalWire's most important business relationship was changing dramatically for the worse.

29. In addition, the statement in ¶ 27 that the Company's results represented a "dramatic turnaround" for Network Engines was materially false and misleading and fostered a misleading impression concerning the Company's then-current financial condition and business prospects, given the on-going negotiations with EMC and the price increase that EMC was demanding.

30. In a conference call with investors later that same day (the "November 6th Conference Call"), defendants Curtis and Bryant discussed the Company's performance and, towards the end of the call, responded to a series of questions from the participants on the call. Defendant Curtis began the call and spoke positively about the Company's positioning for future growth and the success of the Company's acquisition of TidalWire. Specifically, defendant Curtis stated, in pertinent part, as follows:

> As we have said previously, we believe that there is a trend towards the convergence of storage and security applications and *we believe that we have positioned the company to address the growing demand for network appliance solutions in these markets.*
>
> *We consider our acquisition of TidalWire to be a core success for our company. In our Q4, we benefited from the surge in demand for storage networking products distributed by our TidalWire distribution operation*. (Emphasis added.)

Defendant Curtis continued to comment positively on the future opportunities for the Company, stating, in pertinent part, as follows: