> Furthermore, *we are optimistic that in coming quarters, there will be more opportunities to partner with existing and the newly signed software companies to develop, market and distribute new appliances into the storage and security markets*. (Emphasis added.)

Defendant Curtis further emphasized the success of the TidalWire acquisition:

> We have added a highly qualified distribution sales, marketing and logistics team from TidalWire, along with their state-of-the-art CRM and logistic systems and equally important, a channel of over value-added resalers, resellers and systems integrators.

31.   The statements referenced above in ¶ 30 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts, among others, which were known to defendants or recklessly disregarded by them:

(a)  that the Company was in the process of renegotiating its distribution contract with EMC and that the negotiations between the companies had been on-going for an extended period of time without a fruitful resolution;

(b)  that EMC was insisting on a dramatic increase to the prices it charged TidalWire of as much as 50%.

(c)  that the price increases which EMC was insisting upon would substantially reduce the Company's gross margins and would have a significant negative impact on the Company's future financial performance; and

(d)  given the foregoing, that the Company was overstating the financial strength and condition of TidalWire while failing to disclose that TidalWire's most important business relationship was changing dramatically for the worse.

32.   In addition, the statement in ¶ 30 characterizing the TidalWire acquisition as a "core success" for the Company was materially false and misleading in light of the undisclosed fact that the on-going negotiations had already made plain to the defendants that TidalWire's most important business relationship was changing dramatically and for the worse. Indeed,

given the status of the EMC negotiations, the value of TidalWire was already substantially impaired by the time of the November 6th Conference Call.

33.     Additionally, during the November 6th Conference Call defendant Bryant made positive statements about the Company's performance and its future outlook.  Concerning the Company's gross margins, defendant Bryant stated that:

> Gross margins for the fiscal year were 20.6% compared to 14.2% in fiscal 2002. During fiscal 2003, ***the distribution business contributed 19.8% gross margin***, while the OEM appliance business contributed 21.3% gross margins.
>
> The entire 14.2% gross margins from fiscal 2002 were generated exclusively by our OEM appliance business as we had not yet acquired TidalWire, which occurred at the end of the first fiscal quarter of 2003.  (Emphasis added.)

With regard to the dramatic decrease in the Company's net loss, defendant Bryant stated:

> ***This improvement is directly related to the growth of our revenues which was driven by our acquisition of TidalWire*** and the growth in our OEM appliance business, while maintaining control over our operating expenses. (Emphasis added.)

34.     The statements referenced above in ¶ 32 were each materially false and misleading for the reasons stated above in ¶ 31.  In addition, the statements in ¶ 32 were false because, as described by the Former Director of Channel Marketing, the 50% price increase that EMC was demanding would directly affect the Company's gross profit:  "[I]f we were normally making one hundred dollars on every host bus adapter, [EMC] increased our price so we're only making fifty dollars now."  In light of fact that Bryant and the other defendants knew that the prices charged by EMC would rise dramatically, and that this rise would directly and adversely impact the Company's gross profit margins, it was false and misleading for Bryant to tout the Company's gross profit margins and "growth" without indicating that the Company already *knew* -- as opposed to *expected* or *feared* -- that those gross profit margins were going to be slashed immediately by the price increases of the EMC distribution agreement.

14

35.     Also during the November 6th Conference Call, defendant Bryant responded to questions. For example, defendant Bryant was asked if the Company was experiencing pressure from its largest OEM client, EMC, to offer more aggressive prices on its products. The fact that this precise question was asked underscores the important of EMC to the Company's business. The question and answer went as follows:

> OMAR ALMADANNI (ph), ANALYST, SOUNDVIEW: Yes, good morning. Just a question on your largest OEM customer here, from my rough estimate, it looks like it dropped about 7% sequentially in terms of revenues, but you know, that customer had mentioned qualitatively that they saw pretty strong sequential growth in that specific product line.
>
> So I guess the question here is you know, what is the delta coming from, is the, is this customers diversifying to another manufacture, are they pricing more aggressively with you, or you know, how much of that is due to the perhaps consignment issue?
>
> DOUG BRYANT: Omar (ph) , I think, this is Doug. *I think we've stated in the past that, you know, it's really difficult to correlate, you know, what we report versus what our partner reports, and you know, all we can tell you that, you know, we ship it when they ask for it*. And it's just really tough to do any kind of correlation, you know, the fact that we talked about we changed the way, you know, going from that, going to that consignment inventory situation, you know, that certainly had an impact on it, *but other than that, you know, we, you have to talk to our partner about any other questions*.
>
> OMAR ALMADANNI (ph): I mean, would you be able to comment on whether that specific partner is diversifying?
>
> DOUG BRYANT: We can't speak for them.
>
> OMAR ALMADANNI (ph): You can't, OK.
>
> DOUG BRYANT: You should talk to them about that. (Emphasis added.)

36.     The statements made by Defendant Bryant referenced above in ¶ 35 centered on the Company's relationship with EMC and, therefore, created a duty to disclose the ongoing negotiations with EMC and the looming price increase, which EMC was demanding. Defendants, however, did not disclose the negotiations with EMC or the looming price increase.

15

**The Truth Begins To Emerge**

37. On December 10, 2003, Network Engines issued a press release announcing that its distribution agreement with EMC had been amended, and that all changes would be effective January 1, 2004. Under the terms of the amended distribution agreement, Network Engines would incur increased costs relating to the sale of EMC-approved HBAs. The Company further stated that this amendment would result in a decline in its gross profits related to the sale of EMC-approved HBAs, and would also negatively impact the Company's distribution operations gross profits. Defendant Bryant also disclosed that the amendment would bring gross profits on the sale of EMC-approved HBAs "more in line with our gross profit on the distribution of other third party storage networking products, which has ranged from 7% to 12% of net revenues." Finally, the Company stated that it was considering whether this amendment had impaired the goodwill and intangible assets associated with its acquisition of TidalWire.

38. Following this report, shares of Network Engines fell $3.92 per share, or 39%, to close at $6.10 per share, on volume of more than 14.396 million shares traded, or almost fourteen times the average daily volume. By December 15, 2003, the stock had fallen an additional 26.8% to close at $4.46 per share.

**Undisclosed Adverse Information**

39. The market for Network Engines' securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Network Engines' securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Network Engines securities relying upon the integrity of the market price of Network Engines's securities and market information relating to Network Engines. The price of Network Engines's securities

16

dropped precipitously when the true facts about the EMC distribution agreement were revealed to the market, and the Class has been damaged thereby.

40.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Network Engines' securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

41.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint, and the revelation to the market of the concealed true facts, directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Network Engines's business, prospects and operations. These material misstatements and omissions, and the impact of the revelation of such misstatements and omissions on the market, had the cause and effect of creating in the market an unrealistically positive assessment of Network Engines and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated, and, thereafter, to drop precipitously. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, and the revelation to the market of the concealed true facts caused the damages complained of herein.

**Additional Scienter Allegations**

42.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Network Engines, their control over, and/or receipt and/or modification of Network Engines's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Network Engines, participated in the fraudulent scheme alleged herein.

43.     As detailed herein, Network Engines's relationship with EMC was highly material to the Company as EMC-related business represented the bulk of the Company's revenues.  Accordingly, negotiations between EMC and Network Engines were extremely important to the Company and it may be presumed that the Individual Defendants, as well as other Network Engines senior executives, knew or were reckless in not knowing, of the status and nature of the contract negotiations with EMC.

44.     Defendants were further motivated to conceal the truth about the Company and its operations in order to allow defendant Genovesi to sell 75,000 shares of his personally-held stock at artificially inflated prices for gross proceeds of $783,300

**Applicability Of Presumption Of Reliance:**
**<u>Fraud-On-The-Market Doctrine</u>**

45.     At all relevant times, the market for Network Engines's securities was an efficient market for the following reasons, among others:

(a)     Network Engines's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Network Engines filed periodic public reports with the SEC and the NASDAQ;

(c)     Network Engines regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Network Engines was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

46.     As a result of the foregoing, the market for Network Engines's securities promptly digested current information regarding Network Engines from all publicly available sources and reflected such information in Network Engines's stock price. Under these circumstances, all purchasers of Network Engines's securities during the Class Period suffered similar injury through their purchase of Network Engines's securities at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

47.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Network Engines who knew that those statements were false when made.

**FIRST CLAIM**

**Violation Of Section 10(b) Of
The Exchange Act Against And Rule 10b-5
Promulgated Thereunder Against All Defendants**

48.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

49.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) enable defendant Genovesi to sell 75,000 shares of his personally-held stock at artificially inflated prices for gross proceeds of $783,300; and (iii) cause Plaintiffs and other members of the Class to purchase Network Engines's securities at artificially inflated prices.  In furtherance of this unlawful

scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

50.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Network Engines's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

51.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Network Engines as specified herein.

52.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Network Engines's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Network Engines and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

course of business which operated as a fraud and deceit upon the purchasers of Network Engines securities during the Class Period.

53.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

54.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Network Engines's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to

22

obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

55.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Network Engines's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Network Engines's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired Network Engines securities during the Class Period at artificially high prices and were damaged when the disclosure of the concealed facts concerning the EMC distribution situation caused the price of Network Engines's stock to drop.

56.     At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Network Engines was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Network Engines securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

57.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

58. As a direct and proximate result of Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act Against the Individual Defendants

59. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

60. The Individual defendants acted as controlling persons of Network Engines within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

62. As set forth above, Network Engines and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:    June 4, 2004

By: /s/ Nancy Freeman Gans
Nancy Freeman Gans, BBO #184540
**MOULTON & GANS, P.C.**
33 Broad Street, Suite 1100
Boston MA  02109-4216
(617) 369-7979

*Liaison Counsel for Plaintiffs*

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
Rachel S. Fleishman
Carlos F. Ramirez
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

*Lead Counsel For Plaintiffs*

**GELLER RUDMAN PLLC**
Samuel H. Rudman
David A. Rosenfeld
200 Broadhollow Road, Suite 406
Melville, NY 11747
(631) 367-7100

*Attorneys for Plaintiffs Sergio and Ricardo Guerrera*

## CERTIFICATE OF SERVICE

I, Nancy Freeman Gans, hereby certify that a true copy of the above document was served upon the attorney of record for each party by hand on June 4, 2004.

/s/ Nancy Freeman Gans
Nancy Freeman Gans