Litwinski Decl. Ex. 1 at 2 (emphasis added).[7] The Company specifically cautioned that its "*actual results could differ materially from those stated or implied in forward-looking statements due to a number of factors*, including those factors contained in the Company's most recent [10-K] for the year ended September 30, 2002 and most recent [10-Q] for the quarter ended June 30, 2003." Id. (emphasis added).[8]

The risk factors identified in the SEC filings incorporated by reference into both the press release and investor call disclosed the Company's dependence upon EMC – including the risk that EMC could cancel or otherwise modify its contract with Network Engines, and that "[i]f we were to lose these reference sales *or if the margins we derive from such sales were reduced to any significant degree*, our results of operations and financial condition would suffer." Id. Ex. 2 at 24 (emphasis added).[9] Forward-looking statements in the press release and investor call were accompanied by cautionary language that "adequately warned of the possibility that actual results or events may turn out differently." Fitzer, 119 F. Supp. 2d at 31. In light of these cautionary disclosures, the forward-looking statements in the press release and investor call are not actionable.

---

[7] Curtis's Optimistic Statements made on the November 6th investor call were likewise identified as forward looking statements and accompanied by meaningful cautionary language:

"Before we begin, let me remind you that except for historical information presented, *some of the matters discussed during this call may contain forward-looking statements* regarding future events that are *subject to risks and uncertainties and it may subject to the Safe Harbor Provisions of the Private Securities Litigation Reform Act of 1995.*
"*Those factors are incorporated by reference from the press release issued earlier today as well as* by those contained in the section titled factors that may affect future operating results as outlined in *the company's Form 10-Q* for the period ended June 30th, 2003 as well as other documents that may get filed from time to time with the Securities and Exchange Commission." Id. Ex. 6, ex. 99.1 (Company Controller Jim Herlihy's cautionary statement) (emphasis added) at 1. The press release and the transcript of the November 6, 2003 investor call cited in the Complaint may be properly considered by the Court on a motion to dismiss. See supra fn. 1.

[8] "Under the section 'Factors That May Affect Future Operating Results," the Company specifically identified its relationship with its largest customer, EMC, as a risk factor. See Litwinski Decl. Ex. 2 at 24, Ex. 3 at 35.

[9] In fact, the *very first* risk factor listed in the Company's 10-Q filing prior to the Class Period discloses the Company's heavy reliance on revenue from its relationships with EMC: "We derive a significant portion of our revenues from one customer, and our revenues may decline significantly if this customer cancels or delays purchases of our products, terminates their contract with us, or exercises certain of their other rights under the terms of the contract. ... Our distribution business relies on reference sales originating from our largest customer and our business would suffer if we lost these reference sales.... [i]f we were to lose these reference sales or if the margins we derive from such sales were reduced to any significant degree, our results of operations and financial condition would suffer" Litwinski Decl. Ex. 2 at 24 (emphasis added).

9

### III. THE ALLEGATIONS OF UNDISCLOSED "FACTS" SIMILARLY FAIL

With no actionable statements from the November 6th press release or investor call, Plaintiffs attempt to manufacture a fraud claim by imposing a duty to disclose where none existed. (See Compl. ¶¶ 31, 34, 36, 39-42.) First, as discussed above, the statements were themselves immaterial and not actionable as a matter of law, and therefore gave rise to no duty to disclose.[10] Second, Plaintiffs fail to allege particularized facts that contract negotiations with EMC were ongoing at the time of the statements. Third, there is no duty to disclose the existence or status of ongoing contractual negotiations. Finally, the identified statements are not misleading in the absence of the information. As a result, Plaintiffs' claims fail as a matter of law.

#### A. Plaintiffs Fail to Allege Particularized Facts Showing that Defendants Made False or Misleading Statements

Plaintiffs' claims fail because "[f]irst, and most important, there is no indication that the statements made ... were false or misleading at the time" they were made. Carney, 135 F. Supp. 2d at 244. In particular, Plaintiffs' allegations do not support the conclusion that undisclosed, adverse circumstances belying the challenged statements existed on November 6, 2003.

##### 1. Plaintiffs' Allegations Are Made on Information and Belief and Lack the Requisite Particularity to Support a Claim of Fraud

Because Plaintiffs' allegations are made based on investigation of counsel,[11] which is equivalent to their being made on information and belief, Plaintiffs are required to set forth the sources and reasons for their belief with particularity. See Carney, 135 F. Supp. 2d at 241; Fitzer, 119 F. Supp. 2d at 20 (to comply with the PSLRA, plaintiffs must articulate the particularized facts upon which their information and belief are formed). They fail to do either. Though Plaintiffs state that they have reviewed various materials, including Network Engines' SEC filings, Plaintiffs "do not identify with specificity the material reviewed and analyzed by

---

[10] Because Defendants' statements are immaterial as a matter of law, see supra Section II, they cannot give rise to a duty to disclose. See In re Boston Tech., 8 F. Supp. 2d at 53 (duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement).

[11] The Amended Consolidated Complaint states at the outset that Plaintiffs' allegations primarily are "based upon the investigation of their counsel." (Compl. ¶ 1.)

their counsel." Carney, 135 F. Supp. 2d at 247; Fitzer, 119 F. Supp. 2d at 21-22 (though use of public documents, press releases and news reports is "acceptable," plaintiff was unable "to point to particular facts and circumstances that support[ed] her allegations of fraud *within the documents themselves*") (emphasis added)). Plaintiffs likewise "fail to set out with particularity what information counsel discovered in their inquiry, where that information was discovered, and how the information led to the belief that the defendants had engaged in fraudulent conduct." Carney, 135 F. Supp. 2d at 247.

    a. *The single document Plaintiffs identify does not show fraud*

The sole document Plaintiffs identify is the Company's December 10, 2003 press release. (See Compl. ¶ 37.) That press release, however, merely states that the amendment to the EMC Contract will "increase[] costs to Network Engines" and cause a "decline in gross profit related to the sale of EMC-approved HBA's." Litwinski Decl. Ex. 5 at 1. It contains no reference to a 50% price increase, much less the existence of contract negotiations prior to November 6, 2003. See id. Other than the very statements they contend failed to disclose the omitted information, Plaintiffs do not identify a single other document that they reviewed or analyzed, and therefore fail to set out with particularity what information they discovered from such documents, where the information was discovered, or how that information led to the belief that Defendants engaged in fraudulent conduct. See Van Ormer v. Aspen Tech., Inc., 145 F. Supp. 2d 101, 103-04 (D. Mass. 2000) (PSLRA requires pleading who said what, when, and why it supports plaintiffs' belief of fraud). With such deficiencies, the allegations do not meet the particularity requirement for allegations made on information and belief. See Carney, 135 F. Supp. 2d at 247.

    b. *The sole basis for Plaintiffs' claim that contract negotiations existed is interviews with two anonymous sources based on third-level hearsay that does not satisfy the PSLRA*

Plaintiffs' allegations regarding their belief that adverse information existed are limited to a single paragraph of the 62-paragraph Amended Consolidated Complaint. That paragraph (¶ 26) is based on third-level hearsay from a "Former Territory Manager" and "Former Director of

11

Channel Marketing" that is so vague and lacking in particularity that it cannot form the basis of a fraud claim.

First, Plaintiffs allege no facts from which this Court could conclude that the Former Territory Manager "was in a position to have knowledge about the EMC negotiations" (Compl. ¶ 26(a)).[12] They allege merely that the Former Territory Manager "reported directly" to an unidentified Vice President of Sales. Plaintiffs nowhere allege that the Territory Manager attended any internal meetings, much less participated in the negotiations with EMC, or had any other basis for any supposed personal knowledge. Nor do they allege when, where, or what the Vice President of Sales allegedly said to the Former Territory Manager, or that the Vice President of Sales had any knowledge of the negotiations. Indeed, Plaintiffs do not even state that the Former Territory Manager actually received any information from this unidentified Vice President of Sales. These allegations "fall woefully short" of the requirements in this Circuit and the PSLRA. Van Ormer, 145 F. Supp. 2d at 105; Carney, 135 F. Supp. 2d at 255 (dismissing complaint where "[n]othing is said about who at [the company] talked to whom, when those talks occurred or what was said" and where "[n]othing is said about who met with whom, when those meetings occurred and what happened at those meetings").

Plaintiffs' allegations based on an interview of an unidentified former Director of Channel Marketing (the "Former Director") are equally deficient. The Former Director allegedly received his information third-hand, from an unspecified "Company Vice President,"[13] who allegedly heard it from the Company's Vice President of Marketing, Mike Riley. (Compl. ¶ 26(b).) Fatally, Plaintiffs allege no facts indicating how, where, or when such third-level

---

[12] Of course, position alone cannot support scienter as to the Defendants. See In re Chipcom Corp. Sec. Litig., 1996 U.S. Dist. LEXIS 22257, at *32 fn. 19; Carney, 135 F. Supp. 2d at 255 ("attributing knowledge to a defendant merely because of the defendant's status in a corporation, generally fails as a method of meeting the rigorous requirements for pleading scienter."). It is inconsistent with the PSLRA, which precludes Plaintiffs from stating a claim based on Defendants' mere insider status, to *permit* Plaintiffs to show fraud by claiming that anonymous sources had access to information based on *their* status, without any supporting allegations demonstrating that the anonymous source was, in fact, in a position to have, *and did have, knowledge* of such adverse circumstances.

[13] Plaintiffs' reliance on information from an unidentified source – an anonymous "Vice President" whom Plaintiffs do not even allege had direct knowledge – does not meet the pleading standard in this District. See Van Ormer, 145 F. Supp. 2d at 105 (allegations of "'sales managers' who got their information from unspecified sources fall woefully short of meeting particularity requirements."); In re Peritus, 52 F. Supp. 2d at 219 (plaintiffs "must specify… the identity of the speaker.").

12

hearsay trickled down to the Former Director or how, where, and when the other two speakers in the hearsay string gained this information. See Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 277 (D. Mass. 1998) (dismissing claims where "complaint fails to specify the time, place, and speaker of the statements"); Carney, 135 F. Supp. 2d at 241-42. Plaintiffs also fail to disclose how, when, or from whom Mr. Riley (the alleged originator of the information) learned the information. Plaintiffs' assertion that he "sat on the executive team" is no more than an insufficient statement of position. See Carney, 135 F. Supp. 2d at 255.

>   2.  The Former Employees' Statements Also Do Not Support the Conclusion that Contract Negotiations Existed Prior to November 6, 2003 or that a 50% Price Increase was Certain as of November 6, 2003

Even if they could satisfy Rule 9(b) – which they cannot – the former employees' statements are insufficient to show that contract negotiations existed on November 6, 2003. Neither former employee is even alleged to have stated that EMC called an "emergency meeting" prior to November 6, 2003. The Former Territory Manager purportedly said only that EMC "called an 'emergency meeting' in October or November 2003" – but did not indicate when the meeting was held, where it was held, who attended, or – most critically – what occurred at that meeting. (See Compl. ¶ 26(a).) The Former Director purportedly said only that "'emergency meetings' were held in early November 2003" concerning "the EMC situation" that "involved the entire Network Engines executive team" – but did not even indicate whether EMC was involved in these meetings.[14] (Compl. ¶ 26(b).) These statements are plainly insufficient to establish that contract negotiations existed prior to November 6, 2003. Both "October or November" and "early November" include dates *after* November 6, 2003.

Further, neither former employee provided any information regarding the content of such meetings, when EMC allegedly demanded a 50% price increase, or even *whether* EMC demanded a 50% price increase. Though these employees stated that the Company "knew what was happening with EMC well before the sh*t hit the fan with EMC," Plaintiffs do not allege

---

[14] Notably, Plaintiffs do not allege that they interviewed any current or former employees of EMC. Plaintiffs identify no employees of EMC who participated in the alleged negotiations or who called the "emergency meetings."

13

*when* the "sh*t hit the fan" or even what each employee (both of whom used this terminology) meant by the "sh*t hit the fan." Even if it refers to EMC's alleged calling of an "emergency meeting" – and this the most that may be concluded – Plaintiffs allege no facts indicating that either in that meeting or prior to it EMC demanded a 50% price increase, or that the Company and EMC completed their negotiations during that meeting, or otherwise agreed to a price increase at that meeting. Indeed, Plaintiffs allege no statements by the former employees indicating *when* or *whether* EMC even asked for a 50% price increase. Nor do they allege facts showing that the *outcome* of the Company's negotiations with EMC was *certain as hard fact* prior to December 10, 2003, much less prior to November 6, 2003.[15] Accordingly, Plaintiffs fail to allege with particularity that any adverse negotiations occurred prior to November 6, 2003.

### B.   There Was No Duty to Disclose Incomplete Contract Negotiations

Even assuming the Company was in contract negotiations with EMC on or before November 6, 2003, under the law of this Circuit, the Defendants were under no duty to disclose the status of such contract negotiations until the outcome was certain (in this case, on December 10, 2003, when negotiations were completed and the contract amendment was signed). See Backman, 910 F.2d at 13 ("silence, absent a duty to disclose, cannot be actionably misleading") (citation omitted); Evanowski v. Bankworcester Corp., 788 F. Supp. 611, 614 (D. Mass. 1991) ("duty to disclose 'does not arise from the mere possession of nonpublic market information'"; no duty to disclose "the existence of renegotiation discussions" where "original merger agreement" had not yet "been terminated") (citation omitted); see also Gross, 93 F.3d at 992 (the duty to make a corporate disclosure complete and accurate "does not mean that by revealing one

---

[15] Plaintiffs do not even allege that outcome correctly. Prior to the December 10, 2003 amendment to the Contract, Network Engines did not pay any amount to EMC, so there was no "price" that could be increased. See Litwinski Decl. Ex. 4, exhibit 10.26. The Amendment itself introduced a royalty requirement – not a price increase – which had the effect of decreasing Network Engines' gross profit on EMC-referred HBA sales. See id. exhibit 10.26, Amendment 2. This inaccurate characterization calls into further question Plaintiffs' unparticularized allegations that EMC "pushed for a steep price increase throughout 2002" (Compl. ¶ 25) and underscores that the former employees lacked actual knowledge of the "EMC situation." Moreover, as Network Engines did not acquire TidalWire, or its contract with EMC, until December 27, 2002, see Litwinski Decl. Ex. 4 at 20, Plaintiffs' allegation that "negotiations between Network Engines and EMC were ongoing throughout 2002" (Compl. ¶ 26) may not be credited. See Glassman, 90 F.3d 617, 628 (1st Cir. 1996) (legal conclusions and inferences not logically drawn from well-pleaded facts are accorded no deference).

14

fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, . . . are needed so that what was revealed would not be so incomplete as to mislead.") (citation omitted).

In Evanowski, the defendant's public statements about working to complete a previously announced merger made no reference to the fact that the merger price was being renegotiated for a lesser amount. See 788 F. Supp. at 615. Ultimately, the merger was terminated. See id. at 613. The court held that there was no duty to disclose the existence of these negotiations, where the plaintiffs did not allege that the defendants had stopped working to fulfill the merger or that the original agreement had already been terminated. Evanowski dictates the same result here. As in Evanowski, Plaintiffs have not alleged that, on November 6, 2003, when the statements were made, the contract had already been renegotiated and the price (or royalty) raised. Accordingly, none of Defendants' statements were "so incomplete as to mislead" at the time they were made. Id. at 615. ("The mere failure to disclose additional related information that may have been 'interesting, marketwise,' does not result in 10b-5 liability.") (citation omitted).[16]

Case law in other jurisdictions is in accord with the First Circuit's approach. The courts have refused to impose a duty to disclose the status of contract negotiations because doing so would "confuse the stockholder[s], burden the management, and harm the overall position and interest of the corporation in those negotiations." In re Humana Inc. Sec. Litig., 2000 U.S. Dist. LEXIS 21671, at *12 (W.D. Ky. Nov. 7, 2000) (company had no duty to disclose that agreement "wasn't going to be as good of a contract as in the past."), aff'd 42 Fed. Appx. 715, 2002 U.S. App. LEXIS 15710, at *5 (6th Cir. July 31, 2002) (noting with approval the district court's "well-reasoned opinion" that the "defendants had no legal duty to inform the public of these developments until the outcome of the negotiations became *as certain as hard facts*") (emphasis added); Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992) (no duty to disclose the existence or status of negotiations for leveraged buyout).

---

[16] Of course, here, the undisclosed information is not even "related information." The portions of the press release and investor call that Plaintiffs contend are misleading do not even refer to the TidalWire-EMC relationship, much less to the terms of the Contract. (See Compl. ¶ 27.)

15

### C.  The Statements Were Not Misleading Without the Undisclosed Information

Finally, even assuming Defendants' statements were material (which they were not), and that Network Engines and EMC were engaged in contract negotiations prior to November 6, 2003 (though no allegations support this conclusion), no duty to disclose such negotiations existed because the omitted information would not have altered the meaning of the statements themselves. See In re Boston Tech., 8 F. Supp. 2d at 53.

The statements in the press release and investor call concerning past financial performance were "precisely correct" and therefore did not create a duty to disclose. Backman, 910 F.2d at 17; see also Evanowski, 788 F. Supp. at 614. The performance results discussed would have been the same with or without the information, and hence nondisclosure could not have been misleading. See In re Boston Tech, 8 F. Supp. 2d at 54. Though Plaintiffs assert that it was fraudulent for Bryant to "tout the Company's gross profit margins and 'growth'" because "Bryant and the other defendants knew – as opposed to expected or feared – that those gross profit margins were going to be slashed immediately" (Compl. ¶ 34), the law of this Circuit is to the contrary. Accurately reporting past successes does not give rise to a duty to tell the public that at present its conditions or prospects are less positive. See Serabian, 24 F.3d at 361. In any event, "merely alleging the 'fostering' of 'impressions' does not adequately plead" securities fraud." Baron v. Smith, 285 F. Supp. 2d 96, 101 (D. Mass. 2003) (dismissing securities fraud complaint that alleged fraud by omission).

The meaning of Curtis' Optimistic Statements – that the Company was positioned to address growing demand and that there would be more opportunities to partner with software companies – is also the same with or without the undisclosed information. Demand for the Company's product is unrelated to whether Network Engines pays a royalty fee to EMC, and therefore is not misleading without the information.[17]

Finally, the press release statements about the OEM Appliance Business and Bryant's Response to an analyst were not misleading without the information. The analyst posed a

---

[17] Likewise, the Company's opportunities to "partner with" new and existing companies would be unaffected by a "price increase" from EMC.

question about Network Engines' OEM Appliance Business, *not* about the Company's Distribution Business. (See Compl. ¶ 35.) Bryant's Response – "we ship it when they ask for it" – sought to address why the Company reported lower OEM Appliance Business sales to EMC. (Compl. ¶ 35.) Adding information about the Company's unrelated Distribution Business would have had no effect on the meaning of that response or the press release statements about the OEM Appliance Business.

### IV. PLAINTIFFS ALLEGE NO FACTS WHATSOEVER GIVING RISE TO A STRONG INFERENCE OF FRAUDULENT INTENT

"[I]nferences of scienter survive a motion to dismiss only if they are both reasonable and strong inferences." Greebel, 194 F.3d at 195-96. Plaintiffs fail to allege a single particularized fact showing conscious wrongdoing or knowledge of or reckless disregard of falsity by any Defendant with respect to any statement. Even if the allegations themselves could be credited (and they cannot – see supra Section III.A), an inference of scienter would be unreasonable because the allegations do not support Plaintiffs' conclusion that any Defendant had knowledge of such negotiations (or any "50% price increase") on November 6, 2003.[18]

#### A. Plaintiffs' Attempt to Impute Knowledge to Curtis, Bryant, and Genovesi Based on Their Positions Fails As A Matter of Law

Lacking any specific allegations of fact showing that the Individual Defendants had any knowledge of the negotiations with EMC prior to November 6, 2003, Plaintiffs plead only that the Individual Defendants knew about the contract negotiations by dint of their positions within the Company. (See Comp. ¶ 10.)

Such generalized allegations that Defendants must have known facts based on their positions cannot satisfy the scienter requirement in this Circuit. See Gross, 93 F.3d at 991 ("[G]eneral averments of defendants' knowledge of material falsity will not suffice. . . . The rule requires that the particular times, dates, places, or other details of the alleged fraudulent *involvement of the actors be alleged*.") (emphasis added) (citation omitted); In re Galileo Corp.

---

[18] Indeed, no Individual Defendant could have had knowledge of a "50% price increase" because the contract did not include any payments to EMC, and the December 10, 2003 Amendment did not "increase" any "price" but rather introduced a royalty payment. See discussion supra fn. 15.

17

Shareholders Litig., 127 F. Supp. 2d 251, 261 (D. Mass. 2000) (scienter cannot be pleaded "by an allegation that the defendants must have known the facts solely by virtue of their positions"); In re Peritus, 52 F. Supp. 2d at 228 (rejecting allegations of scienter based on defendants' access to unspecified information as a result of their positions with Company).[19]

Plaintiffs' allegations based on interviews of unidentified former employees similarly fail. Neither former employee stated that Defendants Curtis, Bryant, or Genovesi knew the status of contract negotiations with EMC on November 6, 2003 or even that such talks were ongoing. (See Compl. ¶ 26.) The closest Plaintiffs come is asserting that *another* member of the Company's "executive team," Mike Riley (who is *not* a Defendant), told an unnamed Vice President (*not* one of the Defendants) that the executive team held meetings concerning "the EMC situation" sometime in "early November 2003." (Compl. ¶ 26(b).) Even if Riley participated in such alleged meetings in "early November 2003" (which, again, could have been *after* November 6, 2003), the Complaint is devoid of allegations showing when such a meeting occurred; that any Defendant attended such a meeting; with whom at EMC any Defendant was in contact; or what information was conveyed to any Defendant; or what happened at the meeting. In the absence of such allegations, no inference of scienter – much less a strong one – may be drawn, and Plaintiffs' claims fail as a matter of law. See In re Galileo Corp. Shareholders Litig., 127 F. Supp. 2d at 263 (no scienter based on defendant's "regular contacts" with company; complaint failed to allege "with whom" defendant was in contact, "when those contacts occurred, [or] the nature of the information imparted").

### B. Plaintiffs' "Additional Scienter Allegations" Regarding Genovesi's Trades Do Not Support a Strong Inference of Fraudulent Intent

Plaintiffs' attempt to buttress their patently inadequate scienter allegations with "additional scienter allegations" about Genovesi's trades also fails. (See Compl. ¶ 44.) First,

---

[19] To satisfy the scienter requirement, "complaints typically identify internal reports, memoranda or the like, and allege both the content of those documents and defendants' possession of them at the relevant time." In re Boston Tech., 8 F. Supp. 2d at 57 (plaintiffs must "not only allege specific facts supporting the claim that specific facts are false or misleading ... but also *specific facts from which defendants' knowledge* of those events or conditions *can reasonably be inferred*") (emphasis added); Van Ormer, 145 F. Supp. 2d at 104 (allegation that defendants received sales reports containing adverse information held inadequate where plaintiffs failed to specify which reports contained the adverse information, the date and exact information in the reports, or who received them).

18

Plaintiffs allege no stock sales by any other Defendants, and there is no basis for Plaintiffs' assumption (and Plaintiffs allege none) that any Defendant, other than Genovesi himself, would be motivated to defraud the Company for the purpose of enabling Genovesi to sell 75,000 shares for $783,000. Further, Genovesi's sale of 12.8% of his shares during the class period is, as a matter of law, "not suspicious in amount." Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001) (insiders' sales of "only 10 percent and 17 percent, respectively, of their total number of shares and options" were "not suspicious in amount").[20]

Second, Plaintiffs' failure to allege that Genovesi's trading activity during the Class Period was "unusual, well beyond the normal patterns of trading by [him]," precludes a finding of scienter based on such trading. See Greebel, 194 F.3d at 198; In re Peritus, 52 F. Supp. 2d at 224 ("one fact necessary a showing of unusualness is the amount of trading" during comparable period outside Class Period). Plaintiffs merely assert the number of shares that Genovesi traded and the total price. (See Compl. ¶ 44.) Such an allegation is inadequate to raise an inference of fraudulent intent. See Lirette, 27 F. Supp. at 283 (dismissing insider trading claim where plaintiffs failed to show unusual trading pattern).

Nor could Plaintiffs have made such an allegation, as Genovesi's trades were made during the Class Period pursuant to a pre-existing SEC Rule 10b5-1 plan. See Litwinski Decl. Ex. 7. The only inference to be drawn from these trades is that the sales were pre-scheduled and not suspicious. See Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1116 (N.D. Cal. 2003) ("Defendants sold shares under individual SEC Rule 10b5-1 trading plans . . . . This could raise an inference that the sales were pre-scheduled and not suspicious.").

## V.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a)

Plaintiffs' attempt to state a claim for control person liability under Section 20(a) of the Exchange Act also fails because where, as here, there is no primary violation, "secondary

---

[20] See Litwinski Decl. Ex. 7 (listing sale of 75,000 shares during Class Period, out of 585,475 shares held on November 6, 2003).

controlling person liability cannot exist." In re Peritus, 52 F. Supp. 2d at 230 (citation omitted); see also Suna, 107 F.3d at 72.

## CONCLUSION

For the reasons set forth above, the Amended Consolidated Complaint should be dismissed with prejudice.[21]

                                      NETWORK ENGINES, INC., JOHN CURTIS, DOUGLAS G. BRYANT, and LAWRENCE A. GENOVESI,

By their attorneys,

_/s/ Jeffrey B. Rudman_
Jeffrey B. Rudman (BBO #433380)
Daniel W. Halston (BBO #548692)
John A. Litwinski (BBO #650603)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000

Robin L. Alperstein (*pro hac vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
300 Park Avenue
New York, New York 10022
(212) 937-7200

Dated: August 13, 2004

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on _August 13, 2004_

---

[21] Where, as here, Plaintiffs have "pled [their] case with determined imagination, but little factual substance[,] [c]onsiderations of fairness, judicial economy, and congressional purpose in enacting the Securities Laws all point ... to dismissal of [the] complaint with prejudice." See Carney, 135 F. Supp. 2d at 257 (citation omitted).

20