# EXHIBIT 2



# NETWORK ENGINES INC (NENG)

25 DAN ROAD
CANTON, MA 02021
781. 332.1000
http://www.networkengines.com

# 10–Q

**FORM 10–Q**
**Filed on 08/14/2003 – Period: 06/30/2003**
File Number 000–30863



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154&nbsp
www.gsionline.com

Form 10-Q

Table of Contents

--------------------------------------------------------------------------------

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

--------------

FORM 10-Q

(Mark One)

x QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT
   OF 1934

For the quarterly period ended June 30, 2003

OR

...TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
   EXCHANGE ACT OF 1934

For the transition period from                          to

Commission file number: 0-30863

--------------

NETWORK ENGINES, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 04-3064173 |
|---|---|
| (State or other jurisdiction of incorporation) | (I.R.S. Employer Identification No.) |
| 25 Dan Road, Canton, MA | 02021 |
| (Address of principal executive offices) | (Zip Code) |

(781) 332-1000

(Registrant's telephone number, including area code)

--------------

Indicate by check mark whether the registrant: (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period than the
Registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days.  Yes  x  No      ...

Indicate by check mark whether the registrant is an accelerated filer (as
defined in Rule 12b-2 of the Exchange Act.)  Yes      ...  No  x

As of July 31, 2003, there were 34,254,308 shares of the registrant's Common Stock, par value $.01 per share, outstanding.

--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

INDEX

|  | PAGE NUMBER |
|---|---|

PART I. FINANCIAL INFORMATION

| | |
|---|---|
| ITEM 1.FINANCIAL STATEMENTS (UNAUDITED) | |
| CONDENSED CONSOLIDATED BALANCE SHEETS | 1 |
| CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS | 2 |
| CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS | 3 |
| NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS | 4 |
| ITEM 2.MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION | 15 |
| ITEM 3.QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 32 |
| ITEM 4.CONTROLS AND PROCEDURES | 32 |

PART II. OTHER INFORMATION

| | |
|---|---|
| ITEM 1.LEGAL PROCEEDINGS | 33 |
| ITEM 2.CHANGES IN SECURITIES AND USE OF PROCEEDS | 33 |
| ITEM 4.SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 34 |
| ITEM 6.EXHIBITS AND REPORTS ON FORM 8-K | 34 |
| SIGNATURES | 35 |

--------------------------------------------------------------------------------

Table of Contents

PART I. FINANCIAL INFORMATION

ITEM I. FINANCIAL STATEMENTS

NETWORK ENGINES, INC.

CONDENSED CONSOLIDATED BALANCE SHEETS

(in thousands)

(unaudited)

|  | June 30, 2003 | September 30, 2002 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 38,585 | $ 46,552 |
| Short-term investments | -- | 8,546 |
| Restricted cash | 47 | 1,098 |
| Accounts receivable, net of allowances | 11,781 | 2,729 |
| Inventories | 10,009 | 1,956 |
| Prepaid expenses and other current assets | 981 | 1,065 |
| Total current assets | 61,403 | 61,946 |
| Property and equipment, net | 1,770 | 2,236 |
| Goodwill | 7,785 | -- |
| Intangible assets, net | 4,564 | -- |
| Other assets | 55 | 28 |
| Total assets | $ 75,577 | $ 64,210 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 9,120 | $ 1,474 |
| Accrued compensation and other related benefits | 919 | 683 |
| Accrued warranty | 889 | 231 |
| Other accrued expenses | 1,127 | 554 |
| Current portion of accrued restructuring and other charges | 537 | 355 |
| Deferred revenue | 199 | 23 |

| | | |
|---|---:|---:|
| Current portion of capital lease obligations and notes payable | 2 | 14 |
| | --------- | ------------- |
| Total current liabilities | 12,793 | 3,334 |
| Long-term portion of accrued restructuring and other charges | 304 | -- |
| Contingencies (Note 6) | | |
| Stockholders' equity: | | |
| Preferred stock | -- | -- |
| Common stock | 366 | 357 |
| Additional paid-in capital | 175,645 | 174,252 |
| Accumulated deficit | (110,018) | (107,563) |
| Notes receivable from stockholders | -- | (281) |
| Deferred stock compensation | (675) | (1,185) |
| Treasury stock, at cost | (2,838) | (4,707) |
| Accumulated other comprehensive income | -- | 3 |
| | --------- | ------------- |
| Total stockholders' equity | 62,480 | 60,876 |
| | --------- | ------------- |
| Total liabilities and stockholders' equity | $  75,577 $ | 64,210 |
| | --------- | ------------- |

The accompanying notes are an integral part of the condensed consolidated
financial statements.

1

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS

(in thousands, except per share data)

(unaudited)

| | Three months ended June 30, | | Nine months ended June 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |

|  | | | |
|---|---:|---:|---:|---:|
| Net revenues | $ 27,003 | $ 4,130 | $ 52,418 | $ 9,265 |
| Cost of revenues: | | | | |
| Cost of revenues | 21,434 | 3,406 | 41,408 | 8,186 |
| Cost of revenues stock compensation | 14 | 1 | 42 | 133 |
| Total cost of revenues | 21,448 | 3,407 | 41,450 | 8,319 |
| Gross profit | 5,555 | 723 | 10,968 | 946 |
| Operating expenses: | | | | |
| Research and development | 1,096 | 914 | 2,807 | 3,717 |
| Selling and marketing | 1,933 | 874 | 4,372 | 2,846 |
| General and administrative | 1,741 | 1,088 | 4,623 | 3,734 |
| Stock compensation | 229 | 237 | 700 | 4,072 |
| Amortization of intangible assets | 254 | -- | 508 | -- |
| Restructuring and other charges | -- | 353 | 884 | 353 |
| Total operating expenses | 5,253 | 3,466 | 13,894 | 14,722 |
| Income (loss) from operations | 302 | (2,743) | (2,926) | (13,776) |
| Interest and other income, net | 106 | 324 | 471 | 1,270 |
| Net income (loss) | $ 408 | $ (2,419) | $ (2,455) | $(12,506) |
| Net income (loss) per share--basic | $ 0.01 | $ (0.08) | $ (0.08) | $ (0.38) |
| Net income (loss) per share--diluted | $ 0.01 | $ (0.08) | $ (0.08) | $ (0.38) |
| Shares used in computing basic net income (loss) per share | 33,749 | 32,176 | 32,576 | 32,789 |
| Shares used in computing diluted net income (loss) per share | 38,953 | 32,176 | 32,576 | 32,789 |

The accompanying notes are an integral part of the condensed consolidated financial statements.

2

--------------------------------------------------------------------------------

Table of Contents

## NETWORK ENGINES, INC.

### CONSOLIDATED STATEMENTS OF CASH FLOWS

### (in thousands)

### (unaudited)

| | Nine months ended June 30, | |
|---|---|---|
| | 2003 | 2002 |
| Cash flows from operating activities: | | |
| Net loss | $ (2,455) | $ (12,506) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 1,751 | 1,141 |
| Provision for doubtful accounts | 123 | 170 |
| Reversal of provision for stockholder notes receivable | (228) | -- |
| Provision for uncollectible sub-tenant receivables | 138 | |
| Stock compensation | 742 | 4,205 |
| Interest on notes receivable from stockholders | (7) | (28) |
| Changes in operating assets and liabilities, net of effects of acquisition: | | |
| Accounts receivable | (3,249) | (250) |
| Inventories | (5,189) | (2,620) |
| Prepaid expenses and other current assets | 327 | 294 |
| Due from contract manufacturer | -- | 380 |
| Accounts payable | 3,359 | 1,136 |
| Due to contract manufacturer | -- | (3,117) |
| Accrued expenses | 900 | (2,006) |
| Deferred revenue | 144 | (93) |

| | | |
|---|---:|---:|
| Net cash used in operating activities | (3,644) | (13,294) |
| Cash flows from investing activities: | | |
| Purchases of property and equipment | (329) | (322) |
| Sales of short-term investments | 8,546 | -- |
| Refunds and repayments of restricted cash | 540 | 31 |
| Changes in other assets | 2 | 120 |
| Acquisition of TidalWire, including debt repayment, net of cash acquired | (11,101) | -- |
| Payments of transaction costs | (2,129) | -- |
| | ------------ | ---------- |
| Net cash used in investing activities | (4,471) | (171) |
| Cash flows from financing activities: | | |
| Payments on capital lease obligations and notes payable | (12) | (47) |
| Collection of notes receivable from stockholders | 4 | 201 |
| Proceeds from issuance of common stock | 468 | 120 |
| Acquisition of treasury stock | (312) | (3,021) |
| | ------------ | ---------- |
| Net cash provided by (used in) financing activities | 148 | (2,747) |
| | ------------ | ---------- |
| Net decrease in cash and cash equivalents | (7,967) | (16,212) |
| Cash and cash equivalents, beginning of period | 46,552 | 74,805 |
| | ------------ | ---------- |
| Cash and cash equivalents, end of period | $   38,585 | $   58,593 |
| | ------------ | ---------- |

Non-cash investing and financing activities:

| | | |
|---|---:|---:|
| Repurchase of common stock through cancellation of notes receivable from stockholders, including accrued interest | $   512 | $   -- |
| Repurchase of common stock in exchange for amounts owed by stockholder under guarantee agreement | $   518 | $   -- |

The accompanying notes are an integral part of the condensed consolidated
financial statements.

3

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

## 1. BASIS OF PRESENTATION

The accompanying condensed consolidated financial statements have been prepared by Network Engines, Inc. ("Network Engines" or the "Company") in accordance with generally accepted accounting principles and pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations. These financial statements should be read in conjunction with the audited financial statements and the accompanying notes included in the Company's 2002 Annual Report on Form 10-K filed by the Company with the Securities and Exchange Commission.

The information furnished reflects all adjustments, which, in the opinion of management, are of a normal recurring nature and are considered necessary for a fair presentation of results for the interim periods. It should also be noted that results for the interim periods are not necessarily indicative of the results expected for the full year or any future period.

The preparation of these condensed consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant estimates included in the financial statements are restructuring and other charges, accounts receivable and sales allowances, inventory valuation, reserves for warranty and valuation and recovery of acquisition-related intangible assets and expected useful lives of such intangible assets. Actual results could differ from those estimates.

## 2. ACQUISITION OF TIDALWIRE INC.

On December 27, 2002, the Company acquired all of the outstanding capital stock of TidalWire Inc. ("TidalWire"), a privately held corporation located in Westborough, Massachusetts, dedicated to the distribution and support of storage networking products. The estimated fair values of the acquired assets and assumed liabilities have been included in the Company's financial statements as of the acquisition date and the results of the operations of TidalWire have been included in the financial statements since that date.

The estimated aggregate purchase price of $17,560,000 included a net cash payment of approximately $9,320,000, representing gross cash payments of approximately $9,910,000 less amounts due to TidalWire by a stockholder under a note of approximately $590,000, and the reissuance of 3,331,043 shares of the Company's Common Stock that were held by the Company as treasury stock (valued at approximately $3,331,000, based on the average market price of the Company's Common Stock over the period three days before and after the terms of the acquisition were agreed to and announced). In addition, the Company assumed approximately $1,878,000 outstanding under TidalWire's working capital line of credit, which the Company repaid and cancelled on December 27, 2002. As part of the acquisition, the Company also replaced all outstanding TidalWire common stock options with options for the purchase of 1,035,033 shares of the Company's Common Stock with an average exercise price of $0.36 (valued, based on the

Black-Scholes valuation model, at approximately $882,000, of which $304,000 is attributable to unvested stock options and has been allocated to deferred stock compensation). The Company also incurred fees and expenses of approximately $2,149,000 in connection with this acquisition. Included in the aggregate purchase price is $3,350,443 of cash payments and the issuance of 1,407,092 shares of the Company's Common Stock (valued at approximately $1,407,000) made to related parties (See Note 9).

The Company acquired TidalWire primarily because TidalWire has historically been a profitable company with customer management, marketing, logistics and support systems in place to support a growing channel of integrators, resellers and service and solutions providers. The Company distributes certain of its Independent Software Vendor ("ISV") partners' server appliances through TidalWire's channel of integrators, resellers and service and solutions providers thereby allowing the Company's current and potential ISV partners to eliminate the cost of sales associated with the hardware component of the server appliance sale. The Company also utilizes TidalWire's existing infrastructure to diversify its revenues beyond the server appliance market and plans to expand TidalWire's data storage product offerings to include products involved in network security.

4

---

Table of Contents

NETWORK ENGINES, INC.

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

A summary of the estimated assets acquired and liabilities assumed in the acquisition and the fair values recorded for each is as follows (in thousands):

| | |
|---|---:|
| Tangible current assets | $ 9,294 |
| Property and equipment | 477 |
| Goodwill | 7,785 |
| Customer relationships (amortized on a straight-line basis over 5 years) | 5,071 |
| Deferred compensation for unvested employee stock options | 304 |
| Assumed liabilities | (5,371) |
| | ------- |
| Net assets acquired | $17,560 |
| | ------- |

The goodwill has been assigned to the Company's Distribution segment. The Company does not expect goodwill to be deductible for tax purposes.

The Company expects to recognize amortization expense associated with customer relationships of $253,550 per quarter for each of the next five years, resulting in estimated amortization expense of $253,550 for the remainder of fiscal year

2003, $1,014,200 in each of fiscal years 2004, 2005, 2006 and 2007, and $253,550 in fiscal year 2008. The Company recorded amortization expense of approximately $508,000 during the nine months ended June 30, 2003.

Pro forma results for the three months ended June 30, 2002 and the nine months ended June 30, 2003 and 2002, as if the acquisition of TidalWire had been completed as of the beginning of each of these periods, are as follows (in thousands, except per share data):

| | Three months ended June 30, 2002 | Nine months ended June 30, | |
| --- | --- | --- | --- |
| | | 2003 | 2002 |
| Net revenues | $ 12,671 | $ 63,286 | $ 29,877 |
| Net loss | $ (2,373) | $ (2,653) | $ (12,666) |
| Net loss per share--basic and diluted | $ (0.07) | $ (0.08) | $ (0.35) |

Pro forma results for the three months ended June 30, 2003 are not presented as Network Engines and TidalWire were combined for the entire three months ended June 30, 2003. Pro forma results are not necessarily indicative of the results that would have occurred had the business combination been in effect on the dates indicated and are not necessarily indicative of future results.

During the three months ended March 31, 2003, the Company reduced goodwill by $205,000 due to the collection of certain receivables, recorded by TidalWire on December 27, 2002, which were deemed uncollectible at the acquisition date. During the three months ended June 30, 2003, the Company increased goodwill by $32,000 due to an increase in liabilities assumed in the transaction and a reduction in transaction costs.

3. SIGNIFICANT ACCOUNTING POLICIES

Recent Accounting Pronouncements

In November 2002, the Financial Accounting Standards Board issued FASB Interpretation No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, an interpretation of FASB Statements No. 5, 57, and 107 and Rescission of FASB Interpretation No. 34 ("FIN 45"). FIN 45 elaborates on the disclosures to be made by a guarantor in its interim and annual financial statements about its obligations under certain guarantees that it has issued. It also clarifies that a guarantor is required to recognize, at the inception of a guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. FIN 45 does not prescribe a specific approach for subsequently measuring the guarantor's recognized liability over the term of the related guarantee. It also incorporates, without change, the guidance in FASB

Interpretation No. 34, "Disclosure of Indirect Guarantees of Indebtedness of Others," which is being superseded. The disclosure provisions of FIN 45 are effective for financial statements of interim or annual periods that end after December 15, 2002 and the provisions for initial recognition and measurement are effective on a prospective basis for guarantees that are issued or modified after December 31, 2002, irrespective of a guarantor's year-end. The adoption of FIN 45 did not have a material impact on its financial position or results of operations.

5

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

In November 2002, the Emerging Issues Task Force of the FASB reached a consensus on Issue 00-21, Accounting for Revenue Arrangements with Multiple Deliverables ("EITF 00-21"). EITF 00-21 requires that for revenue arrangements with multiple deliverables, those deliverables be divided into separate units of accounting if the deliverables meet certain criteria as defined by EITF 00-21. Arrangement consideration is to be allocated among the separate units of accounting based on their relative fair values and revenue recognition decisions should be considered separately for each separate unit of accounting. EITF 00-21 is effective for all arrangements entered into in fiscal periods beginning after June 15, 2003, with early adoption permitted. The Company is currently evaluating the scope of EITF 00-21 but does not expect the adoption of EITF 00-21 will have a material impact on its financial position or results of operations.

In May 2003, the FASB issued Statement of Financial Accounting Standards No. 150 "Accounting for Certain Financial Instruments With Characteristics of Both Liabilities and Equity" ("SFAS 150") which establishes standards for how an issuer of financial instruments classifies and measures certain financial instruments with characteristics of both liabilities and equity. SFAS 150 requires that an issuer classify a financial instrument that is within its scope as a liability if, at inception, the monetary value of the obligation is based solely or predominantly on a fixed monetary amount known at inception, variations in something other than the fair value of the issuer's equity shares or variations inversely related to changes in the fair value of the issuer's equity shares. SFAS 150 is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The adoption of SFAS 150 is not expected to have a material impact on the Company's financial position or results of operations.

Comprehensive Loss

During each period presented, comprehensive loss was equal to net loss.

Segment Reporting

Prior to the acquisition of TidalWire, the Company organized itself as a single business segment. As a result of the acquisition of TidalWire, the Company now organizes itself into two reportable business segments: OEM Appliance and Distribution. The Company's segments have been determined based upon the channels through which the segments sell products. Sales of server appliances to

the Company's ISV partners are included in the Company's OEM Appliance segment. Sales of server appliances and data storage products to resellers and integrators are included in the Company's Distribution segment. The accounting policies of these segments are the same as those described in the Company's summary of significant accounting policies in its Annual Report on Form 10-K for the year ended September 30, 2002. The Company evaluates its segments' performance based on revenues and gross profit. There are no inter-segment sales or transfers. Management does not review assets as part of the assessment of segment performance; as such, after integration of the TidalWire distribution business, segment asset information is not available.

The following is a summary of the Company's operations by reporting segment (in thousands):

| | Three months ended June 30, | | Nine months ended June 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| **OEM Appliance:** | | | | |
| Net revenues | $ 14,445 | $ 4,130 | $ 29,275 | $ 9,265 |
| Gross profit | $ 2,907 | $ 723 | $ 6,411 | $ 946 |
| **Distribution:** | | | | |
| Net revenues | $ 12,558 | $ -- | $ 23,143 | $ -- |
| Gross profit | $ 2,648 | $ -- | $ 4,557 | $ -- |

```
                        --------- ----------------- -------
        Combined Segments:


        Net revenues
                        $   27,003 $   4,130$  52,418 $ 9,265


                        --------- ----------------- -------
        Gross profit
                        $    5,555 $    723$  10,968 $   946


                        --------- ----------------- -------
                              6
```
--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

Significant Customers

The following table summarizes those customers who accounted for greater than 10% of the Company's net revenues or accounts receivable:

| | Net Revenues for the three months ended June 30, | | Net Revenues for the nine months ended June 30, | | Accounts Receivable at June 30, | |
|---|---|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 | 2003 | 2002 |
| Customer A | 48% | 84% | 50% | 79% | 41% | 75% |

4. NET INCOME (LOSS) PER SHARE AND STOCK-BASED COMPENSATION

Net income (loss) per share

Basic net income (loss) per share is computed by dividing the net income (loss) for the period by the weighted average number of shares of common stock outstanding during the period, excluding shares of common stock subject to repurchase by the Company ("restricted shares"). Diluted net income (loss) per share is computed by dividing the net income (loss) for the period by the weighted average number of shares of common stock and potential common stock outstanding during the period, if dilutive. Potential common stock includes

unvested restricted shares and incremental shares of common stock issuable upon the exercise of stock options and warrants.

Basic and diluted net income (loss) per share were as follows (in thousands, except per share data):

| | Three months ended June 30, | | Nine months ended June 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Net income (loss) | $ 408 | $ (2,419) | $ (2,455) | $(12,506) |
| Weighted average common shares outstanding--basic | 33,749 | 32,176 | 32,576 | 32,789 |
| Weighted average potential common stock | 5,204 | -- | -- | -- |
| Weighted average common shares outstanding--diluted | 38,953 | 32,176 | 32,576 | 32,789 |
| Net income (loss) per common share--basic | $ 0.01 | $ (0.08) | $ (0.08) | $ (0.38) |
| Net income (loss) per common share--diluted | $ 0.01 | $ (0.08) | $ (0.08) | $ (0.38) |
| Common stock options, warrants and restricted common stock that were considered anti-dilutive securities and excluded from the diluted net income (loss) per share calculations, on a weighted-average basis | 256 | 2,600 | 3,905 | 2,560 |

For the three and nine months ended June 30, 2003 and 2002, certain stock options and warrants have been excluded from the diluted net income (loss) per share calculation as their effect would be anti-dilutive. For periods that the Company reports a net loss, all potential common stock is considered anti-dilutive; for periods when the Company reports net income, only potential common shares with purchase prices in excess of the Company's average common stock fair value for the related period are considered anti-dilutive.

7

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

Stock-based compensation

Stock options and restricted stock issued to employees and members of the Company's board of directors are accounted for in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations ("APB 25"); accordingly, compensation expense is recorded for options and restricted stock awarded to employees and directors to

the extent that the exercise or purchase prices are less than the common stock's fair market value on the date of grant, where the number of shares and exercise or purchase price are fixed. The difference between the fair value of the Company's Common Stock and the exercise or purchase price of the stock option or restricted stock award is recorded as deferred stock compensation. Deferred stock compensation is amortized to compensation expense over the vesting period of the underlying stock option or restricted stock. Upon cancellation of options, or repurchase of restricted common stock, with residual deferred compensation balances at the date of cancellation, the remaining amount of unrecognized deferred compensation is reversed as an adjustment to additional paid-in capital. The Company follows the disclosure requirements of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123"). Stock-based awards to non-employees are accounted for under provisions of SFAS 123.

The following table illustrates the effect on net income (loss) and net income (loss) per share as if the Company had applied the fair value recognition provisions of SFAS 123, to stock-based employee awards (in thousands, except per share data):

| | Three months ended June 30, | | | |
| | 2003 | | 2002 | |
| | Net income (loss) | Net income (loss) per share - basic and diluted | Net income (loss) | Net income (loss) per share - basic and diluted |
|---|---|---|---|---|
| As reported | $ 408 | $ 0.01 | (2,419) | $ (0.08) |
| Add: Stock-based compensation expense included in net loss | 195 | | 227 | |
| Deduct: Total stock-based compensation expense | (642) | | (696) | |
| Pro forma | $ (39) | $ -- | $ (2,888) | $ (0.09) |
| Assumptions used in determination of option fair value: | | | | |
| Risk-free interest rate | 2.46% | | 4.62% | |
| Volatility factor | 138% | | 143% | |
| Dividend yield | 0% | | 0% | |
| Weighted average expected option life | 5 years | | 5 years | |

8

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

|  | Nine months ended June 30, | | | |
|  | 2003 | | 2002 | |
|  | Net income (loss) | Net income (loss) per share - basic and diluted | Net income (loss) | Net income (loss) per share - basic and diluted |
| As reported | $ (2,455) $ | (0.08) $ | (12,506) $ | (0.38) |
| Add: Stock-based compensation expense included in net loss | 598 | | 4,099 | |
| Deduct: Total stock-based compensation expense | (1,864) | | (6,017) | |
| Pro forma | $ (3,721) $ | (0.11) $ | (14,424) $ | (0.44) |
| Assumptions used in determination of option fair value: | | | | |
| Risk-free interest rate | 2.64% | | 4.62% | |
| Volatility factor | 138% | | 143% | |
| Dividend yield | 0% | | 0% | |
| Weighted average expected option life | 5 years | | 5 years | |

5. INVENTORIES

Inventories consisted of the following (in thousands):

|  | June 30, 2003 | September 30, 2002 |
| Raw materials | $ 3,210 | $ 1,107 |
| Work in process | 343 | 412 |
| Finished goods | 6,456 | 437 |

```
                             -------------------------------


                    $        10,009$              1,956


                             -------------------------------
```

## 6. CONTINGENCIES

Guarantees and Indemnifications

Director and officer indemnifications - Pursuant to the Company's Second Amended and Restated Certificate of Incorporation, as permitted under Delaware law, the Company indemnifies its officers and directors for certain events or occurrences while the officer or director is, or was serving in his capacity as a director or officer of the Company or as a director, officer or trustee of a different entity, at the Company's request. The term of the indemnification period is for the officer's or director's lifetime. The maximum potential amount of future payments the Company could be required to make under these indemnifications is unlimited; however, the Company has a director and officer insurance policy that limits its exposure and enables it to recover a portion of any future amounts paid. As a result of the Company's insurance policy coverage, the Company believes the estimated fair value of these indemnifications is minimal. Accordingly, the Company has no liabilities recorded for these indemnifications as of June 30, 2003.

Acquisition-related indemnifications - When, as part of an acquisition, the Company acquires all the stock of a company, the Company assumes liabilities for certain events or circumstances that took place prior to the date of acquisition. The maximum potential amount of future payments the Company could be required to make for such obligations is undeterminable. While the provisions of the agreements remain in effect indefinitely, the Company believes that the probability of receiving a claim is unlikely. As a result, the Company has not recorded a liability for these indemnification clauses as of June 30, 2003.

9

---

Table of Contents

NETWORK ENGINES, INC.

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

Product warranties - The Company offers a warranty on all of the products that it sells. Warranties are provided by the Company directly, a third-party contracted to perform warranty service on the Company's behalf or the product manufacturer, depending upon the product sold. Warranty terms vary in duration depending upon the product sold but generally provide for the repair or replacement of any defective products for a period of up to 36 months after shipment. Based upon historical experience and expectation of future conditions, the Company reserves for the estimated costs to fulfill customer warranty obligations upon the recognition of the related revenue. During the three months

ended June 30, 2003, the Company recorded a warranty charge of $770,000 to OEM Appliance cost of revenues, based upon the Company's changed estimates of the cost to fulfill warranties of server appliances sold prior to June 30, 2003.

The following table presents changes in the Company's product warranty liability (in thousands):

| | |
|---|---:|
| Balance at September 30, 2002 | $ 231 |
| Accruals for warranties issued | 14 |
| Warranty liability assumed in acquisition of TidalWire Inc. | 109 |
| Cost of warranties honored during the period | (100) |
| | ------ |
| Balance at December 31, 2002 | $ 254 |
| | ------ |
| Accruals for warranties issued | 285 |
| Cost of warranties honored during the period | (312) |
| | ------ |
| Balance at March 31, 2003 | $ 227 |
| | ------ |
| Accruals for warranties issued | 1,106 |
| Cost of warranties honored during the period | (444) |
| | ------ |
| Balance at June 30, 2003 | $ 889 |
| | ------ |

Contingencies

Initial Public Offering Lawsuit

On or about December 3, 2001, a putative class action lawsuit was filed in the United States District Court for the Southern District of New York against the Company, Lawrence A. Genovesi (the Company's Chairman and former Chief Executive Officer), Douglas G. Bryant (the Company's Chief Financial Officer and Vice President of Finance and Administration), and the following underwriters of the Company's initial public offering: FleetBoston Robertson Stephens, Inc., Credit Suisse First Boston Corp., Goldman Sachs & Co., Lehman Brothers Inc. and Salomon Smith Barney, Inc. (collectively, the "Underwriter Defendants"). An amended class action complaint, captioned In re Network Engines, Inc. Initial Public Offering Securities Litigation, 01 Civ. 10894 (SAS), was filed on April 20, 2002.

The suit alleges that the defendants violated the federal securities laws by

issuing and selling securities pursuant to the Company's initial public offering in July 2000 ("IPO") without disclosing to investors that the Underwriter Defendants had solicited and received excessive and undisclosed commissions from certain investors. The suit also alleges that the Underwriter Defendants entered into agreements with certain customers whereby the Underwriter Defendants agreed to allocate to those customers shares of the Company's Common Stock in the offering, in exchange for which the customers agreed to purchase additional shares of the Company's Common Stock in the aftermarket at pre-determined prices. The suit alleges that such tie-in arrangements were designed to and did maintain, distort and/or inflate the price of the Company's Common Stock in the aftermarket. The suit further alleges that the Underwriter Defendants received undisclosed and excessive brokerage commissions and that, as a consequence, the Underwriter Defendants successfully increased investor interest in the manipulated IPO securities and increased the Underwriter Defendants' individual and collective underwritings, compensation and revenues. The suit seeks

10

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS-- (Continued)

damages and certification of a plaintiff class consisting of all persons who acquired shares of the Company's Common Stock between July 13, 2000 and December 6, 2000.

In July 2002, the Company, Lawrence A. Genovesi and Douglas G. Bryant joined in an omnibus motion to dismiss challenging the legal sufficiency of plaintiffs' claims. The motion was filed on behalf of hundreds of issuer and individual defendants named in similar lawsuits. Plaintiffs opposed the motion, and the Court heard oral argument on the motion in November 2002. On February 19, 2003, the Court issued an opinion and order denying the motion as to the Company and the case may now proceed to discovery. In addition, in October 2002, Lawrence A. Genovesi and Douglas G. Bryant were dismissed from this case without prejudice. On July 9, 2003, a special committee of the Board of Directors has authorized the Company to negotiate a settlement of the pending claims substantially consistent with a memorandum of understanding negotiated among class plaintiffs, all issuer defendants and their insurers. Any such settlement would be subject to approval by the Court.

The Company is unable to predict the outcome of this suit and its ultimate effect, if any, on the Company's financial condition; however, the Company's defense against this suit has and may continue to result in the expenditure of significant financial and managerial resources. No amounts have been accrued for this matter.

TidalWire Acquisition Lawsuit

A purported class action and derivative lawsuit was filed on January 7, 2003 in the Court of Chancery in the State of Delaware against the Company and certain members of its Board of Directors relating to the acquisition of TidalWire. The plaintiffs in the complaint allege that the Company and the named members of its Board of Directors breached their fiduciary duties by, among other things, paying an excessive amount in the acquisition of TidalWire and purportedly failing to disclose material facts in the Company's Joint Proxy Statement/Information Statement distributed to stockholders for approval of the

issuance of shares of the Company's Common Stock in the merger. The plaintiffs are seeking damages, rescission of the merger and other relief. On June 18, 2003, the Court denied a motion to dismiss filed by the Company and the named members of its Board of Directors. The Company and the named members of its Board of Directors have since answered the complaint and the case is proceeding through discovery. The Company believes that it has highly meritorious defenses and intends to vigorously defend against the suit, but given the early stage of the proceedings, the Company cannot predict the ultimate outcome of the litigation. However, as of June 30, 2003, the Company has recorded a liability of $250,000 in connection with this litigation.

## 7. RESTRUCTURING AND OTHER CHARGES

During the year ended September 30, 2002, the Company reduced its workforce, which impacted employees in all of the Company's groups. The implementation of this reduction in workforce resulted in a charge of $353,000 to operations, which was comprised entirely of employee related charges, including severance payments to terminated employees.

In December 2002, the Company recorded a charge to operations of approximately $914,000. This charge was comprised entirely of future lease and lease-related payments and resulted from the continued vacancy of certain leased facilities and the expected future vacancy of certain leased facilities currently occupied by a sub-tenant. When the Company restructured its operations during fiscal 2001, a portion of the charges that were recorded were based on the curtailment of a planned expansion into leased facilities of approximately 24,000 square feet as well as vacating approximately 17,000 square feet of leased space. In December 2002, based on the real estate market in the area of these facilities, the lack of interest in the spaces that the Company had been actively marketing to sublease and the deteriorating financial condition of the sub-tenant, the Company revised its estimates as to the duration of an expected sublease of these facilities, if any, and the estimated sublease income. These revised estimates assumed no sublease income from the Company's vacant 17,000 square foot space through the end of its current lease and approximately $126,000 of sublease income during the final nine months of its current lease on the 24,000 square foot space. Both leases currently expire in March 2005. During the nine months ended June 30, 2003, the Company received $30,000 of sublease income not previously anticipated, which is reflected as a recovery of the December 2002 restructuring and other charges.

11

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS-- (Continued)

The following table sets forth restructuring and other charges accrual activity during the nine months ended June 30, 2003 (in thousands):

| | Employee Related | Facility Related | Other | Total |
|---|---|---|---|---|
| Restructuring and other charges accrual balance at September 30, 2002 | $ 32 | $ 281 | $ 42 | $ 355 |

| | | | | |
|---|---|---|---|---|
| Cash payments | (1) | (70) | (30) | (101) |
| Restructuring and other charges | -- | 914 | -- | 914 |
| | -------- | -------- | ----- | ------ |
| Restructuring and other charges accrual balance at December 31, 2002 | $    31 | $ 1,125 | $ 12 | $1,168 |
| | -------- | -------- | ----- | ------ |
| Cash payments | (12) | (116) | (7) | (135) |
| Sub-lease income received, in excess of estimates | -- | (30) | -- | (30) |
| | -------- | -------- | ----- | ------ |
| Restructuring and other charges accrual balance at March 31, 2003 | $    19 | $   979 | $  5 | $1,003 |
| | -------- | -------- | ----- | ------ |
| Cash payments | -- | (158) | (4) | (162) |
| Non-cash adjustments | (19) | -- | 19 | -- |
| | -------- | -------- | ----- | ------ |
| Restructuring and other charges accrual balance at June 30, 2003 | $    -- | $   821 | $ 20 | $  841 |
| | -------- | -------- | ----- | ------ |

The Company expects the remaining restructuring accrual balance to be fully utilized by March 31, 2005, including cash payments of approximately $167,000 during the remainder of fiscal 2003, approximately $437,000 during fiscal 2004 and approximately $237,000 during fiscal 2005.

8. ACQUISITION OF IP PERFORMANCE

In connection with the Company's acquisition of IP Performance, Inc. in November 2000, the Company issued 321,756 shares of restricted common stock to key employee stockholders of IP Performance. In connection with the issuance of these restricted shares, the Company recorded approximately $6.4 million of deferred compensation, which was being recognized as stock compensation expense ratably over the three-year vesting period, beginning on November 8, 2000. In December 2001, the Company terminated the employment of all of the former IP Performance employees. In accordance with the restricted stock agreements with these individuals, all of the remaining unvested restricted stock vested upon termination. As a result, during the nine months ended June 30, 2002, the Company recognized the remaining deferred stock compensation of approximately $3.5 million.

9. RELATED PARTY TRANSACTIONS

In January 2001, the Company entered into a series of related agreements with Lawrence A. Genovesi, currently Chairman of the Board and formerly President, Chief Executive Officer and Chief Technology Officer of the Company. These agreements were entered into to avoid significant sales of the Company's Common Stock by Mr. Genovesi as a result of a margin call on a personal loan collateralized by Mr. Genovesi's holdings of the Company's Common Stock. The Company guaranteed a personal loan obtained by Mr. Genovesi from a financial institution (the "Bank") through a deposit of $1,051,850 of the Company's cash

with the Bank (the "Guarantee"), which was to expire in January 2002. In January 2002, the Company extended the Guarantee period to January 2003. Mr. Genovesi and the Company also entered into an agreement whereby Mr. Genovesi agreed to reimburse the Company for any obligations incurred by the Company under the Guarantee (the "Reimbursement Agreement"). Any unpaid balances under the Reimbursement Agreement bore interest at a rate 10% per annum. On January 6, 2003, pursuant to the Guarantee, the Bank applied $968,596 of the Company's cash deposit to the repayment of Mr. Genovesi's

12

---

Table of Contents

NETWORK ENGINES, INC.

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

personal loan and refunded $83,254 to the Company. On January 27, 2003, Mr. Genovesi repaid the Company $974,168 to satisfy his obligations under the Reimbursement Agreement, including accrued interest. Of that amount, $456,276 was paid in cash and $517,892 was paid with the proceeds from the repurchase by the Company of 391,128 shares of the Company's Common Stock owned by Mr. Genovesi. The purchase price was determined based on the average closing price of the Company's Common Stock over the ten trading days prior to and including January 17, 2003.

In connection with the Company's issuance of 375,000 shares of its Common Stock, the Company and Mr. Genovesi entered into a recourse note (the "Recourse Note"), in November 1999, in the principal amount of $90,000, bearing interest at an annual rate of 6.08% and payable upon the earlier of demand by the Company or November 18, 2004. In addition, in January 2001, Mr. Genovesi executed a revolving promissory note of up to $210,000 (the "Note") with the Company. The Note had an interest rate of 5.9% per annum and was due and payable in full upon the earlier of January 9, 2002 or 30 days following the date Mr. Genovesi ceased to be an employee of the Company. In November 2001, the Company repurchased 234,822 shares of the Company's Common Stock from Mr. Genovesi for $225,195 in a private transaction. The purchase price was determined based on the average closing price of the Company's Common Stock over the ten trading days prior to the purchase date. Mr. Genovesi used the proceeds to pay off all amounts outstanding under the Note of $140,343, to pay $39,813, including accrued interest, of the Recourse Note and to pay taxes incurred in connection with the Company's repurchase of its Common Stock from Mr. Genovesi. Also in November 2001, the Company repurchased 93,750 shares of the Company's Common Stock held by Mr. Genovesi as restricted stock for $22,500. The purchase price was equal to the price at which these shares were sold to Mr. Genovesi in November 1999. The proceeds were used to pay down $22,500 of the Recourse Note. At December 31, 2002, $22,500 remained outstanding under the Recourse Note, which was repaid by Mr. Genovesi on January 27, 2003 with the proceeds from the repurchase by the Company of 17,070 shares of the Company's Common Stock owned by Mr. Genovesi. The purchase price was determined based on the average closing price of the Company's Common Stock over the ten trading days prior to and including January 17, 2003.

In conjunction with the Guarantee, the Reimbursement Agreement and the Note, the Company and Mr. Genovesi entered into a pledge agreement whereby Mr. Genovesi pledged to the Company all shares of the Company's Common Stock owned by Mr. Genovesi as of the date of the agreement or subsequently acquired, and all options and other rights to acquire shares of the Company's Common Stock owned

by Mr. Genovesi as of the date of the agreement or subsequently acquired
(collectively the "Pledged Securities"). Additionally, Mr. Genovesi pledged to
the Company all additional securities or other consideration from time to time
acquired by Mr. Genovesi in substitution for, or in respect of the Pledged
Securities. If Mr. Genovesi had elected to sell any additional Pledged
Securities during the term of the agreement, all proceeds of such sale would
have been applied to any amounts payable under the Reimbursement Agreement. In
addition to the Pledged Securities, the obligations of Mr. Genovesi under the
Reimbursement Agreement were collateralized by a second mortgage on certain real
property owned by Mr. Genovesi. As stated above, on January 27, 2003, Mr.
Genovesi satisfied his obligations in full under each of the Guarantee, the
Reimbursement Agreement, the Recourse Note and pledge agreement.

In April 2001, the Company entered into full recourse loan agreements with
certain employees and certain officers of the Company all of whom were employees
or officers of the Company at that time (the "Loan Agreements"). The Loan
Agreements were entered into to avoid substantial sales of the Company's Common
Stock by these employees and officers as a result of alternative minimum tax
obligations incurred by these employees and officers in connection with their
exercise of options to purchase shares of the Company's Common Stock. The amount
loaned to the employees and officers under the Loan Agreements was approximately
$736,000, which was recorded net of approximately $228,000 of reserves for
uncollectibility. Outstanding amounts under the Loan Agreements accrued interest
at a rate of 4.63% per annum and were originally due and payable in full upon
the earlier of one year from the date of each individual agreement or thirty
days after termination of employment with the Company, unless termination was
involuntary and without cause. In conjunction with the Loan Agreements, each
employee and officer pledged all shares of capital stock, and options to
purchase capital stock, of the Company then owned, or acquired in the future
(the "Pledged Stock"), and any distributions on the Pledged Stock or proceeds
from their sale. Amounts due under these Loan Agreements were included in the
balance sheet as notes receivable from stockholders.

In April 2002, one former officer's loan was repaid in full, including accrued
interest of approximately $2,500, through a payment to the Company of $29,727 of
cash and a sale to the Company of 30,000 shares of the Company's Common Stock in
exchange for the retirement of $27,000 of the former officer's note payable. The
price per share of the Company's Common Stock was based on the market price as
of the close of business on the date of the repurchase. Because the amounts
outstanding under certain of the Loan Agreements exceeded the value of the
Company's Common Stock pledged as collateral, in January 2002, the Company
extended the repayment dates to September 2002 for loans with an aggregate
principal amount of $226,996 due from one of its current officers and one of its
former officers and in March 2002, the Company extended the repayment dates to
July 2002 for the remaining loans with a net principal amount of $255,000.
Subsequently, in early July 2002, the Company also

13

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

extended the repayment dates for these remaining loans to September 2002. In
September 2002, loans to one current officer and one former officer totaling
approximately $240,000 were repaid in full, including accrued interest of

approximately $13,000, through sales to the Company of 230,777 shares of the Company's Common Stock in exchange for the retirement of these loans. The remaining loans due from one former officer and one former employee totaling approximately $489,000 as of December 31, 2002, were repaid in full, including accrued interest of approximately $33,000, in January 2003 through the repurchase by the Company of 278,600 shares of the Company's Common Stock. For all purchases noted above, the price per share of the Company's Common Stock was based on the market price as of the close of business on the dates of these repurchases. As of December 31, 2002, the Company determined that there was no need for reserves for the uncollectibility of these stockholder notes receivable and reversed reserves of $228,000 as a decrease to general and administrative expenses during the three months ended December 31, 2002.

All shares of the Company's Common Stock repurchased under these related party agreements were recorded as treasury stock at the cost to repurchase.

In connection with the Company's acquisition of TidalWire, the Company paid $1,144,615 to Ascent Venture Partners (together with its affiliated entities, "Ascent") and $2,205,828 to HarbourVest Partners (together with its affiliated entities, "HarbourVest"), two substantial stockholders of the Company. At the time of the acquisition, Ascent and HarbourVest owned approximately 18.1% and 16.3% of the outstanding common stock of the Company, respectively. Ascent and HarbourVest also owned 12.9% and 24.9% of the outstanding common stock of TidalWire, respectively. Pursuant to the terms of the merger agreement, the Company issued 480,706 shares and 926,386 shares of its common stock previously held as treasury stock to Ascent and HarbourVest, respectively, and made the aforementioned cash payments to Ascent and HarbourVest in exchange for all of the TidalWire common stock held by Ascent and HarbourVest. The consideration paid to Ascent and HarbourVest may be deemed to have been indirectly paid to Frank M. Polestra and Robert M. Wadsworth, two of the Company's directors. As a managing member or general partner of each of the general partners that control Ascent, Mr. Polestra may be deemed to have indirectly received the $1,144,615 of cash paid to Ascent as well as beneficial ownership of 480,706 shares of the Company's Common Stock issued to Ascent. As a managing director of the limited liability corporation that controls HarbourVest, Mr. Wadsworth may be deemed to have indirectly received the $2,205,828 of cash paid to HarbourVest as well as beneficial ownership of 926,386 shares of the Company's Common Stock issued to HarbourVest.

In connection with the TidalWire acquisition, the Company has engaged Akibia, Inc. ("Akibia") to provide certain customer support and warranty fulfillment services. Akibia charges the Company a fee for these services based upon sales of certain of the Company's products. A director of the Company is also a director of PSI Holding Group, Inc. ("PSI") the parent company of Akibia. In addition, Ascent and HarbourVest each own greater than 5% of the outstanding stock of the Company and greater than 5% of the outstanding stock of PSI. In the three and nine months ended June 30, 2003, the Company recognized $335,000 and $646,000 of expense as a result of its agreements with Akibia. At June 30, 2003, the Company had a payable to Akibia of $115,000.

14

--------------------------------------------------------------------------------

Table of Contents

ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION

Special Note Regarding Forward-Looking Statements

This Quarterly Report on Form 10-Q contains forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended, that involve risks and uncertainties. All statements other than statements of historical information provided herein are forward-looking statements and may contain information about financial results, economic conditions, trends and known uncertainties. Our actual results could differ materially from those discussed in the forward-looking statements as a result of a number of factors, which include those discussed in this section and elsewhere in this report and the risks discussed in our other filings with the Securities and Exchange Commission. Readers are cautioned not to place undue reliance on these forward-looking statements, which reflect management's analysis, judgment, belief or expectation only as of the date hereof. We undertake no obligation to publicly reissue these forward-looking statements to reflect events or circumstances that arise after the date hereof.

The following discussion and analysis should be read in conjunction with the condensed consolidated financial statements and the notes thereto included in Item 1 in this Quarterly Report on Form 10-Q and our Annual Report on Form 10-K for the fiscal year ended September 30, 2002 filed by the Company with the Securities and Exchange Commission.

Overview

We are a provider of server appliance hardware platforms and custom integration services. Server appliances are pre-configured computer network infrastructure devices designed to deliver specific application functionality. We are focused on partnering with independent software vendors ("ISVs") to provide these strategic partners with server appliance development, integration, fulfillment and support services to allow these strategic partners to deliver "turn-key" solutions to their end-user customers.

Working closely with our software partners, our goal is to ensure that appliance performance is optimized with maximum price/performance and minimum total cost of ownership. Appliance solutions built using our hardware platforms and custom integration services are designed to be secure and easy to install and operate.

In December 2002, we acquired TidalWire Inc. ("TidalWire"), a specialist distributor of data storage networking connectivity products that provides extensive pre- and post-sales support to their customers. In addition to the revenue associated with the distribution of storage networking connectivity products, the acquisition of TidalWire provides us with a sophisticated logistics system, relationships with a significant number of value-added resellers and systems integrators in North America, and expanded post-sales support capabilities. A key reason for acquiring TidalWire was to allow us to offer these distribution capabilities to both current and potential ISV partners and thereby give us the ability to expand our server appliance business. We believe that the distribution of server appliances is an attractive value proposition to ISVs because it provides them with the option of not taking ownership of the hardware component of the appliance and maintaining a pure software company financial profile. In addition to enhancing our server appliance business, we have expanded the product offerings of TidalWire into the network security market. We believe that by providing channel partners with new products from major data storage and network security system and component vendors, we will be able to attract and retain key channel partners.

As a result of our acquisition of TidalWire, the combined company develops, manufactures, and distributes server appliances and complementary products for mission-critical data storage and network security applications. By offering a combination of application integration services, value-added utilities, a suite