Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Concentrations of Risk*

*Credit.* Financial instruments which potentially subject the Company to concentrations of credit risk consist principally of cash, cash equivalents, restricted cash, short–term investments and trade receivables. The Company invests primarily in municipal bonds as well as government agency securities and money market funds of major financial institutions. There are no significant concentrations in any one issuer of securities. The Company provides credit to customers in the normal course of business and does not require collateral from its customers but routinely assesses their financial strength. The Company maintains reserves for potential credit losses and such losses have been within management's expectations.

*Customers.*

The following table summarizes those customers who accounted for greater than 10% of the Company's net revenues or accounts receivable:

| | Net Revenue for the year ended September 30, | | | Accounts Receivable at September 30, | | |
|---|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2000** | **2001** | **2002** |
| Customer A | 16% | * | * | * | * | * |
| Customer B | 12% | * | * | * | * | * |
| Customer C | * | * | 83% | * | * | 86% |
| Customer D | * | * | * | 13% | * | * |
| Customer E | * | * | * | 10% | * | * |
| Customer F | * | * | * | * | 21% | * |

* indicates the amount is less than 10% of total amount.

*Fair Value of Financial Instruments*

Financial instruments, including cash, cash equivalents, restricted cash, short–term investments, accounts receivable, notes receivable and accounts payable, are carried in the financial statements at amounts that approximate their fair value as of September 30, 2001 and 2002.

*Inventories*

Inventories are valued at the lower of cost or market, with cost determined using the first–in, first–out method.

*Due from Contract Manufacturer*

During the normal course of operations, the Company sells certain inventory components to its contract manufacturer. The Company does not record revenue from these transactions and, accordingly, trade receivables are not recorded for balances due from the Company's contract manufacturer.

47

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Property and Equipment*

Property and equipment are recorded at cost and depreciated using the straight–line method over their estimated useful lives. Leasehold improvements are amortized over the shorter of the useful life of the improvement or the remaining term of the lease. Property and equipment held under capital leases is stated at the present value of the minimum lease payments at the inception of the lease and are amortized using the straight–line method over the lesser of the life of the related asset or the term of the lease. Upon retirement or sale, the cost of the assets disposed of and the related accumulated depreciation are removed from the accounts and any resulting gain or loss is included in the determination of net income or loss. Repairs and maintenance are charged to expense as incurred.

*Intangible Assets*

Acquisition–related intangible assets result from the Company's acquisitions, which are accounted for under the purchase method. Intangible assets are reported at cost, net of accumulated amortization and are amortized on a straight–line basis over their estimated useful lives. The Company periodically evaluates the existence of intangible asset impairments. Recoverability of these assets is assessed at each reporting period based on undiscounted expected cash flows, considering a number of factors including past operating results, budgets and economic projections, market trends and product development cycles.

*Revenue Recognition*

The Company generally recognizes product revenue upon shipment to customers provided persuasive evidence of the arrangement has been received, the sales price is fixed or determinable, collection of the related receivable is reasonably assured, title and risk of loss have passed to the customer, and all other revenue recognition criteria of SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" are met. The Company recognizes license revenue upon sell through to the licensees' end–users, provided all other revenue recognition criteria have been met. Customers are not granted rights to return products after the purchase has been made. However, in certain circumstances, the Company has accepted returns, although no contractual obligation existed. The Company records a provision for potential returns based on historical return rates and returns have been immaterial to date. The Company offers a warranty on all products that generally provides for repair or replacement of any defective products for a period of up to 36 months after shipment. Based upon historical experience and expectation of future conditions, the Company reserves for the estimated costs to fulfill customer warranty obligations upon the recognition of the related revenue.

*Advertising Costs*

Advertising costs are charged to expense as incurred. Advertising expenses for the years ended September 30, 2000 and 2001 were approximately $1,271,000 and $1,480,000, respectively. The Company did not incur any advertising expense during the year ended September 30, 2002.

48

THh0

MmEDIGH

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Research and Development*

Research and development costs, except for certain software development costs, are expensed as incurred. Software development costs incurred after technological feasibility has been achieved and until the products are available for general release are capitalized and upon general release are amortized as the greater of the ratio of current revenues to total expected revenues from the product or the straight–line method over the remaining estimated economic life of the product. Costs of internally developed software qualifying for capitalization have not been material to date.

*Accounting for Stock–Based Compensation*

Stock options and restricted stock issued to employees and members of the Company's board of directors are accounted for in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations ("APB 25"); accordingly, compensation expense is recorded for options and restricted stock awarded to employees and directors to the extent that the exercise or purchase prices are less than the common stock's fair market value on the date of grant, where the number of shares and exercise or purchase price are fixed. The difference between the fair value of the Company's common stock and the exercise or purchase price of the stock option or restricted stock award is recorded as deferred stock compensation. Deferred stock compensation is amortized to compensation expense over the vesting period of the underlying stock option or restricted stock. Upon cancellation of options with residual deferred compensation balances at the date of cancellation, the remaining amount of unrecognized deferred compensation is reversed as an adjustment to additional paid–in capital. The Company follows the disclosure requirements of Statement of Financial Accounting Standards No. 123, "Accounting for Stock–Based Compensation" ("SFAS 123") (see Note 8). Stock–based awards to non–employees are accounted for under provisions of SFAS 123.

*Income Taxes*

Deferred tax assets and liabilities are determined based on the difference between the financial statement and the tax bases of assets and liabilities using enacted tax rates in effect in the years in which the differences are expected to reverse. A valuation reserve against deferred tax assets is recorded if, based upon the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized.

*Comprehensive Income (Loss)*

Comprehensive income (loss) is comprised of two components, net income (loss) and other comprehensive income (loss). During the years ended September 30, 2000 and 2001, the Company had no items qualifying as other comprehensive income (loss); accordingly, comprehensive loss equaled net loss. During the year ended September 30, 2002, other comprehensive income related to unrealized gains on short–term investments.

49

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Net Loss Per Common Share*

Basic net loss per common share is computed by dividing the net loss attributable to common stockholders for the period by the weighted average number of shares of common stock outstanding during the period, excluding shares of common stock subject to repurchase by the Company in the event of the termination of the stockholder's employment ("restricted shares"). Diluted net loss per common share is computed by dividing the net loss attributable to common stockholders for the period by the weighted average number of shares of common stock and potential common stock outstanding during the period, if dilutive. Potential common stock includes unvested restricted shares and incremental shares of common stock issuable upon the exercise of stock options and warrants. Because the inclusion of potential common stock would be anti–dilutive for all periods presented, diluted net loss per common share is the same as basic net loss per common share.

The following table sets forth the potential common stock excluded from the calculation of net loss per common share because their inclusion would be anti–dilutive (in thousands):

|  | As of September 30, | | |
| --- | --- | --- | --- |
|  | 2000 | 2001 | 2002 |
| Options to purchase common stock | 4,381 | 6,045 | 4,046 |
| Warrants to purchase common stock | 1,786 | 1,625 | 1,462 |
| Unvested restricted common stock | 556 | 396 | 166 |
|  | 6,723 | 8,066 | 5,674 |

*Recent Accounting Pronouncements*

In June 2001, the Financial Accounting Standards Board ("FASB") issued SFAS No. 141, "Business Combinations" ("SFAS 141") and SFAS No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142"). SFAS 141 requires that all business combinations be accounted for under the purchase method of accounting only and that certain acquired intangible assets in a business combination be recognized as assets apart from goodwill. SFAS 142 requires, among other things, the cessation of the amortization of goodwill. In addition, SFAS 142 includes provisions for the reclassification of certain existing recognized intangibles as goodwill, reassessment of the useful lives of existing recognized intangibles, reclassification of certain intangibles out of previously reported goodwill and the identification of reporting units for purposes of assessing potential future impairments of goodwill. SFAS 142 also requires the completion of a transitional goodwill impairment test six months from the date of adoption. SFAS 141 is effective for all business combinations initiated after June 30, 2001. SFAS 142 is effective for the Company's fiscal year beginning on October 1, 2002. The Company does not expect SFAS 142 to have a material impact on its financial position and results of operations.

In August 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long–Lived Assets" ("SFAS 144"). The objectives of SFAS 144 are to address significant issues relating to the implementation of FASB Statement No. 121, "Accounting for the Impairment of Long–Lived Assets and for Long–Lived Assets to Be Disposed Of" ("SFAS 121"), and to develop a single

50

**Table of Contents**

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

accounting model, based on the framework established in SFAS 121, for long–lived assets to be disposed of by sale, whether previously held and used or newly acquired. SFAS 144 supersedes SFAS 121; however, it retains the fundamental provisions of SFAS 121 for (1) the recognition and measurement of the impairment of long–lived assets to be held and used and (2) the measurement of long–lived assets to be disposed of by sale. SFAS 144 supersedes the accounting and reporting provisions of Accounting Principles Board No. 30, "Reporting the Results of Operations—Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions" ("APB 30"), for segments of a business to be disposed of. However, SFAS 144 retains APB 30's requirement that entities report discontinued operations separately from continuing operations and extends that reporting requirement to "a component of an entity" that either has been disposed of or is classified as "held for sale." SFAS 144 also amends the guidance of Accounting Research Bulletin No. 51, "Consolidated Financial Statements," to eliminate the exception to consolidation for a temporarily controlled subsidiary. SFAS 144 is effective for financial statements issued for fiscal years beginning after December 15, 2001, including interim periods, and, generally, its provisions are to be applied prospectively. The Company does not expect SFAS 144 to have a material impact on the Company's financial position or results of operations.

In June 2002, the FASB issued SFAS No. 146, *"Accounting for Costs Associated with Exit or Disposal Activities"* ("SFAS No. 146"). This statement addresses financial accounting and reporting for costs associated with exit or disposal activities and nullifies EITF Issue No. 94–3, *"Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)"* ("EITF 94–3"). SFAS No. 146 requires that a liability for a cost associated with an exit or disposal activity be recognized when the liability is incurred. EITF 94–3 allowed for an exit cost liability to be recognized at the date of an entity's commitment to an exit plan. SFAS 146 also requires that liabilities recorded in connection with exit plans be initially measured at fair value. The provisions of SFAS 146 are effective for exit or disposal activities that are initiated after December 31, 2002, with early adoption encouraged. The Company does not expect the adoption of SFAS 146 will have a material impact on its financial position or results of operations.

## 3. INVESTMENTS

Cash equivalents consist of the following (in thousands):

|  | September 30, | | | |
|---|---|---|---|---|
|  | **2001** | | **2002** | |
| Municipal bonds | $ | 69,240 | $ | 41,296 |
| Money market funds |  | 4,843 |  | 4,942 |
|  | $ | 74,083 | $ | 46,238 |

At September 30, 2002, short–term investments, which consisted of government agency securities with a cost of approximately $8,543,000, including accrued interest, were recorded at their fair value of

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

approximately $8,546,000. Gross realized and unrealized gains on short–term investments for the year ended September 30, 2002 were immaterial. All marketable securities held at September 30, 2002 mature within one year. There were no short–term investments at September 30, 2001.

## 4. INVENTORIES

Inventories consisted of the following (in thousands):

|  | September 30, | |
|---|---|---|
|  | 2001 | 2002 |
| Raw materials | $ 226 | 1,107 |
| Work in process | 235 | 412 |
| Finished goods | 146 | 437 |
|  | $ 607 | 1,956 |

During the year ended September 30, 2001, the Company recorded an inventory write–down of approximately $23,657,000 for excess and obsolete inventory related to the Company's WebEngine Blazer, WebEngine Sierra and StorageEngine Voyager products. This excess and obsolete inventory was due to an unanticipated shortfall in sales of these products and the resulting reduction in expected future sales of these products as well as the discontinuation of the Company's WebEngine Blazer and StorageEngine Voyager products. The net write–down included inventory held at the Company's contract manufacturer, inventory on–hand and firm purchase commitments. Subsequent to recording the inventory–write–down, the Company recorded a reduction of the gross charge of approximately $3,379,000 as a result of the Company's better–than–expected sales of products and components as well as favorable negotiations with vendors on inventory commitments, which had been initially included in the gross inventory write–down.

## 5. PROPERTY AND EQUIPMENT

Property and equipment consisted of the following (in thousands):

|  | Useful Life | September 30, | |
|---|---|---|---|
|  |  | 2001 | 2002 |
| Office furniture and equipment | 5 years | $ 906 | $ 831 |
| Engineering and production equipment | 3 years | 641 | 1,011 |
| Computer equipment and software | 3 years | 2,992 | 2,905 |
| Leasehold improvements | Lesser of 3 years or lease term | 1,630 | 1,635 |
| &sp; |  | 6,169 | 6,382 |
| Less: accumulated depreciation and amortization |  | 2,715 | 4,146 |
|  |  | $ 3,454 | $ 2,236 |

52

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

As of September 30, 2001 and 2002, the Company had approximately $69,000 and $14,000 (net of approximately $207,000 and $262,000 of accumulated amortization) of office furniture, computer software and equipment under capital leases, respectively.

Depreciation and amortization expense was approximately $1,353,000, $3,047,000 and $1,536,000 for the years ended September 30, 2000, 2001 and 2002, respectively.

## 6. STOCKHOLDERS' EQUITY

### Preferred Stock

The Company has authorized up to 5,000,000 shares of preferred stock, $0.01 par value per share for issuance. The preferred stock will have such rights, preferences, privileges and restrictions, including voting rights, dividend rights, conversion rights, redemption privileges, and liquidation preferences, as shall be determined by the board of directors upon its issuance.

### Common Stock

On November 12, 1999, the Company completed a three–for–one split of the Company's common stock, which was effected through a stock dividend (the "1999 Stock Split"). On May 17, 2000, the Company completed a 2.5–for–one split of the Company's common stock, which was effected through a stock dividend (the "2000 Stock Split"). All common stock share and per share amounts that appear in the financial statements and the notes thereto have been restated to reflect both the 1999 Stock Split and the 2000 Stock Split.

In November 1999, the Company issued 262,500 shares of restricted stock at $0.24 per share to certain directors of the Company. Of these shares, 75,000 shares vested 50% on November 18, 2000 and 12.5% per quarter thereafter and 187,500 shares vested 25% on November 18, 2000 and 6.25% per quarter thereafter. As of September 30, 2002, 203,906 shares had vested. Unvested restricted shares are subject to forfeiture in the event that a director ceases to be a director of the Company. The Company recorded deferred stock compensation of approximately $522,000, which represents the excess of the fair value of the restricted shares at the date of issue over the purchase price. Compensation expense is being recognized ratably over the vesting period of the restricted stock. For the years ended September 30, 2000, 2001 and 2002, the Company recognized approximately $145,000, $172,000 and $79,000, respectively, of related stock compensation expense.

In November 1999, the Company issued 375,000 shares to Lawrence A. Genovesi, the Company's former Chief Executive Officer and current Chairman of the board of directors. These shares vested quarterly upon the achievement of certain financial targets or in December 2004, whichever was earlier. As of September 30, 2002, 174,107 shares had vested. Unvested restricted shares are subject to forfeiture in the event that Mr. Genovesi ceased to be employed by the Company. The Company recorded deferred stock compensation of approximately $684,000, which represents the

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

excess of the fair value of the restricted shares at the date of issue over the purchase price. Compensation expense is being recognized ratably over the vesting period of the restricted stock. For the years ended September 30, 2000, 2001 and 2002, the Company recognized approximately $124,000, $136,000 and $75,000 respectively, of related stock compensation expense. In connection with these restricted stock grants, the Company accepted a recourse note receivable from Mr. Genovesi in the amount of $90,000. This note has an interest rate of 6.08% and is payable on the earlier of demand by the Company or November 18, 2004. In connection with a severance agreement effective September 30, 2001, the Company agreed to amend this restricted stock agreement and, in November 2001, the Company repurchased 93,750 of these shares of restricted common stock at $0.24 per share, which represented the original issue price, through the cancellation of an equal amount due under the note receivable from Mr. Genovesi (approximately $23,000). Additionally, for the remaining unvested restricted common stock of 187,500 shares, the Company amended the agreement to provide for quarterly vesting of that amount through September 30, 2004, contingent upon Mr. Genovesi remaining a director of the Company. As of September 30, 2002, approximately $26,000 remains outstanding under the recourse note receivable from Mr. Genovesi.

On July 18, 2000, the Company completed its initial public offering of common stock. The Company sold 7,475,000 shares of its common stock, par value $.01 per share (the "Common Stock") at $17 per share including the underwriters' over–allotment option. The Company received proceeds of approximately $116,900,000, net of offering costs and underwriting fees totaling approximately $10,175,000, from its initial public offering. In connection with the Company's initial public offering, all outstanding shares of redeemable convertible preferred stock converted into 21,448,442 shares of common stock, in accordance with the Company's certificate of incorporation. Prior to the conversion, the Company had four series of redeemable convertible preferred stock: Series A preferred stock, Series B preferred stock, Series C preferred stock and Series D preferred stock.

*Treasury stock*

On August 14, 2001, the Company announced that its board of directors had approved the repurchase of up to $5 million of the Company's common stock in the open market or in non–solicited privately negotiated transactions. The Company plans to use repurchased shares to fund any merger and acquisition activities as well as its employee stock plans. During the years ended September 30, 2001 and 2002, the Company repurchased approximately 300,900 and 4,597,000 shares of common stock at a cost of approximately $198,000 and $4,509,000, including approximately $411,000 through the cancellation of outstanding notes receivable from stockholders and approximately $24,000 in cashless option exercises.

7. RELATED PARTY TRANSACTIONS

In January 2001, the Company entered into a series of related agreements with Lawrence A. Genovesi, the Company's current Chairman and former President, Chief Executive Officer and Chief Technology Officer. These agreements were entered into to avoid significant sales of the Company's

54

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

stock by Mr. Genovesi as a result of a margin call on a personal loan collateralized by Mr. Genovesi's holdings of the Company's common stock. The Company agreed to guarantee a personal loan obtained by Mr. Genovesi from a financial institution (the "Bank") through a deposit of $1,051,850 of the Company's cash with the Bank (the "Guarantee"). The Guarantee period originally expired on January 9, 2002 and the Company extended the Guarantee to January 9, 2003, at which time the balance of the amount deposited with the Bank, which is not required to satisfy any obligations under the Guarantee, will be returned to the Company. Mr. Genovesi and the Company also entered into an agreement whereby Mr. Genovesi has agreed to reimburse the Company for any obligations incurred by the Company under the Guarantee (the "Reimbursement Agreement"). Any unpaid balances under the Reimbursement Agreement bear interest at a rate of 10% per annum. In the event of a default under the Reimbursement Agreement by Mr. Genovesi, the Company has the right to apply any and all compensation due to Mr. Genovesi against all of Mr. Genovesi's obligations outstanding under the Reimbursement Agreement. In addition, the Company and Mr. Genovesi entered into a revolving promissory note of up to $210,000 (the "Note"). The Note bore interest at a rate of 5.9% per annum and was due and payable in full upon the earlier of January 9, 2002 or 30 days following the date Mr. Genovesi ceased to be an employee of the Company. Mr. Genovesi borrowed approximately $139,000 under the Note, which was repaid in full in November 2001, plus accrued interest of approximately $2,000.

In conjunction with the Guarantee, the Reimbursement Agreement and the Note, the Company and Mr. Genovesi entered into a pledge agreement whereby Mr. Genovesi pledged to the Company all shares of the Company's common stock owned by Mr. Genovesi as of the date of the agreement or subsequently acquired, and all options and other rights to acquire shares of the Company's common stock owned by Mr. Genovesi as of the date of the agreement or subsequently acquired (collectively, the "Pledged Securities"). Additionally, Mr. Genovesi pledged to the Company all additional securities or other consideration from time to time acquired by Mr. Genovesi in substitution for, or in respect of, the Pledged Securities. If Mr. Genovesi elects to sell any of the Pledged Securities during the term of the agreement, all proceeds of such sale will be applied to any amounts payable under the Reimbursement Agreement. In addition to the Pledged Securities, Mr. Genovesi's obligations under the Reimbursement Agreement are collateralized by a second mortgage on certain real property owned by Mr. Genovesi. As of September 30, 2002, no amounts were required to be reimbursed to the Company under the Reimbursement Agreement. In November 2001, the Company repurchased 234,822 shares of the Company's common stock from Mr. Genovesi for $225,195 in a private transaction. The purchase price was determined based on the average closing price of the Company's common stock over the ten trading days prior to the purchase date. Mr. Genovesi used the proceeds to pay all amounts outstanding under the Note (approximately $141,000), to pay down a recourse note payable to the Company (approximately $39,000) and to pay taxes incurred in connection with the Company's repurchase of its common stock from Mr. Genovesi. The Company recorded the repurchased shares as treasury stock at the cost paid to Mr. Genovesi.

In April 2001, the Company entered into full recourse loan agreements with certain employees and certain officers of the Company all of whom were employees or officers of the Company at that

55

Table of Contents

**NETWORK ENGINES, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

time (the "Loan Agreements"). These loan agreements were entered into to avoid substantial sales of the Company's common stock by these employees and officers as a result of alternative minimum tax obligations incurred by these employees and officers in connection with their exercise of options to purchase shares of the Company's common stock. The net amount loaned to the employees and officers under the Loan Agreements was approximately $508,000. Outstanding amounts under the Loan Agreements accrue interest at a rate of 4.63% per annum and were originally due and payable in full upon the earlier of one year from the date of each individual agreement or thirty days after termination of employment with the Company, unless termination was involuntary and without cause. In conjunction with the Loan Agreements, each employee and officer pledged all shares of capital stock, and options to purchase capital stock, of the Company then owned, or acquired in the future (the "Pledged Stock"), and any distributions on the Pledged Stock or proceeds from their sale. Amounts due under these Loan Agreements have been included in the balance sheet as notes receivable from stockholders.

In April 2002, one former officer's loan was repaid in full, including accrued interest of approximately $2,500, through a payment to the Company of $29,727 of cash and a sale to the Company of 30,000 shares of the Company's common stock in exchange for the retirement of $27,000 of the former officer's note payable. The price per share of the Company's common stock was based on the market price as of the close of business on the date of the repurchase. The common stock repurchased was recorded as treasury stock at the cost to repurchase. Because the amounts outstanding under certain of the Loan Agreements exceeded the value of the Company's common stock pledged as collateral, in January 2002, the Company extended the repayment dates to September 2002 for loans with an aggregate principal amount of $226,996 due from one of its current officers and one of its former officers and in March 2002, the Company extended the repayment dates to July 2002 for the remaining loans with a net principal amount of $255,000. Subsequently, in early July 2002, the Company also extended the repayment dates for these remaining loans to September 2002. In September 2002, loans to one current officer and one former officer totaling approximately $240,000 were repaid in full, including accrued interest of approximately $13,000, through sales to the Company of 230,777 shares of the Company's common stock in exchange for the retirement of these loans. The net remaining loans due from one former officer and one former employee total approximately $255,000 as of September 30, 2002 and are in default. The Company has issued demand notices related to these loans. The Company expects to recover any amounts not paid in cash through the reacquisition of common stock.

**8. STOCK INCENTIVE PLANS**

Options and awards to purchase shares of the Company's common stock have been granted to employees and directors under the Company's 1997 Stock Incentive Plan (the "1997 Plan"), which was adopted by the board of directors in November 1997. On October 21, 1999, the 1997 Plan was terminated and all outstanding options became options under the 1999 Stock Incentive Plan.

In October 1999, the Company's shareholders approved the 1999 Stock Incentive Plan (the "1999 Plan"). Under the 1999 Plan, stock option and restricted stock or other stock–based awards for up to

56

Table of Contents

## NETWORK ENGINES, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

4,747,902 shares of common stock may be issued to employees, officers, directors, consultants and advisors of the Company. Options are granted for terms of up to ten years and vest over varying periods. New employee option grants generally vest 25% on the first anniversary of the grant date and thereafter in equal quarterly installments over the next three years. Subsequent grants to existing employees generally vest in equal quarterly installments over four years. The option price per share is determined by the board of directors on the grant date.

In May 2000, the Company's shareholders approved an increase of 3,300,000 in the number of shares authorized under the 1999 Plan and an automatic annual increase in the number of shares authorized under the 1999 Plan. The automatic annual increase is equal to the lesser of: 5% of the outstanding shares on the first day of each fiscal year; 4,000,000 shares or an amount determined by the board of directors, which is subject to a maximum of 20,047,902 authorized shares under the plan. During the years ended September 30, 2001 and 2002, the Company increased the number of shares available under the plan by 1,710,929 and 1,759,405 shares, respectively. As a result, as of September 30, 2002, the Company is authorized to grant options, restricted stock or other awards of up to 11,518,236 shares of common stock.

In May 2000, the Company's shareholders approved the 2000 Director Option Plan. Under the 2000 Director Option Plan, the Company may make formula grants of stock options to non−employee directors of up to 500,000 shares of common stock. Under the 2000 Director Option Plan, 200,000 options have been granted, 15,000 options have been cancelled and no options have been exercised through September 30, 2002.

Stock option activity for the 1997 Plan, the 1999 Plan and the 2000 Director Option Plan (the "Plans"), since October 1, 1999 was as follows:

|  | Number of Shares |  | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding, September 30, 1999 | 1,937,153 | $ | 0.13 |
| Granted | 3,323,299 |  | 6.20 |
| Exercised | (650,577) |  | 0.11 |
| Cancelled | (229,287) |  | 2.28 |
| Outstanding, September 30, 2000 | 4,380,588 |  | 4.62 |
| Granted | 4,681,751 |  | 2.57 |
| Exercised | (243,624) |  | 0.25 |
| Cancelled | (2,773,841) |  | 5.66 |
| Outstanding, September 30, 2001 | 6,044,874 |  | 2.73 |
| Granted | 935,000 |  | 1.04 |
| Exercised | (414,299) |  | 0.22 |
| Cancelled | (2,519,153) |  | 4.28 |
| Outstanding, September 30, 2002 | 4,046,422 | $ | 1.79 |

As of September 30, 2000, 2001 and 2002, options to purchase 107,057, 1,340,117 and 1,751,967 shares of common stock, respectively, were exercisable with a weighted−average exercise price

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

per share of $0.14, $2.95 and $2.07, respectively. The weighted average fair value of options granted during the year ended September 30, 2000 with exercise prices equal to the fair market value was $16.01 per share (781,925 options). The weighted average fair value of options granted during the year ended September 30, 2000 with exercise prices below fair market value was $7.40 per share (2,541,374 options). All options granted during the years ended September 30, 2001 and 2002 were granted with exercise prices equal to the fair market value of the Company's common stock on the grant date and had weighted average fair values of $2.46 and $0.94 per share, respectively. As of September 30, 2002, 6,020,813 shares were available for future grants under the Plans and the Company had reserved 4,046,422 shares of common stock for the exercise of outstanding stock options.

The following table summarizes the stock options outstanding at September 30, 2002:

| | Options Outstanding | | | Options Exercisable | |
| --- | --- | --- | --- | --- | --- |
| Exercise Price Range | Number of Options | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) | Number of Options | Weighted Average Exercise Price |
| $0.07–$0.24 | 680,744 | $ 0.21 | 6.89 | 516,894 | $ 0.20 |
| $0.58–$0.87 | 964,884 | $ 0.65 | 8.86 | 370,997 | $ 0.64 |
| $0.92–$1.20 | 1,702,125 | $ 1.11 | 9.01 | 426,858 | $ 1.17 |
| $1.63–$2.53 | 388,749 | $ 1.80 | 7.85 | 238,478 | $ 1.84 |
| $6.00–$8.00 | 124,046 | $ 7.23 | 7.55 | 90,209 | $ 7.04 |
| $12.88–$14.50 | 168,249 | $ 14.23 | 7.83 | 99,718 | $ 14.28 |
| $27.63–$39.81 | 17,625 | $ 33.13 | 7.89 | 8,813 | $ 33.13 |
| | 4,046,422 | $ 1.79 | 8.41 | 1,751,967 | $ 2.07 |

During the year ended September 30, 2000, the Company recorded deferred stock compensation of approximately $13,916,000 for restricted stock and stock options granted at prices deemed to be below fair market value for financial reporting purposes. During the year ended September 30, 2001, the Company recorded deferred stock compensation $6,351,000 associated with the Company's acquisition of IP Performance, Inc. (see Note 13). The Company recognized stock compensation expense of approximately $2,921,000, $6,132,000 and $4,438,000 for the years ended September 30, 2000, 2001 and 2002, respectively. During the years ended September 30, 2000, 2001 and 2002, the Company reversed approximately $263,000, $5,577,000 and $1,190,000 of deferred stock compensation due to the cancellation of unvested options held by terminated employees.

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Had compensation expense for the Company's Plans been determined based on the fair value at the date of grant for awards made since the Plans' adoption, consistent with the provisions of SFAS 123, the Company's net loss attributable to common stockholders and net loss per common share for the years ended September 30, 2000, 2001 and 2002 would have increased to the pro forma amounts indicated below:

| | 2000 | | 2001 | | 2002 | |
| | Net loss attributable to common stockholders | Net loss per common share | Net loss attributable to common stockholders | Net loss per common share | Net loss attributable to common stockholders | Net loss per common share |
| --- | --- | --- | --- | --- | --- | --- |
| | | | (in thousands, except per share data) | | | |
| As reported | $    (20,584) | $    (1.99) | $    (69,523) | $    (2.03) | $    (14,125) | $    (0.44) |
| Pro forma | $    (21,990) | $    (2.13) | $    (73,131) | $    (2.14) | $    (16,433) | $    (0.51) |

For this purpose, the fair value of options at the date of grant were estimated using the Black–Scholes option pricing model with the following assumptions: risk–free interest rates of 6.20%, 4.85% and 4.28% for 2000, 2001 and 2002, respectively; no dividend yield for each of the years presented; a volatility factor of 150% for 2000, 183% for 2001 and 143% for 2002; and a weighted–average expected life of the options of five years for each of the years presented.

In May 2000, the Company's shareholders approved the 2000 Employee Stock Purchase Plan (the "Purchase Plan"). Under the Purchase Plan, the Company may issue up to an aggregate of 750,000 shares of common stock to eligible employees. Eligible employees must be employed by the Company for more than 20 hours per week and more than five months in a fiscal year. Under the Purchase Plan, the Company makes two offerings each fiscal year, at the end of which employees may purchase shares of common stock through payroll deductions made over the term of each offering. The per–share purchase price at the end of each offering is equal to lesser of 85% of the closing price of the common stock at the beginning or end of the offering period. Offering periods begin on the 15th day of November and May each year. During the years ended September 30, 2001 and 2002, 116,372 and 76,681 shares were issued under the Purchase Plan.

## 9.  STOCK WARRANTS

During the years ended September 30, 1997, 1998 and 1999, the Company issued warrants to purchase 249,487, 1,645,732 and 798,562 shares of common stock, respectively, in connection with the Company's issuance of subordinated promissory notes and notes payable. These warrants were issued with exercise prices ranging from $0.07 per share to $0.53 per share and expiration dates between August 2002 and January 2009. The fair value of these warrants was $41,000, $588,000 and $608,000, respectively, and was recorded in additional paid–in capital and interest expense over the life of the related subordinated promissory notes and notes payable.

During the year ended September 30, 1999, the Company issued additional warrants to purchase 206,250 shares of common stock in connection with the Company's issuance of redeemable convertible preferred stock. Each warrant expires ten years from the date of issuance and has an exercise price of $0.37 per share. The fair value of these warrants was approximately $157,000, which

59

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

was recorded as a discount on the related redeemable convertible preferred stock and as additional paid–in capital.

During the year ended September 30, 1999, the Company entered into agreements with the holders of certain subordinated promissory notes whereby the warrants originally issued in conjunction with these subordinated promissory notes were reduced from a right to purchase 1,645,732 shares of common stock to 1,096,125 shares of common stock.

All of the warrants issued by the Company were exercisable on the date of the grant. The following table summarizes stock warrant activity during each of the three years ended September 30, 2002:

| | Shares | Exercise Price | Expiration Date |
|---|---|---|---|
| Outstanding, September 30, 1999 | 2,350,424 | $0.07–$0.53 | August 2002–January 2009 |
| Exercise of warrants | (564,704) | $0.37 | |
| Outstanding, September 30, 2000 | 1,785,720 | $0.07–$0.53 | August 2002–January 2009 |
| Exercise of warrants | (160,312) | $0.37 | |
| Outstanding, September 30, 2001 | 1,625,408 | $0.07–$0.53 | August 2002–January 2009 |
| Expiration of warrants | (163,238) | $0.07–$0.53 | |
| Outstanding, September 30, 2002 | 1,462,170 | $0.37 | October 2007–January 2009 |

During the year ended September 30, 2001, 104,062 warrants were exercised in a cashless transaction in accordance with the terms of the warrant agreements.

As of September 30, 2002, the Company had reserved 1,462,170 shares of common stock for the exercise of all of the Company's outstanding warrants.

**10.    COMMITMENTS AND CONTINGENCIES**

*Operating Leases*

The Company leases its office space under non–cancelable operating leases. As of September 30, 2002, the future minimum lease payments under these non–cancelable operating leases were as follows (in thousands):

| Year Ending September 30, | | |
|---|---|---|
| 2003 | $ | 892 |
| 2004 | | 916 |
| 2005 | | 356 |
| Total | $ | 2,164 |

**NETWORK ENGINES, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

The total of future minimum rentals to be received by the Company under non–cancelable sub–leases related to the above leases is $747,000. Such amounts are not reflected in the schedule of lease payments above (See Note 16.).

After utilization of the vacant space provision recorded as part of the July 2001 restructuring (see Note 14), rent expense for the years ended September 30, 2001 and 2002, net of sublease income of approximately $36,000 and $296,000, was approximately $1,086,000 and $472,000. For the year ended September 30, 2000, rent expense was approximately $614,000.

*Capital leases*

The Company leases certain furniture, equipment and software under non–cancelable capital leases. The lease terms range from 36 to 60 months and have interest rates of 12% to 15.5%. As of September 30, 2002, the required monthly installment of principal and interest for all capital leases was approximately $3,000. Future minimum lease payments under all non–cancelable capital leases as of September 30, 2002 were approximately $14,000, including interest of approximately $1,000, all of which are due to be paid in 2003.

*Contingencies*

On December 29, 1999, a former employee, George Flate, commenced a lawsuit against the Company and two former officers and directors of the Company in Suffolk Superior Court, a Massachusetts state court. Mr. Flate alleged that the Company unlawfully terminated him in an effort to deprive him of commission payments. Specifically, he alleged a breach of the implied covenant of good faith and fair dealing against the Company and a claim of intentional interference with contractual relations against the former officers of the Company named in the lawsuit. Mr. Flate was employed by the Company as its Vice President of OEM Sales for approximately one year. In April 2002, the Company completed a settlement with Mr. Flate for less than $350,000. The Company accounted for the settlement as a charge to general and administrative expenses during the year ended September 30, 2002.

On or about December 3, 2001, a putative class action lawsuit was filed in the United States District Court for the Southern District of New York against Network Engines, Lawrence A. Genovesi (Network Engines' Chairman and then Chief Executive Officer), Douglas G. Bryant (Network Engines' Chief Financial Officer and Vice President of Administration), and the following underwriters of Network Engines' initial public offering: FleetBoston Robertson Stephens, Inc., Credit Suisse First Boston Corp., Goldman Sachs & Co., Lehman Brothers Inc. and Salomon Smith Barney, Inc. (collectively, the "Underwriter Defendants"). An amended class action complaint, captioned In re Network Engines, Inc. Initial Public Offering Securities Litigation, 01 Civ. 10894 (SAS), was filed on April 20, 2002.

61

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The suit alleges that the defendants violated the federal securities laws by issuing and selling securities pursuant to Network Engines' initial public offering in July 2000 ("IPO") without disclosing to investors that the Underwriter Defendants had solicited and received excessive and undisclosed commissions from certain investors. The suit also alleges that the Underwriter Defendants entered into agreements with certain customers whereby the Underwriter Defendants agreed to allocate to those customers shares of Network Engines' stock in the offering, in exchange for which the customers agreed to purchase additional shares of Network Engines' shares in the aftermarket at pre–determined prices. The suit alleges that such tie–in arrangements were designed to and did maintain, distort and/or inflate the price of Network Engines' common stock in the aftermarket. The suit further alleges that the Underwriter Defendants received undisclosed and excessive brokerage commissions and that, as a consequence, the Underwriter Defendants successfully increased investor interest in the manipulated IPO securities and increased the Underwriter Defendants' individual and collective underwritings, compensation and revenues. The suit seeks damages and certification of a plaintiff class consisting of all persons who acquired shares of Network Engines' common stock between July 13, 2000 and December 6, 2000.

In July 2002, Network Engines, Lawrence A. Genovesi and Douglas G. Bryant joined in an omnibus motion to dismiss challenging the legal sufficiency of plaintiffs' claims. The motion was filed on behalf of hundreds of issuer and individual defendants named in similar lawsuits. Plaintiffs opposed the motion, and the Court heard oral argument on the motion in November 2002. In addition, in October 2002, Lawrence A. Genovesi and Douglas G. Bryant were dismissed from this case without prejudice.

Network Engines is unable to predict the outcome of this suit and its ultimate effect, if any, on Network Engines' financial condition; however, Network Engines' defense against this suit could result in the expenditure of significant financial and managerial resources. No amounts have been accrued for this matter.

## 11. INCOME TAXES

Due to the loss incurred during fiscal years 2000, 2001 and 2002, the Company did not record a provision for any federal or state income taxes in those years. The following is a reconciliation between the amount of the Company's income taxes utilizing the U.S. federal statutory rate and the Company's actual provision for income taxes for the years ended September 30, 2000, 2001 and 2002 (in thousands):

| | 2000 | 2001 | 2002 |
|---|---|---|---|
| At U.S. federal statutory rate | $ (4,243) | $ (23,638) | $ (4,803) |
| State taxes, net of federal effect | (673) | (3,879) | (531) |
| Research and development credits | (220) | (515) | (323) |
| Non–deductible stock option compensation charge | 948 | 2,085 | 1,509 |
| Non–deductible intangible asset amortization | — | 916 | — |
| Non–deductible expenses and other items | (56) | 71 | (43) |
| Effect of change in valuation allowance | 4,244 | 24,960 | 4,191 |
| Provision for income taxes | $ — | $ — | $ — |

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. As of September 30, 2001 and 2002, net deferred tax assets consisted of the following (in thousands):

|  | 2001 | 2002 |
|---|---|---|
| Net operating losses | $ 18,372 | $ 28,294 |
| Tax credit carryforwards | 1,345 | 1,672 |
| Capitalized research and engineering | 5,265 | 5,811 |
| Temporary differences | 8,716 | 2,112 |
| Total deferred tax asset | 33,698 | 37,889 |
| Valuation allowance | (33,698) | (37,889) |
| Net deferred tax asset | $ — | $ — |

A valuation allowance is established if it is more likely than not that all or a portion of the deferred tax asset will not be realized. Accordingly, as of September 30, 2001 and 2002, a valuation allowance was recorded for the full amount of the deferred tax asset due to the uncertainty of their realization.

As of September 30, 2002, the Company had net operating loss carryforwards for federal and state income tax purposes of approximately $70.8 million and $70.4 million, which expire at various dates through 2021 and 2006, respectively. The Company also has available research and development credits for federal and state income tax purposes of approximately $1,248,000 and $349,000, respectively, which expire at various dates through 2021.

An ownership change, as defined in the Internal Revenue Code, resulting from the issuance of additional stock may limit the amount of net operating loss and tax credit carryforwards that can be utilized annually to offset future taxable income and tax liabilities. The amount of the annual limitation is determined based upon the Company's value immediately prior to the ownership change. Subsequent significant changes in ownership could further affect the limitations in future years.

12.  **EMPLOYEE SAVINGS PLAN**

The Company sponsors a savings plan for its employees, who meet certain eligibility requirements, which is designed to be a qualified plan under section 401(k) of the Internal Revenue Code. Eligible employees are permitted to contribute to the 401(k) plan through payroll deductions within statutory and plan limits. The Company may make discretionary contributions upon the approval of the 401(k) plan trustees and the Company's board of directors. Through September 30, 2002, the Company has not made any contributions to the plan.

13.  **ACQUISITION OF IP PERFORMANCE**

On November 8, 2000, the Company completed its acquisition of IP Performance, Inc. ("IP Performance"), a developer of network acceleration technology, through the exchange of 128,693

63

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

shares of Network Engines common stock for all outstanding shares of IP Performance capital stock. The acquisition was accounted for using the purchase method of accounting. Accordingly, the fair market value of the acquired assets and assumed liabilities have been included in the Company's financial statements as of the acquisition date and the results of IP Performance operations have been included in the Company's financial statements thereafter. The purchase price of approximately $2,540,000, plus assumed net liabilities of approximately $95,000 and acquisition expenses of approximately $63,000, resulted in goodwill and intangible assets of approximately $2,698,000. The Company's pro forma statements of operations prior to the acquisition would not differ materially from reported results.

In July 2001, the Company completed an intensive review of its business, which resulted in its implementation of a restructuring plan. This restructuring plan included a discontinuation of much of the customized hardware and software that had previously been a part of the Company's product development process. As a result of this restructuring and an assessment of expected future cash flows, the Company determined that the recoverability of the IP Performance–related intangible assets was unlikely. Accordingly, the Company recognized an impairment charge as a component of restructuring and other charges, for the full amount of the remaining unamortized intangible assets, approximately $2,023,000, during the fourth quarter of fiscal 2001. Prior to the impairment, the Company had been amortizing the goodwill and intangible assets over a three–year period, resulting in approximately $675,000 of amortization expense during the year ended September 30, 2001.

The Company also issued 321,756 shares of restricted common stock to key employee stockholders of IP Performance. Under the terms of the restricted stock agreements, these shares were restricted as to sale and such restrictions lapsed in three equal annual installments, beginning on November 8, 2001, contingent upon continued employment of the holder. In connection with the issuance of these restricted shares, the Company recorded approximately $6,351,000 of deferred compensation, which was being recognized as stock compensation expense ratably over the vesting period. In December 2001, the Company terminated the employment of all of the former IP Performance employees. In accordance with the restricted stock agreements with these individuals, all of the remaining unvested restricted stock vested upon termination. As a result, during the year ended September 30, 2002, the Company recognized the remaining deferred compensation of approximately $3,461,000.

## 14. RESTRUCTURING AND OTHER CHARGES

During the year ended September 30, 2001, the Company undertook two restructurings of its operations, the first of these restructurings occurred in April 2001 and the second in July 2001. Through the April 2001 restructuring, the Company sought to better align the Company's operating expenses with reduced revenues, and as a result of its implementation, the Company recorded a charge to operations of $2,812,000. This charge was due to a reduction in workforce from 243 employees to 170 employees, the curtailment of a planned expansion into leased facilities and other items. This

64

Table of Contents

### NETWORK ENGINES, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

charge included approximately $951,000 for employee related costs including severance payments to terminated employees and stock option compensation expense related to modifications of certain stock options held by terminated employees, approximately $1,331,000 to write off certain assets related to facilities that the Company will not be occupying and approximately $530,000 primarily related to non–refundable deposits on tradeshows the Company did not attend, as well as costs for certain other sales and marketing non–cancellable commitments. The Company's July 2001 restructuring was the result of an intensive review of its business, which resulted in a refocus of the Company's sales strategy toward strategic partnerships with ISVs and OEMs and a discontinuation of much of the customized hardware and software that was previously included in the Company's products. As a result of the implementation of the July 2001 restructuring, the Company recorded a charge to operations of approximately $6,871,000. This charge included approximately $1,643,000 of employee related costs as the Company reduced its workforce by 65 employees, approximately $2,224,000 as a result of the Company's disposal of certain property and equipment, approximately $2,023,000 to write off goodwill and intangible assets which were deemed to be impaired, approximately $618,000 of facility costs associated with non–cancelable operating leases for space which will not be occupied and approximately $363,000 of other charges. In addition to the April 2001 and July 2001 restructurings, in March 2001, the Company recorded a charge due to the retirement of fixed assets related to its WebEngine Blazer product line. These fixed assets had a total net book value of approximately $1,203,000 and consisted primarily of computer equipment previously utilized in the production and sales of the WebEngine Blazer, the Company's previous generation web content server appliance product. The total of the restructuring and other charges detailed above was approximately $10,886,000 recorded for the year ended September 30, 2001. The reduction in the Company's workforce implemented during the year ended September 30, 2001 impacted employees in all of the Company's groups, including manufacturing, research and development, selling and marketing and general and administrative.

During the year ended September 30, 2002, the Company implemented an additional restructuring. In an effort to further streamline its operations, the Company reduced its workforce by 13 employees, which impacted employees in all of the Company's groups. The implementation of this reduction in workforce resulted in a charge of $353,000 to operations, which is comprised entirely of employee related charges, including severance payments to terminated employees.

65

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following table sets forth restructuring accrual activity during the years ended September 30, 2001 and 2002:

|  | Employee Related | Facility Related | Impaired Assets | Other | Total |
|---|---|---|---|---|---|
| Restructuring and other charges during 2001 | $ 2,594 | $ 1,949 | $ 5,450 | $ 893 | $ 10,886 |
| Cash payments | (1,917) | (196) | — | (317) | (2,430) |
| Non–cash write–offs utilization | (186) | (1,194) | (5,450) | (258) | (7,088) |
| Restructuring and other charges accrual balance at September 30, 2001 | 491 | 559 | — | 318 | 1,368 |
| Restructuring and other charges during 2002 | 353 |  |  |  | 353 |
| Cash payments | (812) | (278) |  | (276) | (1,366) |
| Restructuring and other charges accrual balance at September 30, 2002 | $ 32 | $ 281 | $ — | $ 42 | $ 355 |

The Company expects the remaining restructuring accrual balance to be substantially utilized by September 30, 2003, comprising cash payments of approximately $355,000.

### 15.  SEGMENT AND GEOGRAPHIC DATA

The Company organizes itself as one segment and through September 30, 2002 conducted its operations primarily in the United States. Revenues were generated from the following geographic regions (in thousands):

|  | Year ended September 30, | | |
|---|---|---|---|
|  | 2000 | 2001 | 2002 |
| United States | $ 41,803 | $ 12,095 | $ 14,244 |
| Other countries | 1,271 | 1,420 | 290 |
|  | $ 43,074 | $ 13,515 | $ 14,534 |

All of the Company's long–lived assets were located in the United States as of September 30, 2001 and 2002.

### 16.  SUBSEQUENT EVENTS

On November 11, 2002, the Company entered into a definitive agreement to acquire all of the outstanding common shares of TidalWire, Inc. ("TidalWire"), a privately held corporation located in Westborough, Massachusetts, dedicated to the distribution and support of storage networking products. The agreement is subject to the approval by the stockholders of both TidalWire and the Company.

In connection with the acquisition, the Company agreed to make a net cash payment of approximately $8,805,000, representing gross cash payments of approximately $9,350,000 less repayments of stockholder notes receivable of approximately $545,000, and to issue approximately 3,331,000 shares of its common stock (valued at approximately $3,331,000). In addition, the Company agreed to assume all amounts outstanding under TidalWire's $5,000,000 working capital line of credit (approximately $2,700,000 was outstanding as of October 31, 2002). As part of the acquisition, the

66

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Company also agreed to replace outstanding TidalWire common stock options with options for the purchase of approximately 1,669,000 shares of Network Engines' common stock with an average exercise price of $0.36 (valued, based on the Black–Scholes valuation model, at approximately $1,014,000). The Company also anticipates incurring fees and expenses of approximately $1,900,000 in connection with this acquisition. The acquisition agreement includes a provision whereby the amount of cash paid by the Company to the stockholders of TidalWire may be adjusted based upon TidalWire's working capital as of the closing of the merger or if TidalWire transaction costs exceed $650,000.

At September 30, 2002, the Company had a sub–lease agreement related to certain office space previously occupied by the Company (see Note 10). The non–cancellable sub–lease agreement provides for the payment of approximately $747,000 of rental payments to the Company during the period from October 1, 2002 through March 30, 2005. On December 13, 2002, the Company began discussions with this sub–tenant to renegotiate the terms of the sub–lease agreement. The Company expects to record a charge in the first quarter of its fiscal year ending September 30, 2003 as a result of these renegotiation discussions. The Company does not have the ability to estimate the amount of the charge at this time.

17.   QUARTERLY FINANCIAL DATA (UNAUDITED)

The following information has been derived from unaudited consolidated financial statements that, in the opinion of management, include all recurring adjustments necessary for a fair presentation of such information.

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2001 | March 31, 2002 | June 30, 2002 | September 30, 2002 &bsp; |
| | (in thousands, except per share data) | | | |
| Revenues | $    2,101 | $    3,034 | $    4,130 | $    5,269 |
| Gross profit (loss) | (44) | 267 | 723 | 1,112 |
| Net loss | (7,191) | (2,896) | (2,419) | (1,619) |
| Basic and diluted net loss per common share | $    (0.21) | $    (0.09) | $    (0.08) | $    (0.05) |
| Basic and diluted weighted average shares outstanding | 33,576 | 32,847 | 32,176 | 31,230 |

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2000 | March 31, 2001 | June 30, 2001 | September 30, 2001 |
| | (in thousands, except per share data) | | | |
| Revenues | $    6,894 | $    2,516 | $    2,380 | $    1,725 |
| Gross profit (loss) | (13,358) | (9,708) | 2,977 | 645 |
| Net loss | (25,862) | (22,802) | (9,640) | (11,219) |
| Basic and diluted net loss per common share | $    (0.76) | $    (0.67) | $    (0.28) | $    (0.32) |
| Basic and diluted weighted average shares outstanding | 33,862 | 34,219 | 34,436 | 34,522 |

During the fourth quarter of fiscal 2001, the Company recorded a recovery of approximately $542,000 as a result of the Company's better–than–expected sales of products and components as well as favorable negotiations with vendors on inventory commitments, which had been included in the write–down of inventory earlier in fiscal 2001. The Company also recorded restructuring and other charges of approximately $6,871,000 during the fourth quarter of fiscal 2001.

**Table of Contents**

**ITEM 9.     CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

NONE

<div align="center">

**PART III**

</div>

Certain information required by Part III of this Form 10–K is omitted because we will file a definitive proxy statement pursuant to Regulation 14A (the "Proxy Statement") not later than 120 days after the end of the fiscal year covered by this Form 10–K, and certain information to be included therein is incorporated herein by reference.

**ITEM 10.     DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT**

The information regarding directors and compliance with Section 16 (a) of the Securities and Exchange Act of 1934, as amended, required by Item 10 of Form 10–K is incorporated herein by reference to the Proxy Statement. The information regarding executive officers is included in Part I of this Form 10–K under the section captioned "Executive Officers of the Company."

**ITEM 11.     EXECUTIVE COMPENSATION**

The information required by Item 11 of Form 10–K is incorporated herein by reference to the Proxy Statement, under the section captioned "Executive Compensation and Other Information." The information specified in Item 402 (k) and (l) of Regulation S–K and set forth in the Proxy Statement is not incorporated by reference.

**ITEM 12.     SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The information required by Item 12 of Form 10–K is incorporated by reference from the Proxy Statement under the section captioned "Security Ownership of Certain Beneficial Owners and Management."

**ITEM 13.     CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**

The information required by Item 13 of Form 10–K is incorporated by reference from the Proxy Statement under the section captioned "Certain Relationships and Related Transactions."

**ITEM 14.     CONTROLS AND PROCEDURES**

(a) *Evaluation of disclosure controls and procedures.* Based on their evaluation of the Company's disclosure controls and procedures (as defined in Rules 13a–14(c) and 15d–14(c) under the Securities Exchange Act of 1934) as of a date within 90 days of the filing date of this Annual Report on Form 10–K, the Company's chief executive officer and chief financial officer have concluded that the Company's disclosure controls and procedures are designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and are operating in an effective manner.

(b) *Changes in internal controls.* There were no significant changes in the Company's internal controls or in other factors that could significantly affect these controls subsequent to the date of their most recent evaluation.

<div align="center">

68

</div>

Table of Contents

## PART IV

ITEM 15.        EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8–K

### (a)  (1)  Financial Statements

The following consolidated financial statements are filed as part of this report under "Item 8— Financial Statements and Supplementary Data":

|  | Page |
|---|---|
| Report of Independent Accountants | 40 |
| Consolidated Balance Sheet as of September 30, 2001 and 2002 | 41 |
| Consolidated Statement of Operations for the years ended September 30, 2000, 2001 and 2002 | 42 |
| Consolidated Statement of Stockholders' Equity (Deficit) for the years ended September 30, 2000, 2001 and 2002 | 43 |
| Consolidated Statement of Cash Flows for the years ended September 30, 2000, 2001 and 2002 | 45 |
| Notes to Consolidated Financial Statements | 46 |

### (a)  (2)  List of Schedules

Schedule II—Valuation and Qualifying Accounts for the three fiscal years ended September 30, 2002.

All other schedules to the consolidated financial statements are omitted as the required information is either inapplicable or presented in the consolidated financial statements.

### (a)  (3)  List of Exhibits

The exhibits which are filed with this report or which are incorporated by reference are set forth in the Exhibit Index hereto.

### (b)  Reports on Form 8–K

We filed a Current Report on Form 8–K, dated September 9, 2002, disclosing the repurchase of 159,331 shares of our common stock from one of our executive officers.

We filed a Current Report on Form 8–K, dated November 15, 2002, disclosing the announcement of our definitive agreement to acquire TidalWire, Inc.

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized, on December 20, 2002.

NETWORK ENGINES, INC

By:    /s/  John H. Curtis

John H. Curtis
President and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, the Report has been signed as of December 20, 2002 below by the following persons on behalf of the Registrant and in the capacities indicated.

| Name | Title |
| --- | --- |
| /S/  JOHN H. CURTIS<br>John H. Curtis | President and Chief Executive Officer (Principal Executive Officer) |
| /S/  DOUGLAS G. BRYANT<br>Douglas G. Bryant | Vice President of Administration, Chief Financial Officer, Treasurer and Secretary (Principal Financial Officer and Principal Accounting Officer) |
| /S/  LAWRENCE A. GENOVESI<br>Lawrence A. Genovesi | Director |
| /S/  JOHN A. BLAESER<br>John A. Blaeser | Director |
| /S/  FONTAINE K. RICHARDSON<br>Fontaine K. Richardson | Director |
| /S/  DENNIS A. KIRSHY<br>Dennis A. Kirshy | Director |
| /S/  FRANK M. POLESTRA<br>Frank M. Polestra | Director |
| /S/  ROBERT M. WADSWORTH<br>Robert M. Wadsworth | Director |

70

**Table of Contents**

I, John H. Curtis, certify that:

1. I have reviewed this annual report on Form 10–K of Network Engines, Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–14 and 15d–14) for the registrant and have:

a) Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the &147;Evaluation Date"); and

c) Presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Dated: December 20, 2002

/s/  JOHN H. CURTIS

John H. Curtis
*President and Chief
Executive Officer (Principal
Executive Officer)*

71

Table of Contents

I, Douglas G. Bryant, certify that:

1. I have reviewed this annual report on Form 10–K of Network Engines, Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–14 and 15d–14) for the registrant and have:

a) Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c) Presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Dated: December 20, 2002        /S/  DOUGLAS G. BRYANT

Douglas G. Bryant
*Chief Financial Officer, Vice President of Administration, Treasurer and Secretary (Principal Financial Officer)*

72

Table of Contents

### REPORT OF INDEPENDENT ACCOUNTANTS ON FINANCIAL
### STATEMENT SCHEDULE

To the Board of Directors and Stockholders of Network Engines, Inc.:

Our audits of the consolidated financial statements referred to in our report dated November 5, 2002, except for footnote 16 for which the date is December 20, 2002, appearing in this Annual Report on Form 10–K of Network Engines, Inc. also included an audit of the financial statement schedule listed in Item 15(a)(2) of this Form 10–K. In our opinion, the financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

/s/   PRICEWATERHOUSECOOPERS LLP

Boston, Massachusetts
November 5, 2002

73

Table of Contents

## SCHEDULE II

### NETWORK ENGINES, INC.
### VALUATION AND QUALIFYING ACCOUNTS
#### (in thousands)

| Fiscal Year | Description | Balance at Beginning of Period | Additions | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| 2000: | ALLOWANCE FOR DOUBTFUL ACCOUNTS | $ 227 | $ 176 | $ 33 | $ 370 |
| 2001: | ALLOWANCE FOR DOUBTFUL ACCOUNTS | $ 370 | $ 755 | $ 111 | $ 1,014 |
| 2002: | ALLOWANCE FOR DOUBTFUL ACCOUNTS | $ 1,014 | $ 29 | $ 803 | $ 240 |

74

Table of Contents

# EXHIBIT INDEX

| Exhibit No. | Exhibit |
|---|---|
| 3.1** | Second Amended and Restated Certificate of Incorporation of the Registrant. |
| 3.2** | Second Amended and Restated By–laws of the Registrant |
| 4.1* | Specimen common stock certificate |
| 4.2$ | Agreement and Plan of Merger dated November 11, 2002, among Network Engines, Inc., Ninja Acquisition Co. and TidalWire, Inc. |
| 10.1* | Lease dated October 19, 1999 with New Boston Batterymarch, LP for 25 Dan Road, Canton, Massachusetts |
| 10.2* | The Registrant's 1999 Stock Incentive Plan |
| 10.3* | Form of Incentive Stock Option Agreement under the Registrant's 1999 Stock Incentive Plan |
| 10.4* | The Registrant's 2000 Employee Stock Purchase Plan |
| 10.5* | The Registrant's 2000 Director Stock Option Plan |
| 10.6* | Investor Rights Agreement Investor Rights Agreement, dated December 20, 1999, among the Registrant and certain investors in our preferred stock and warrants. |
| 10.7* | Restricted Stock Agreement with Lawrence Genovesi, dated November 18, 1999, under the 1999 Stock Incentive Plan. |
| 10.11* | Restricted Stock Agreement with John Blaeser, dated November 18, 1999, under the 1999 Stock Incentive Plan |
| 10.15* | Form of option granted to each of Frank M. Polestra and Robert M. Wadsworth on March 16, 2000 |
| 10.16* | Form of First Amendment to the Registrant's 1999 Stock Incentive Plan |
| 10.18* | First Amendment dated February 1, 2000 and Second Amendment dated June 1, 2000 to Lease for 25 Dan Road, Canton, Massachusetts |
| 10.19*** | Reimbursement Agreement, dated January 9, 2001, between the Registrant and Lawrence A. Genovesi |
| 10.20*** | Secured Revolving Promissory Note, dated January 9, 2001, between the Registrant and Lawrence A. Genovesi |
| 10.21*** | Pledge Agreement, dated January 9, 2001, between the Registrant and Lawrence A. Genovesi |
| 10.22**** | Employment Agreement, dated March 21, 2001, between the Registrant and John H. Curtis |
| 10.23**** | Incentive Stock Option Agreement, dated March 21, 2001, between the Registrant and John H. Curtis |
| 10.24**** | Nonstatutory Stock Option Agreement, dated March 21, 2001, between the Registrant and John H. Curtis |
| 10.25**** | Secured Promissory Note, dated April 9, 2001, between the Registrant and Rene E. Thibault |
| 10.28**** | Pledge Agreement, dated April 9, 2001, between the Registrant and Rene E. Thibault |

| Exhibit No. | Exhibit |
|---|---|
| 10.31***** | Sub–lease agreement dated June 21, 2001, with Techmar Communications, Inc. for 45 Dan Road, Canton, Massachusetts. |
| 10.32***** | Consent to Sub–lease from Dan Road Buildings, LLC regarding sub–lease agreement for 45 Dan Road, Canton, Massachusetts. |
| 10.33# | Severance Agreement, dated November 13, 2001, between the Registrant and Lawrence A. Genovesi. |
| 10.34# | Amendment No. 1 to Restricted Stock Agreement, dated November 14, 2001, with Lawrence Genovesi |
| 10.35## | Form of Retention Agreement, dated November 1, 2001, between the Registrant and Douglas G. Bryant. |
| 10.36+### | Purchase Agreement for product between the Registrant and EMC Corporation, dated February 5, 2002. |
| 10.37 | Retention Agreement, dated April 12, 2002, between the Registrant and John H. Curtis. |
| 21.1 | Subsidiaries of the Registrant |
| 23.1 | Consent of PricewaterhouseCoopers LLP |
| 99.1 | John H. Curtis Certification Pursuant to Section 906 of the Sarbanes–Oxley Act of 2002. |
| 99.2 | Douglas G. Bryant Certification Pursuant to Section 906 of the Sarbanes–Oxley Act of 2002. |

* Incorporated by reference from exhibits filed with the Company's registration statement (File No. 333–34286) on Form S–1, as amended, filed under the Securities Act of 1933, as amended.
** Incorporated by reference from exhibits filed with the Company's Annual Report on Form 10–K for the period ended September 30, 2000.
*** Incorporated by reference from exhibits filed with the Company's Quarterly Report on Form 10–Q for the period ended December 31, 2000.
**** Incorporated by reference from exhibits filed with the Company's Quarterly Report on Form 10–Q for the period ended March 31, 2001.
***** Incorporated by reference from exhibits filed with the Company's Quarterly Report on Form 10–Q for the period ended June 30, 2001.
\# Incorporated by reference from exhibits filed with the Company's Annual Report on Form 10–K for the period ended September 30, 2001.
\## Incorporated by reference from exhibits filed with the Company's Quarterly Report on Form 10–Q for the period ended December 31, 2001.
\### Incorporated by reference from exhibits filed with the Company's Quarterly Report on Form 10–Q for the period ended March 31, 2002.
$ Incorporated by reference from an exhibit filed with the Company's Current Report on Form 8–K dated November 15, 2002.
\+ Confidential treatment requested as to certain portions, which portions were omitted and filed separately with the Securities and Exchange Commission pursuant to a Confidential Treatment Request.