granted rights to return products after the purchase has been made. However, in certain circumstances, the Company has accepted returns from these customers, although no contractual obligation existed. Distribution customers are granted rights to return products within 30 days after the date of purchase. The Company records a provision for potential returns based on historical return rates and returns have been immaterial to date. The Company includes shipping and handling costs, if any, reimbursed by its customers as net revenues and cost of revenues.

Product Warranties

The Company offers a warranty on all products that generally provides for repair or replacement of any defective products for a period of up to 36 months after shipment. Based upon historical experience and expectation of future conditions, the Company accrues for the estimated costs to fulfill customer warranty obligations upon the recognition of the related revenue.

Advertising Costs

Advertising costs are expensed as incurred. Advertising expenses were approximately $1,480,000 for the year ended September 30, 2001 and were immaterial in the years ended September 30, 2002 and 2003.

Research and Development

Research and development costs, except for certain software development costs, are expensed as incurred. Related to software to be sold or licensed to customers, software development costs incurred after technological feasibility has been achieved and until the products are available for general release are capitalized and upon general release are amortized as the greater of the ratio of current revenues to total expected revenues from the product or the straight-line method over the remaining estimated economic life of the product. Costs of internally developed software qualifying for capitalization have not been material to date.

Accounting for Stock-Based Compensation

Stock options and restricted stock issued to employees and members of the Company's board of directors are accounted for in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations ("APB 25"). Accordingly, compensation expense is recorded for options and restricted stock awarded to employees and directors to the extent that the exercise or purchase prices are less than the common stock's fair market value on

63

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

the date of grant, where the number of shares and exercise or purchase price are fixed. The difference between the fair value of the Company's common stock and the exercise or purchase price of the stock option or restricted stock award is recorded as deferred stock compensation. Deferred stock compensation is amortized to compensation expense over the vesting period of the underlying stock option or restricted stock. Upon cancellation of options with residual

deferred compensation balances at the date of cancellation, the remaining amount of unrecognized deferred compensation is reversed as an adjustment to additional paid-in capital. The Company follows the disclosure requirements of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123"), as amended by SFAS 148 "Accounting for Stock-Based Compensation--Transition and Disclosure" (see Note 9). Stock-based awards to non-employees are accounted for at their fair value in accordance with SFAS 123.

During the year ended September 30, 2000, the Company recorded deferred stock compensation of approximately $13,916,000 for restricted stock and stock options granted at prices deemed to be below fair market value for financial reporting purposes. During the year ended September 30, 2001, the Company recorded deferred stock compensation $6,351,000 associated with the Company's acquisition of IP Performance, Inc. (see Note 13). During the year ended September 30, 2003, the Company recorded deferred stock compensation of $304,000 associated with the Company's acquisition of TidalWire, Inc. (see Note 13). The Company recognized stock compensation expense of approximately $6,132,000, $4,438,000 and $984,000 for the years ended September 30, 2001, 2002 and 2003, respectively. During the years ended September 30, 2001, 2002 and 2003, the Company reversed approximately $5,577,000, $1,190,000 and $73,000 of deferred stock compensation due to the cancellation of unvested options held by terminated employees.

The following table illustrates the effect on net loss and net loss per share as if the Company had applied the fair value recognition provisions of SFAS 123, to stock-based employee awards:

| | Years ended September 30, | | | | | |
| | 2001 | | 2002 | | 2003 | |
| | Net loss | Net loss per share - basic and diluted | Net loss | Net loss per share - basic and diluted | Net loss | Net loss per share - basic and diluted |
| | (in thousands, except per share data) | | | | | |
| As reported | $(69,523) | $ (2.03) | $(14,125) | $ (0.44) | $ (1,385) | $ (0.04) |
| Add: Stock-based compensation expense included in net loss | $ 6,132 | | $ 4,438 | | $ 984 | |
| Deduct: Total stock-based compensation expense | $ (9,740) | | $ (6,746) | | $ (2,753) | |
| Pro forma | $(73,131) | $ (2.14) | $(16,433) | $ (0.51) | $ (3,154) | $ (0.10) |

64

---

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

The fair value of these stock awards at the date of grant was estimated using the Black-Scholes model with the following assumptions:

|  | Stock Options | Employee Stock Purchase Plan | Stock Options | Employee Stock Purchase Plan | Stock Options | Employee Stock Purchase Plan |
|---|---|---|---|---|---|---|
| Risk-free interest rate | 4.85% | 3.79% | 4.62% | 2.28% | 2.77% | 1.34% |
| Volatility factor | 183% | 183% | 143% | 143% | 141% | 141% |
| Dividend yield | 0% | 0% | 0% | 0% | 0% | 0% |
| Weighted average expected option life | 5 years | 1 year | 5 years | 1 year | 5 years | 1 year |

All options granted during the years ended September 30, 2001, 2002 and 2003 were granted with exercise prices equal to the fair market value of the Company's common stock on the grant date and had weighted average fair values of $2.46, $0.94 and $1.07 per share, respectively. As of September 30, 2003, 5,566,162 shares were available for future grants under the Company's 1999 Stock Incentive Plan and the Company's 2000 Director Stock Option Plan, respectively, and the Company had reserved 5,539,387 shares of common stock for the exercise of outstanding stock options. In addition, the Company is authorized to issue 387,071 shares under its 2000 Employee Stock Purchase Plan.

Income Taxes

Deferred tax assets and liabilities are determined based on the difference between the financial statement and the tax bases of assets and liabilities using enacted tax rates in effect in the years in which the differences are expected to reverse. A valuation reserve against deferred tax assets is recorded if, based upon the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized.

Comprehensive Income (Loss)

Comprehensive income (loss) is comprised of two components, net income (loss) and other comprehensive income (loss). During the year ended September 30, 2003, other comprehensive income consisted of realization of previously unrealized gains on short-term investments as a result of the sales of these short-term investments. During the year ended September 30, 2002, other comprehensive income related to unrealized gains on short-term investments. During the year ended September 30, 2001, the Company had no items qualifying as other comprehensive income (loss). Accordingly, comprehensive loss equaled net loss.

Net Loss per Share

Basic net loss per share is computed by dividing the net loss attributable to common stockholders for the period by the weighted average number of shares of common stock outstanding during the period, excluding shares of common stock subject to repurchase by the Company in the event of the termination of the stockholder's employment ("restricted shares"). Diluted net loss per common share is computed by dividing the net loss attributable to common stockholders for the period by the weighted average number of shares of common stock and potential common stock outstanding during the period, if dilutive. Potential common stock includes unvested shares of restricted stock and

65

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

incremental shares of common stock issuable upon the exercise of stock options and warrants. Because the inclusion of potential common stock would be anti-dilutive for all annual periods presented, diluted net loss per share is the same as basic net loss per share.

The following table sets forth the potential common stock excluded from the calculation of net loss per share because their inclusion would be anti-dilutive (in thousands):

|  | As of September 30, | | |
|---|---|---|---|
|  | 2001 | 2002 | 2003 |
| Options to purchase common stock | 6,045 | 4,046 | 5,539 |
| Warrants to purchase common stock | 1,625 | 1,599 | 546 |
| Unvested restricted common stock | 396 | 166 | 65 |
|  | 8,066 | 5,811 | 6,150 |

Recent Accounting Pronouncements

In November 2002, the Financial Accounting Standards Board ("FASB") issued FASB Interpretation No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, an interpretation of FASB Statements No. 5, 57, and 107 and Rescission of FASB Interpretation No. 34 ("FIN 45"). FIN 45 elaborates on the disclosures to be made by a guarantor in its interim and annual financial statements about its obligations under certain guarantees that it has issued. It also clarifies that a guarantor is required to recognize, at the inception of a guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. FIN 45 does not prescribe a specific approach for subsequently measuring the guarantor's recognized liability over the term of the related guarantee. It also incorporates, without change, the guidance in FASB Interpretation No. 34, "Disclosure of Indirect Guarantees of Indebtedness of Others," which is being superseded. The disclosure provisions of FIN 45 are effective for financial statements of interim or annual periods that end after December 15, 2002, and the provisions for initial recognition and measurement are effective on a prospective basis for guarantees that are issued or modified after December 31, 2002, irrespective of a guarantor's year-end. The adoption of FIN 45 did not have a material impact on the Company's financial position or results of operations.

In November 2002, the Emerging Issues Task Force of the FASB reached a consensus

on Issue 00-21, Accounting for Revenue Arrangements with Multiple Deliverables ("EITF 00-21"). EITF 00-21 requires that for revenue arrangements with multiple deliverables, those deliverables be divided into separate units of accounting if the deliverables meet certain criteria as defined by EITF 00-21. Arrangement consideration is to be allocated among the separate units of accounting based on their relative fair values and revenue recognition decisions should be considered separately for each separate unit of accounting. EITF 00-21 is effective for all arrangements entered into in fiscal periods beginning after June 15, 2003, with early adoption permitted. The adoption of EITF 00-21 did not have a material impact on the Company's financial position or its results of operations.

66

--------------------------------------------------------------------------------

Table of Contents

### NETWORK ENGINES, INC.

#### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

In May 2003, the FASB issued Statement of Financial Accounting Standards No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity" ("SFAS 150"). SFAS 150 establishes standards for how an issuer of equity classifies and measures on its balance sheet certain financial instruments with characteristics of both liabilities and equity. SFAS 150 is effective for financial instruments entered into or modified after May 31, 2003 and for existing financial instruments after October 1, 2003. The adoption of SFAS 150 is not expected to have an impact on the Company's financial position or its results of operation.

3. ACQUISITIONS, GOODWILL AND INTANGIBLE ASSETS

TidalWire Inc.

On December 27, 2002, the Company acquired all of the outstanding capital stock of TidalWire Inc. ("TidalWire"), a privately held corporation previously located in Westborough, Massachusetts dedicated to the distribution and support of data storage networking products. The estimated fair values of the acquired assets and assumed liabilities were included in the Company's financial statements as of the acquisition date, and the results of the operations of TidalWire have been included in the financial statements since that date.

The aggregate purchase price of $17,544,000 included a net cash payment of approximately $9,320,000, representing gross cash payments of approximately $9,910,000 less amounts due to TidalWire by a stockholder under a note of approximately $590,000, and the issuance of 3,331,043 shares of the Company's common stock that were held by the Company as treasury stock (valued at approximately $3,331,000, based on the average market price of the Company's common stock over the period three days before and after the terms of the acquisition were agreed to and announced). In addition, the Company assumed approximately $1,878,000 outstanding under TidalWire's working capital line of credit, which the Company repaid and cancelled on December 27, 2002. As part of the acquisition, the Company also replaced all outstanding TidalWire common stock options with options for the purchase of 1,035,033 shares of the Company's common stock with an average exercise price of $0.36. The value of these options, based on the Black-Scholes valuation model was $578,000. Related to the unvested portion of the replaced stock options, the Company recorded $304,000 as deferred stock compensation expense based on the intrinsic value of those

employee stock options. The Company also incurred fees and expenses of
approximately $2,133,000 in connection with this acquisition. The aggregate
purchase price included cash payments of $3,350,443 and the issuance of
1,407,092 shares of the Company's common stock (valued at approximately
$1,407,000) to related parties (See Note 8).

The Company acquired TidalWire primarily because TidalWire had historically been
a profitable company with customer management, marketing, logistics and support
systems in place to support a growing channel of integrators, resellers and
service and solutions providers. The Company distributes certain of its
Independent Software Vendor ("ISV") partners' server appliances through
TidalWire's channel of integrators, resellers and service and solutions
providers thereby allowing the Company's current and potential ISV partners to
eliminate the cost of sales associated with the hardware

67

-------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

component of the server appliance sale. The Company also utilizes TidalWire's
existing infrastructure to diversify its sources of revenues beyond the server
appliance market and plans to expand TidalWire's data storage product offerings
to include products involved in network security.

A summary of the assets acquired and liabilities assumed in the acquisition and
the fair values recorded for each is as follows (in thousands):

| | |
|---|---:|
| Cash | $    97 |
| Accounts receivable | 6,060 |
| Inventories | 2,864 |
| Other current assets | 244 |
| Property and equipment and other long-lived assets | 477 |
| Goodwill | 7,786 |
| Customer relationships (amortized on a straight-line basis over 5 years) | 5,071 |
| Accounts payable | (4,287) |
| Other liabilities, excluding debt of $1,878 (repaid on acquisition date) | (1,072) |
| Deferred compensation for unvested employee stock options | 304 |
| | ------- |
| Net assets acquired | $17,544 |
| | ------- |

All goodwill has been assigned to the Company's Distribution segment. The Company does not expect goodwill to be deductible for tax purposes.

During the year ended September 30, 2003, and as of September 30, 2003, the Company had recorded amortization expense and had accumulated amortization, respectively, of $762,000. The Company expects to recognize amortization expense associated with intangible assets of $253,550 per quarter for each of the next five years, resulting in estimated amortization expense of $1,014,200 in each of fiscal years 2004, 2005, 2006 and 2007, and $253,550 in fiscal year 2008. The Company recorded amortization expense of approximately $762,000 during the year ended September 30, 2003 (see Note 16).

The following unaudited pro forma results of operations of the Company give effect to the acquisition of TidalWire as if it had occurred at the beginning of fiscal 2002 (in thousands, except per share data):

|  | Unaudited Pro forma (in thousands, except per share data) | |
|  | --- | --- |
|  | 2002 | 2003 |
| Net revenues | $ 45,155 | $92,111 |
| Net loss | $(12,725) | $(1,584) |
| Net loss per share--basic and diluted | $ (0.36) | $ (0.05) |

These unaudited pro forma results have been prepared for comparative purposes only and do not purport to be indicative of the results of operations that actually would have resulted had the acquisition occurred on the dates indicated and are not necessarily indicative of future results.

68

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

IP Performance, Inc.

On November 8, 2000, the Company completed its acquisition of IP Performance, Inc. ("IP Performance"), a developer of network acceleration technology, through the exchange of 128,693 shares of Network Engines common stock for all outstanding shares of IP Performance capital stock. The acquisition was accounted for using the purchase method of accounting. Accordingly, the fair market value of the acquired assets and assumed liabilities have been included in the Company's financial statements as of the acquisition date and the results of IP Performance operations have been included in the Company's financial statements thereafter. The purchase price of approximately $2,540,000, plus assumed net liabilities of approximately $95,000 and acquisition expenses of

approximately $63,000, resulted in goodwill and intangible assets of approximately $2,698,000. The Company's pro forma statements of operations prior to the acquisition would not differ materially from reported results.

In July 2001, the Company completed an intensive review of its business, which resulted in its implementation of a restructuring plan. This restructuring plan included a discontinuation of much of the customized hardware and software that had previously been a part of the Company's product development process. As a result of this restructuring and an assessment of expected future cash flows, the Company determined that the recoverability of the IP Performance-related intangible assets was unlikely. Accordingly, the Company recognized an impairment charge as a component of restructuring and other charges, for the full amount of the remaining unamortized intangible assets, approximately $2,023,000, during the fourth quarter of fiscal 2001. Prior to the impairment, the Company had been amortizing the goodwill and intangible assets over a three-year period, resulting in approximately $675,000 of amortization expense during the year ended September 30, 2001.

The Company also issued 321,756 shares of restricted common stock to key employee stockholders of IP Performance. Under the terms of the restricted stock agreements, these shares were restricted as to sale and such restrictions lapsed in three equal annual installments, beginning on November 8, 2001, contingent upon continued employment of the holder. In connection with the issuance of these restricted shares, the Company recorded approximately $6,351,000 of deferred compensation, which was being recognized as stock compensation expense ratably over the vesting period. In December 2001, the Company terminated the employment of all of the former IP Performance employees. In accordance with the restricted stock agreements with these individuals, all of the remaining unvested restricted stock vested upon termination. As a result, during the year ended September 30, 2002, the Company recognized the remaining deferred stock compensation of approximately $3,461,000.

69

------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

4.  CASH EQUIVALENTS AND INVESTMENTS

Cash equivalents and investments consist of the following (in thousands):

|                     | September 30 | |
| --- | --- | --- |
|                     | 2002 | 2003 |
| Municipal bonds     | $41,296 | $27,561 |
| Money market funds  | 4,942 | 4,787 |
|                     | $46,238 | $32,348 |

--------------

At September 30, 2002, short-term investments, which consisted of government agency securities with a cost of approximately $8,543,000, including accrued interest, were recorded at their fair value of approximately $8,546,000. Gross realized gains on short-term investments for the year ended September 30, 2003 were $46,000. Gross realized and unrealized gains on short-term investments for the year ended September 30, 2002 were immaterial. All marketable securities held at September 30, 2002 matured within one year. There were no short-term investments at September 30, 2003.

5. INVENTORIES

Inventories consisted of the following (in thousands):

|  | September 30, | |
| --- | --- | --- |
|  | 2002 | 2003 |
| Raw materials | $1,107 | $ 2,625 |
| Work in process | 412 | 800 |
| Finished goods | 437 | 11,512 |
|  | $1,956 | $14,937 |

6. PROPERTY AND EQUIPMENT

Property and equipment consisted of the following (in thousands):

|  |  | September 30, | |
| --- | --- | --- | --- |
|  | Useful Life | 2002 | 2003 |
| Office furniture and equipment | 5 years | $ 831 | $ 876 |
| Engineering and production equipment | 3 years | 1,011 | 1,290 |
| Computer equipment and software | 3 years | 2,905 | 3,743 |
| Leasehold improvements | 5 years | 1,635 | 1,703 |
|  |  | 6,382 | 7,612 |
| Less: accumulated depreciation and amortization |  | 4,146 | 5,763 |

$ 2,236$1,849

-------------

As of September 30, 2002, the Company had approximately $14,000 (net of approximately $262,000 of accumulated amortization) of office furniture, computer software and equipment under capital leases. At September 30, 2003, the Company had no property, plant and equipment under capital leases.

70

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

Depreciation and amortization expense, related to property and equipment, was approximately $3,047,000, $1,536,000 and $1,617,000 for the years ended September 30, 2001, 2002 and 2003, respectively.

7.  STOCKHOLDERS' EQUITY

Preferred Stock

The Company has authorized up to 5,000,000 shares of preferred stock, $0.01 par value per share for issuance. The preferred stock will have such rights, preferences, privileges and restrictions, including voting rights, dividend rights, conversion rights, redemption privileges, and liquidation preferences, as shall be determined by the board of directors upon its issuance.

Common Stock

In November 1999, the Company issued 262,500 shares of restricted common stock at $0.24 per share to certain directors of the Company. Of these shares, 75,000 shares vested 50% on November 18, 2000 and 12.5% per quarter thereafter and 187,500 shares vested 25% on November 18, 2000 and 6.25% per quarter thereafter. As of September 30, 2003, 250,781 shares had vested. Unvested restricted shares are subject to forfeiture in the event that a director ceases to be a director of the Company. The Company recorded deferred stock compensation of approximately $522,000, which represented the excess of the fair value, of the restricted shares at the date of issue over the purchase price. Compensation expense is being recognized ratably over the vesting period of the restricted stock. For the years ended September 30, 2001, 2002 and 2003, the Company recognized approximately $172,000, $79,000 and $93,000, respectively, of related stock compensation expense.

In November 1999, the Company issued 375,000 shares of restricted common stock to Lawrence A. Genovesi, the Company's former Chief Executive Officer and current Chairman of the board of directors. These shares vested quarterly upon the achievement of certain financial targets or in December 2004, whichever was earlier. As of September 30, 2003, 227,679 shares had vested. Unvested restricted shares are subject to forfeiture in the event that Mr. Genovesi ceased to be employed by the Company. The Company recorded deferred stock compensation of approximately $684,000, which represented the excess of the fair value, of the restricted shares at the date of issue over the purchase price. Compensation expense is being recognized ratably over the vesting period of the

restricted stock. For the years ended September 30, 2001, 2002 and 2003, the Company recognized approximately $136,000, $75,000 and $98,000, respectively, of related stock compensation expense. In connection with these restricted stock grants, the Company accepted a recourse note receivable from Mr. Genovesi in the amount of $90,000. This note had an interest rate of 6.08% and was payable on the earlier of demand by the Company or November 18, 2004. In connection with a severance agreement effective September 30, 2001, the Company agreed to amend this restricted stock agreement and, in November 2001, the Company repurchased 93,750 of these shares of restricted common stock at $0.24 per share, which represented the original issue price, through the cancellation of an equal amount due under the note receivable from Mr. Genovesi (approximately $23,000). Additionally, for the remaining

71

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

unvested restricted common stock of 187,500 shares as of September 30, 2001, the Company amended the agreement to provide for quarterly vesting of that amount through September 30, 2004, contingent upon Mr. Genovesi remaining a director of the Company. As of September 30, 2002, approximately $26,000 remained outstanding under the recourse note receivable from Mr. Genovesi and was repaid in full through a combination of cash repayments and stock repurchases in fiscal 2003. As a result, no amounts remain outstanding from Mr. Genovesi as of September 30, 2003.

Treasury stock

On August 14, 2001, the Company announced that its board of directors had approved the repurchase of up to $5 million of the Company's common stock in the open market or in non-solicited privately negotiated transactions. During the years ended September 30, 2001, 2002 and 2003, the Company repurchased approximately 300,900, 4,097,592 and 308,000 shares of common stock for cash of approximately $198,000, $4,074,000 and $312,000. In addition, during the years ended September 30, 2002 and 2003, the Company repurchased 476,452 and 686,798 shares of common stock through the cancellation of approximately $411,000 and $1,031,000, respectively, of outstanding notes receivable from stockholders. Also, in the year ended September 30, 2002 the Company reacquired 23,159 shares for $24,000 in cashless option exercise transactions.

In December 2002, the Company used 3,331,043 of the repurchased shares to fund a portion of its acquisition of TidalWire Inc. and plans to use the remaining shares to fund its employee stock option plan.

8.  RELATED PARTY TRANSACTIONS

In January 2001, the Company entered into a series of related agreements with Lawrence A. Genovesi, currently Chairman of the Board and formerly President, Chief Executive Officer and Chief Technology Officer of the Company. These agreements were entered into to avoid significant sales of the Company's common stock by Mr. Genovesi as a result of a margin call on a personal loan collateralized by Mr. Genovesi's holdings of the Company's common stock. The Company guaranteed a personal loan obtained by Mr. Genovesi from a financial institution (the "Bank") through a deposit of $1,051,850 of the Company's cash

with the Bank (the "Guarantee"), which was to expire in January 2002. In January 2002, the Company extended the Guarantee period to January 2003. Mr. Genovesi and the Company also entered into an agreement whereby Mr. Genovesi agreed to reimburse the Company for any obligations incurred by the Company under the Guarantee (the "Reimbursement Agreement"). Any unpaid balances under the Reimbursement Agreement bore interest at a rate 10% per annum. On January 6, 2003, pursuant to the Guarantee, the Bank applied $968,596 of the Company's cash deposit to the repayment of Mr. Genovesi's personal loan and refunded $83,254 to the Company. On January 27, 2003, Mr. Genovesi repaid the Company $974,168 to satisfy his obligations under the Reimbursement Agreement, including accrued interest. Of that amount, $456,276 was paid in cash and $517,892 was paid with the proceeds from the repurchase by the Company of 391,128 shares of the Company's common stock owned by Mr. Genovesi. The purchase price of $1.32 per share was determined based on the average closing price of the Company's common stock over the ten trading days prior to and including January 17, 2003.

72

---

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

In connection with the Company's issuance of 375,000 shares of restricted common stock to Mr. Genovesi in November 1999, the Company and Mr. Genovesi entered into a recourse note (the "Recourse Note"), in November 1999, in the principal amount of $90,000, bearing interest at an annual rate of 6.08% and payable upon the earlier of demand by the Company or November 18, 2004. In addition, in January 2001, Mr. Genovesi executed a revolving promissory note of up to $210,000 (the "Note") with the Company. The Note had an interest rate of 5.9% per annum and was due and payable in full upon the earlier of January 9, 2002 or 30 days following the date Mr. Genovesi ceased to be an employee of the Company. In November 2001, the Company repurchased 234,822 shares of the Company's common stock from Mr. Genovesi for $225,195 in a private transaction. The purchase price was determined based on the average closing price of the Company's common stock over the ten trading days prior to the purchase date. Mr. Genovesi used the proceeds to repay all amounts outstanding under the Note of $140,343, to pay $39,813, including accrued interest, of the Recourse Note and to pay taxes incurred in connection with the Company's repurchase of its common stock from Mr. Genovesi. Also in November 2001, the Company repurchased 93,750 shares of the Company's common stock held by Mr. Genovesi as restricted stock for $22,500. The purchase price was equal to the price at which these shares were sold to Mr. Genovesi in November 1999. The proceeds were used to pay down $22,500 of the Recourse Note. On January 27, 2003 Mr. Genovesi repaid, $22,600 that remained outstanding under the Recourse Note, with the proceeds from the repurchase by the Company of 17,070 shares of the Company's common stock owned by Mr. Genovesi. The purchase price was determined based on the average closing price of the Company's common stock over the ten trading days prior to and including January 17, 2003.

In conjunction with the Guarantee, the Reimbursement Agreement and the Note, the Company and Mr. Genovesi entered into a pledge agreement whereby Mr. Genovesi pledged to the Company all shares of the Company's common stock owned by Mr. Genovesi as of the date of the agreement or subsequently acquired, and all options and other rights to acquire shares of the Company's common stock owned by Mr. Genovesi as of the date of the agreement or subsequently acquired (collectively the "Pledged Securities"). Additionally, Mr. Genovesi pledged to

the Company all additional securities or other consideration from time to time acquired by Mr. Genovesi in substitution for, or in respect of the Pledged Securities. If Mr. Genovesi had elected to sell any additional Pledged Securities during the term of the agreement, all proceeds of such sale would have been applied to any amounts payable under the Reimbursement Agreement. In addition to the Pledged Securities, the obligations of Mr. Genovesi under the Reimbursement Agreement were collateralized by a second mortgage on certain real property owned by Mr. Genovesi. As stated above, on January 27, 2003, Mr. Genovesi satisfied his obligations in full under each of the Guarantee, the Reimbursement Agreement, the Recourse Note and the pledge agreement.

In April 2001, the Company entered into full recourse loan agreements with certain employees and certain officers of the Company, all of whom were employees or officers of the Company at that time (the "Loan Agreements"). The Loan Agreements were entered into to avoid substantial sales of the Company's common stock by these employees and officers as a result of alternative minimum tax obligations incurred by these employees and officers in connection with their exercise of options to

73

---

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

purchase shares of the Company's common stock. The amount loaned to the employees and officers under the Loan Agreements was approximately $736,000, which was recorded net of approximately $228,000 of reserves for uncollectibility. Outstanding amounts under the Loan Agreements accrued interest at a rate of 4.63% per annum and were originally due and payable in full upon the earlier of one year from the date of each individual agreement or thirty days after termination of employment with the Company, unless termination was involuntary and without cause. In conjunction with the Loan Agreements, each employee and officer pledged all shares of capital stock, and options to purchase capital stock, of the Company then owned, or acquired in the future (the "Pledged Stock"), and any distributions on the Pledged Stock or proceeds from their sale. Amounts due under these Loan Agreements were included in the balance sheet as notes receivable from stockholders.

In April 2002, one former officer's loan with principal of $54,000 was repaid in full, including accrued interest of approximately $2,500, through a payment to the Company of $29,800 of cash and a sale to the Company of 30,000 shares of the Company's common stock. The price per share of the Company's common stock was based on the market price as of the close of business on the date of the repurchase. Because the amounts outstanding under certain of the Loan Agreements exceeded the value of the Company's common stock pledged as collateral, in January 2002, the Company extended the repayment dates to September 2002 for loans with an aggregate principal amount of $226,996 due from one of its current officers and one of its former officers and in March 2002, the Company extended the repayment dates to July 2002 for the remaining loans with a net principal amount of $255,000. Subsequently, in early July 2002, the Company also extended the repayment dates for these remaining loans to September 2002. In September 2002, loans to one current officer and one former officer totaling approximately $240,000 were repaid in full, including accrued interest of approximately $13,000, through sales to the Company of 230,777 shares of the Company's common stock in exchange for the retirement of these loans. The remaining loans due

from one former officer and one former employee totaling approximately $489,000 as of December 31, 2002, were repaid in full, including accrued interest of approximately $33,000, in January 2003 through the repurchase by the Company of 278,600 shares of the Company's common stock. For all purchases noted above, the price per share of the Company's common stock was based on the market price as of the close of business on the dates of these repurchases. As of December 31, 2002, the Company determined that there was no need for reserves for the uncollectibility of these stockholder notes receivable and reversed reserves of $228,000 as a decrease to general and administrative expenses during the three months ended December 31, 2002.

All shares of the Company's common stock repurchased under these related party agreements were recorded as treasury stock at the cost to repurchase.

In connection with the Company's acquisition of TidalWire, the Company paid $1,144,615 to Ascent Venture Partners (together with its affiliated entities, "Ascent") and $2,205,828 to HarbourVest Partners (together with its affiliated entities, "HarbourVest"), two substantial stockholders of the Company. At the time of the acquisition, Ascent and HarbourVest owned approximately 18.1% and 16.3% of the outstanding common stock of the Company, respectively. Ascent and HarbourVest also

74

---

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

owned 12.9% and 24.9% of the outstanding common stock of TidalWire, respectively. Pursuant to the terms of the merger agreement, the Company also issued 480,706 shares and 926,386 shares of its common stock previously held as treasury stock to Ascent and HarbourVest, respectively, and made the aforementioned cash payments to Ascent and HarbourVest in exchange for all of the TidalWire common stock held by Ascent and HarbourVest. The consideration paid to Ascent and HarbourVest may be deemed to have been indirectly paid to Frank M. Polestra and Robert M. Wadsworth, two of the Company's directors. As a managing member or general partner of each of the general partners that control Ascent, Mr. Polestra may be deemed to have indirectly received the $1,144,615 of cash paid to Ascent as well as beneficial ownership of 480,706 shares of the Company's common stock issued to Ascent. As a managing director of the limited liability corporation that controls HarbourVest, Mr. Wadsworth may be deemed to have indirectly received the $2,205,828 of cash paid to HarbourVest as well as beneficial ownership of 926,386 shares of the Company's common stock issued to HarbourVest.

In connection with the TidalWire acquisition, the Company has engaged Akibia, Inc. ("Akibia") to provide certain warranty fulfillment services. Akibia charges the Company a fee for these services based upon sales of certain of the Company's products. A director of the Company is also a director of PSI Holding Group, Inc. ("PSI"), the parent company of Akibia. In addition, during the year ended September 30, 2003, Ascent and HarbourVest each owned greater than 5% of the outstanding stock of the Company and greater than 5% of the outstanding stock of PSI. In the year ended September 30, 2003, the Company recognized $972,000 of expense as a result of its customer support and warranty fulfillment services agreements with Akibia. In addition, TidalWire had certain agreements with Akibia related to administrative and accounting services and leased certain

facilities from Akibia. These agreements terminated in March 2003. Payments related to these agreements by us during fiscal 2003 totaled $53,000. At September 30, 2003, the Company had amounts payable to Akibia of approximately $193,000.

Ascent Venture Partners III, L.P., one of the Company's significant stockholders, owns approximately 16% of the outstanding capital stock of Network Intelligence Corporation. Network Intelligence Corporation has a contract with the Company to purchase certain of its products. In the fiscal years ending September 30, 2002 and 2003, sales to Network Intelligence Incorporation were approximately $2.5 million and $821,000, respectively. In addition, Frank Polestra, a member of our Board of Directors, is the Managing Member of the General Partner of Ascent Venture Partners III, L.P.

9.  STOCK INCENTIVE PLANS

Options and awards to purchase shares of the Company's common stock have been granted to employees and directors under the Company's 1997 Stock Incentive Plan (the "1997 Plan"), which was adopted by the board of directors in November 1997. On October 21, 1999, the 1997 Plan was terminated and all outstanding options became options under the 1999 Stock Incentive Plan.

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

In October 1999, the Company's shareholders approved the 1999 Stock Incentive Plan (the "1999 Plan"). Under the 1999 Plan, stock option and restricted stock or other stock-based awards for up to 4,747,902 shares of common stock may be issued to employees, officers, directors, consultants and advisors of the Company. Options are granted for terms of up to ten years and vest over varying periods. Option grants to new employees generally vest 25% on the first anniversary of the grant date and thereafter in equal quarterly installments over the next three years. Subsequent grants to existing employees generally vest in equal quarterly installments over four years. The option price per share is determined by the board of directors on the grant date.

In May 2000, the Company's shareholders approved an increase of 3,300,000 in the number of shares authorized under the 1999 Plan and an automatic annual increase in the number of shares authorized under the 1999 Plan. The automatic annual increase is equal to the lesser of: 5% of the outstanding shares on the first day of each fiscal year; 4,000,000 shares; or an amount determined by the board of directors, which is subject to a maximum of 20,047,902 authorized shares under the plan. During the years ended September 30, 2001, 2002 and 2003, the Company increased the number of shares available under the plan by 1,710,929, 1,759,405 and 1,539,037 shares, respectively. As a result, as of September 30, 2003, the Company is authorized to grant options, restricted stock or other awards of up to 13,057,273 shares of common stock.

In May 2000, the Company's shareholders approved the 2000 Director Option Plan. Under the 2000 Director Option Plan, the Company may make formula grants of stock options to non-employee directors of up to 500,000 shares of common stock. Under the 2000 Director Option Plan, options to purchase 325,000 shares have been granted, options to purchase 45,000 shares have been exercised and options

to purchase 15,000 shares have been cancelled through September 30, 2003.

In connection with the Company's acquisition of TidalWire in December 2002, the Company assumed all options outstanding under TidalWire's option plan (the "TidalWire Options"). Pursuant to the merger agreement, the TidalWire Options converted into options to purchase 1,035,033 shares of the Company's common stock at an average exercise price of $0.36 per share. Pursuant to TidalWire's option plan, the vesting associated with fifty percent of the unvested TidalWire Options was accelerated upon the completion of the Company's acquisition of TidalWire and, as a result, options to purchase 475,448 shares of the Company's common stock vested on December 27, 2002. The remaining unvested options vest over a one to two year period beginning December 27, 2002, depending on the original date of grant and all options expire ten years from the original date of grant.

76

---

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

All stock option activity since October 1, 2000 was as follows:

|  | Number of Shares | Weighted Average Exercise Price |
|---|---|---|
| Outstanding, September 30, 2000 | 4,380,588 $ | 4.62 |
| Granted | 4,681,751 | 2.57 |
| Exercised | (243,624) | 0.25 |
| Cancelled | (2,773,841) | 5.66 |
| Outstanding, September 30, 2001 | 6,044,874 | 2.73 |
| Granted | 935,000 | 1.04 |
| Exercised | (414,299) | 0.22 |
| Cancelled | (2,519,153) | 4.28 |
| Outstanding, September 30, 2002 | 4,046,422 | 1.79 |
| Granted | 2,350,500 | 1.20 |
| Options assumed in acquisition of TidalWire Inc. | 1,035,033 | 0.36 |
| Exercised | (1,345,756) | 0.57 |

| | | |
|---|---|---|
| Cancelled | (546,812) | 2.69 |
| | ---------- | |
| Outstanding, September 30, 2003 | 5,539,387 | 1.48 |
| | ---------- | |

As of September 30, 2001, 2002 and 2003, options to purchase 1,340,117, 1,751,967 and 2,303,745 shares of common stock, respectively, were exercisable with a weighted-average exercise price per share of $2.95, $2.07 and $1.72, respectively.

The following table summarizes the stock options outstanding at September 30, 2003:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Exercise Price Range | Number | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) | Number | Weighted Average Exercise Price |
| $0.07-$0.24 | 387,301 | $ 0.24 | 6.12 | 360,854 | $ 0.24 |
| $0.58-$0.87 | 917,845 | 0.49 | 7.94 | 616,970 | $ 0.48 |
| $0.92-$1.20 | 2,163,761 | 0.93 | 8.44 | 399,968 | $ 0.92 |
| $1.63-$2.53 | 1,422,739 | 1.15 | 8.09 | 604,297 | $ 1.16 |
| $6.00-$8.00 | 261,616 | 1.88 | 7.43 | 137,513 | $ 1.88 |
| $12.88-$14.50 | 119,000 | 3.17 | 9.71 | -- | $ -- |
| $27.63-$39.81 | 267,125 | 11.71 | 7.15 | 184,143 | $ 12.20 |
| | --------- | | | ---------- | |
| | 5,539,387 | $ 1.48 | 8.02 | 2,303,745 | $ 1.72 |
| | --------- | | | ---------- | |

In May 2000, the Company's shareholders approved the 2000 Employee Stock Purchase Plan (the "Purchase Plan"). Under the Purchase Plan, the Company may issue up to an aggregate of 750,000 shares of common stock to eligible employees. Eligible employees must be employed by the Company for more than 20 hours per week and more than five months in a fiscal year. Under the Purchase Plan, the Company makes two offerings each fiscal year, at the end of which employees may purchase shares of common stock through payroll deductions made over the term of each offering. The per-share

------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

purchase price at the end of each offering is equal to lesser of 85% of the closing price of the common stock at the beginning or end of the offering period. Offering periods begin on the 15th day of November and May each year. During the years ended September 30, 2001, 2002 and 2003, 116,372, 76,681 and 169,876 of common stock shares were issued under the Purchase Plan, respectively.

10.    STOCK WARRANTS

Prior to October 1, 2000, the Company issued warrants to purchase 2,350,424 shares of the Company's common stock. The fair value of these warrants was $1,198,000. These warrants were issued in connection with multiple private debt and equity financing activities. These warrants were issued with exercise prices ranging from $0.07 per share to $0.53 per share and have expiration dates between August 2002 and January 2009.

During the years ended September 30, 2001 and 2003, pursuant to the original warrant agreements, warrants to purchase 104,062 and 1,052,738 shares of the Company's common stock, respectively, were exercised through cashless exercises and resulted in the issuance of 102,815 and 988,451 shares of the Company's common stock, respectively.

All of the warrants issued by the Company were exercisable on the date of the grant. The following table summarizes stock warrant activity during each of the three years ended September 30, 2003:

| | Shares | Exercise Price | Expiration Date |
|---|---|---|---|
| Outstanding, September 30, 2000 | 1,785,720 | $0.07-$0.53 | August 2002-January 2009 |
| Cashless exercise of warrants | (104,062) | $0.37 | |
| Exercise of warrants | (56,250) | $0.37 | |
| | ---------- | | |
| Outstanding, September 30, 2001 | 1,625,408 | $0.07-$0.53 | August 2002-January 2009 |
| Expiration of warrants | (26,250) | $0.53 | |
| | ---------- | | |
| Outstanding, September 30, 2002 | 1,599,158 | $0.34 | October 2007-January 2009 |
| Cashless exercise of warrants | (1,052,738) | $0.33 | |
| | ---------- | | |
| Outstanding, September 30, 2003 | 546,420 | $0.37 | December 2008-January 2009 |
| | ---------- | | |

As of September 30, 2003, the Company had reserved 546,420 shares of common stock for the exercise of all of the Company's outstanding warrants.

78

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

11.    COMMITMENTS AND CONTINGENCIES

Operating Leases

The Company leases its office space under non-cancelable operating leases
through March 2005. As of September 30, 2003, the future minimum lease payments
under the Company's original non-cancelable operating leases were as follows (in
thousands):

| Year Ending September 30, | |
|---|---|
| 2004 | $615 |
| 2005 | 308 |
| | ---- |
| Total | $923 |
| | ---- |

After utilization of the vacant space provision recorded as part of the July
2001 and December 2002 restructurings (see Note 14), rent expense for the years
ended September 30, 2001, 2002 and 2003, net of sublease income of approximately
$36,000, $296,000 and $311,000, was approximately $1,086,000, $472,000 and
$437,000.

In October 2003, the Company entered into an amendment of its office space
lease. The amendment of this lease extended the lease term through March 2007
for 52,000 square feet of office and manufacturing space and eliminated
approximately 24,000 square feet of office space that the Company previously
subleased to a third party. This lease amendment required a termination payment
by the Company of $54,000 and was effective October 31, 2003. As a result of
this lease amendment, the Company has lease payment commitments of $610,000 in
each of the years ended September 30, 2004, 2005 and 2006, respectively, and
$305,000 in 2007.

Contingencies

Initial Public Offering Lawsuit

On or about December 3, 2001, a putative class action lawsuit was filed in the
United States District Court for the Southern District of New York against the
Company, Lawrence A. Genovesi (the Company's Chairman and former Chief Executive
Officer), Douglas G. Bryant (the Company's Chief Financial Officer and Vice
President of Finance and Administration), and the following underwriters of the
Company's initial public offering: FleetBoston Robertson Stephens, Inc., Credit

Suisse First Boston Corp., Goldman Sachs & Co., Lehman Brothers Inc. and Salomon Smith Barney, Inc. (collectively, the "Underwriter Defendants"). An amended class action complaint, captioned In re Network Engines, Inc. Initial Public Offering Securities Litigation, 01 Civ. 10894 (SAS), was filed on April 20, 2002.

The suit alleges that the defendants violated the federal securities laws by issuing and selling securities pursuant to the Company's initial public offering in July 2000 ("IPO") without disclosing to investors that the Underwriter Defendants had solicited and received excessive and undisclosed

79

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

commissions from certain investors. The suit also alleges that the Underwriter Defendants entered into agreements with certain customers whereby the Underwriter Defendants agreed to allocate to those customers shares of the Company's common stock in the offering, in exchange for which the customers agreed to purchase additional shares of the Company's common stock in the aftermarket at pre-determined prices. The suit alleges that such tie-in arrangements were designed to and did maintain, distort and/or inflate the price of the Company's common stock in the aftermarket. The suit further alleges that the Underwriter Defendants received undisclosed and excessive brokerage commissions and that, as a consequence, the Underwriter Defendants successfully increased investor interest in the manipulated IPO securities and increased the Underwriter Defendants' individual and collective underwritings, compensation and revenues. The suit seeks damages and certification of a plaintiff class consisting of all persons who acquired shares of the Company's common stock between July 13, 2000 and December 6, 2000.

In July 2002, the Company, Lawrence A. Genovesi and Douglas G. Bryant joined in an omnibus motion to dismiss the suit challenging the legal sufficiency of plaintiffs' claims. The motion was filed on behalf of hundreds of issuer and individual defendants named in similar lawsuits. Plaintiffs opposed the motion, and the Court heard oral argument on the motion in November 2002. On February 19, 2003, the Court issued an opinion and order denying the motion as to the Company. However, in October 2002, Lawrence A. Genovesi and Douglas G. Bryant were dismissed from this case without prejudice. On July 9, 2003, a Special Committee of the Company's Board of Directors authorized the Company to negotiate a settlement of the pending claims substantially consistent with a memorandum of understanding negotiated among class plaintiffs, all issuer defendants and their insurers. The settlement would provide, among other things, for a release of the Company and the Individual Defendants for the conduct alleged in the amended complaint to be wrongful. The Company would agree to undertake other responsibilities under the settlement, including agreeing to assign, or not assert, certain potential claims that the Company may have against its underwriters. Any direct financial impact of the proposed settlement is expected to be borne by the Company's insurers. Any such settlement would be subject to various contingencies, including approval by the Court overseeing the litigation.

The Company is unable to predict the outcome of this suit and its ultimate effect, if any, on the Company's financial condition; however, the Company's

defense against this suit has and may continue to result in the expenditure of significant financial and managerial resources. No amounts have been accrued for this matter.

TidalWire Acquisition Lawsuit

A purported class action and derivative lawsuit was filed on January 7, 2003 in the Court of Chancery in the State of Delaware against the Company and certain members of its Board of Directors relating to the acquisition of TidalWire Inc. The plaintiffs in the complaint allege that the Company and the named directors of its Board of Directors breached their fiduciary duties by, among other things, paying an excessive amount in the acquisition of TidalWire and purportedly failing to disclose material facts in the Company's Joint Proxy Statement/Information Statement distributed to

80

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

stockholders for approval of the issuance of shares of the Company's common stock in the merger. The plaintiffs are seeking damages, rescission of the merger and other relief. As of September 30, 2003, no liability was recorded in connection with this litigation. On October 30, 2003, the Court approved a settlement of the action negotiated by the parties, and that settlement became final on December 1, 2003. Under the settlement, all claims against the Company and the individual Board members (the "Defendants") were dismissed with prejudice, and (a) the Defendants in the lawsuit paid $600,000 to us, (b) plaintiff's attorney fees of $185,000 were paid out of that $600,000 amount, and (c) in the disclosure for its next annual meeting, the Company will detail certain information concerning relationships among Board members.

Employment lawsuit

On December 29, 1999, a former employee, commenced a lawsuit against the Company and two former officers and directors of the Company in Suffolk Superior Court, a Massachusetts state court. The former employee alleged that the Company unlawfully terminated this employee in an effort to deprive this employee of sales commission payments. In April 2002, the Company completed a settlement with the former employee for less than $350,000. The Company accounted for the settlement as a charge to general and administrative expenses during the year ended September 30, 2002.

Guarantees and Indemnifications

Director and officer indemnifications - Pursuant to the Company's Second Amended and Restated Certificate of Incorporation, as permitted under Delaware law, the Company indemnifies its officers and directors for certain events or occurrences while the officer or director is, or was serving in his capacity as a director or officer of the Company or as a director, officer or trustee of a different entity, at the Company's request. The term of the indemnification period is for the officer's or director's lifetime. The maximum potential amount of future payments the Company could be required to make under these indemnifications is unlimited; however, the Company has a director and officer insurance policy that limits its exposure and enables it to recover a portion of any future amounts

paid. As a result of the Company's insurance policy coverage, the Company believes the estimated fair value of these indemnifications is minimal. Accordingly, the Company has no liabilities recorded for these indemnifications as of September 30, 2003.

Acquisition-related indemnifications--When, as part of an acquisition, the Company acquires all the stock of a company, the Company assumes liabilities for certain events or circumstances that took place prior to the date of acquisition. The maximum potential amount of future payments the Company could be required to make for such obligations is undeterminable. While the provisions of the agreements remain in effect indefinitely, the Company believes that the probability of receiving a claim for such liabilities is unlikely. As a result, the Company has not recorded a liability for these indemnification clauses as of September 30, 2003.

81

---

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

Product warranties--The Company offers a warranty on all of the products that it sells. Warranties are provided by the Company directly, by a third-party contracted to perform warranty service on the Company's behalf or by the product manufacturer, depending upon the product sold. Warranty terms vary in duration depending upon the product sold but generally provide for the repair or replacement of any defective products for a period of up to 36 months after shipment. Based upon historical experience and expectation of future conditions, the Company reserves for the estimated costs to fulfill customer warranty obligations upon the recognition of the related revenue. During the year ended September 30, 2003, the Company recorded a warranty charge of $886,000 to OEM Appliance cost of revenues, based upon the Company's increased estimates of the cost to fulfill warranties of certain server appliances sold prior to September 30, 2003.

The following table presents changes in the Company's product warranty liability (in thousands):

| | |
|---|---:|
| Balance at September 30, 2002 | $ 231 |
| Accruals for warranties issued | 1,858 |
| Warranty liability assumed in acquisition of TidalWire Inc. | 109 |
| Cost of warranties honored during the period | (1,593) |
| | ------- |
| Balance at September 30, 2003 | $ 605 |
| | ------- |

12.  INCOME TAXES

Due to the losses incurred during fiscal years 2001, 2002 and 2003, the Company did not record a provision for any federal or state income taxes in those years. The following is a reconciliation between the amount of the Company's income taxes utilizing the U.S. federal statutory rate and the Company's actual provision for income taxes for the years ended September 30, 2001, 2002 and 2003 (in thousands):

|  | 2001 | 2002 | 2003 |
|---|---|---|---|
| At U.S. federal statutory rate | $(23,638) | $(4,803) | $(471) |
| State taxes, net of federal effect | (3,879) | (531) | (18) |
| Research and development credits | (515) | (323) | (21) |
| Non-deductible stock option compensation charge | 2,085 | 1,509 | 335 |
| Non-deductible intangible asset amortization | 916 | -- | -- |
| Non-deductible expenses and other items | 71 | (43) | 33 |
| Effect of change in valuation allowance | 24,960 | 4,191 | 142 |
| Provision for income taxes | $    -- | $    -- | $  -- |

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. As of September 30, 2002 and 2003, net deferred tax assets consisted of the following (in thousands):

|  | 2002 | 2003 |
|---|---|---|
| Net operating losses | $ 28,294 | $ 27,458 |
| Tax credit carryforwards | 1,672 | 1,694 |
| Capitalized research and engineering | 5,811 | 5,083 |
| Temporary differences | 2,112 | 3,805 |
| Intangible assets--TidalWire | -- | (1,724) |

| | | |
|---|---|---|
| Total deferred tax asset | 37,889 | 36,316 |
| Valuation allowance | (37,889) | (36,316) |
| Net deferred tax asset | $    -- | $    -- |

A valuation allowance is established if it is more likely than not that all or a portion of the deferred tax asset will not be realized. Accordingly, as of September 30, 2002 and 2003, a valuation allowance was recorded for the full amount of the deferred tax asset due to the uncertainty of their realization.

As of September 30, 2003, the Company had net operating loss carryforwards for federal and state income tax purposes of approximately $68.7 million and $68.3 million, which expire at various dates through 2022 and 2007, respectively. The Company also has available research and development credits for federal and state income tax purposes of approximately $1.3 million and $654,000, respectively, which expire at various dates from 2006 through 2023.

An ownership change, as defined in the Internal Revenue Code, resulting from the issuance of additional stock may limit the amount of net operating loss and tax credit carryforwards that can be utilized annually to offset future taxable income and tax liabilities. The amount of the annual limitation is determined based upon the Company's value immediately prior to the ownership change. Subsequent significant changes in ownership could further affect the limitations in future years.

13.  EMPLOYEE SAVINGS PLAN

The Company sponsors a savings plan for its employees, who meet certain eligibility requirements, which is designed to be a qualified plan under section 401(k) of the Internal Revenue Code. Eligible employees are permitted to contribute to the 401(k) plan through payroll deductions within statutory and plan limits. The Company may make discretionary contributions upon the approval of the 401(k) plan trustees and the Company's board of directors. Through September 30, 2003, the Company has not made any contributions to the plan.

14.  RESTRUCTURING AND OTHER CHARGES

During the year ended September 30, 2001, the Company undertook two restructurings of its operations; the first of these restructurings occurred in April 2001 and the second in July 2001.

83

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

Through the April 2001 restructuring, the Company sought to better align the Company's operating expenses with reduced revenues, and as a result of its

implementation, the Company recorded a charge to operations of $2,812,000. This charge was due to a reduction in workforce from 243 employees to 170 employees, the curtailment of a planned expansion into leased facilities and other items. This charge included approximately $951,000 for employee related costs including severance payments to terminated employees and stock option compensation expense related to modifications of certain stock options held by terminated employees, approximately $1,331,000 to write off certain assets related to facilities that the Company would not be occupying and approximately $530,000 primarily related to non-refundable deposits on tradeshows the Company did not attend, as well as costs for certain other sales and marketing non-cancellable commitments. The Company's July 2001 restructuring was the result of an intensive review of its business, which resulted in a refocus of the Company's sales strategy toward strategic partnerships with independent software vendors (ISVs) and original equipment manufacturers (OEMs) and a discontinuation of much of the customized hardware and software that was previously included in the Company's products. As a result of the implementation of the July 2001 restructuring, the Company recorded a charge to operations of approximately $6,871,000. This charge included approximately $1,643,000 of employee related costs as the Company reduced its workforce by an additional 65 employees, approximately $2,224,000 as a result of the Company's disposal of certain property and equipment, approximately $2,023,000 to write off goodwill and intangible assets which were deemed to be impaired, approximately $618,000 of facility costs associated with non-cancelable operating leases for space which would not be occupied and approximately $363,000 of other charges. In addition to the April 2001 and July 2001 restructurings, in March 2001, the Company recorded a charge due to the retirement of fixed assets related to its WebEngine Blazer product line. These fixed assets had a total net book value of approximately $1,203,000 and consisted primarily of computer equipment previously utilized in the production and sales of the WebEngine Blazer, the Company's previous generation web content server appliance product. The total of the restructuring and other charges detailed above was approximately $10,886,000 recorded for the year ended September 30, 2001. The reduction in the Company's workforce implemented during the year ended September 30, 2001 impacted employees in all of the Company's groups, including manufacturing, research and development, selling and marketing and general and administrative.

During the year ended September 30, 2002, the Company implemented an additional restructuring. In an effort to further streamline its operations, the Company reduced its workforce by 13 employees, which impacted employees in all of the Company's departments. The implementation of this reduction in workforce resulted in a charge of $353,000 to operations, which was comprised entirely of employee related charges, including severance payments to terminated employees.

During the year ended September 30, 2003, the Company recorded a charge to operations of $507,000. This charge was comprised entirely of future lease and lease-related payments and resulted from the continued vacancy of certain leased facilities and the expected future vacancy of certain leased facilities currently occupied by a sub-tenant. When the Company restructured its operations during fiscal 2001, a portion of the charges that were recorded were based on the curtailment of a

84

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)