planned expansion into leased facilities of approximately 24,000 square feet as well as vacating approximately 17,000 square feet of leased space. In December 2002, based on the real estate market in the area of these facilities, the lack of interest in the spaces that the Company had been actively marketing to sublease and the deteriorating financial condition of the sub-tenant, the Company revised its estimates as to the duration of an expected sublease of these facilities and the estimated sublease income. These revised estimates assumed no sublease income from the Company's vacant 17,000 square foot space through the end of the Company's original lease term, March 2005, and approximately $126,000 of sublease income during the final nine months through March 2005 of its lease on the 24,000 square foot space. As a result, the Company recorded a charge to operations of $914,000. In the second quarter of fiscal 2003, the Company received $30,000 of sublease income not previously anticipated and, as a result, reversed $30,000 of its restructuring accrual. In October 2003, the Company further amended its lease, which extended the lease term on its primary office and manufacturing space and eliminated the remaining lease on the 24,000 square foot space as of October 31, 2003. This lease amendment required the Company to pay a termination charge of $54,000. In addition, the Company revised its estimate as to the expected future vacancy of the 17,000 square foot space and determined that approximately 8,500 square feet of this space would be occupied by the Company beginning in October of fiscal 2004. As a result of the Company's lease amendment and revised estimates, the Company reversed approximately $377,000 of its restructuring accrual. Beginning in April 2005, the Company expects to utilize all of its leased space through the end of its amended lease term, March 2007.

The following table sets forth restructuring accrual activity during the years ended September 30, 2001, 2002 and 2003 (in thousands):

| | Employee Related | Facility Related | Impaired Assets | Other | Total |
|---|---|---|---|---|---|
| Restructuring and other charges during 2001 | $ 2,594 | $ 1,949 | $ 5,450 | $ 893 | $10,886 |
| Cash payments | (1,917) | (196) | -- | (317) | (2,430) |
| Non-cash utilization | (186) | (1,194) | (5,450) | (258) | (7,088) |
| Restructuring and other charges accrual balance at September 30, 2001 | 491 | 559 | -- | 318 | 1,368 |
| Restructuring and other charges during 2002 | 353 | | | | 353 |
| Cash payments | (812) | (278) | -- | (276) | (1,366) |
| Restructuring and other charges accrual balance at September 30, 2002 | 32 | 281 | -- | 42 | 355 |
| Restructuring and other charges during 2003 | | 914 | | | 914 |
| Sublease income received in excess of estimates | | (30) | | | (30) |
| Revision of estimated liabilities for leased space | | (377) | | | (377) |
| Cash payments | (13) | (513) | | (59) | (585) |

| | | | | |
|---|---|---|---|---|
| Non-cash utilization | (19) | (13) | 32 | -- |
| Restructuring and other charges accrual balance at September 30, 2003 $ | -- $ | 262 $ | -- $ 15 $ | 277 |

85

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

The Company expects the remaining restructuring accrual balance to be substantially utilized by March 31, 2005, comprising cash payments of approximately $218,000 in fiscal 2004 and $60,000 in fiscal 2005.

15.  SEGMENT AND GEOGRAPHIC DATA

Prior to the acquisition of TidalWire, the Company organized itself as a single business segment. As a result of the acquisition of TidalWire, the Company now organizes itself into two reportable business segments: OEM Appliance and Distribution. The Company's segments have been determined based upon the channels through which the segments sell products. Sales of server appliances to the Company's network equipment and ISV partners are included in the Company's OEM Appliance segment. Sales of server appliances and data storage products to VARs and systems integrators are included in the Company's Distribution segment. The accounting policies of these segments are the same as those described in Note 2: "Summary of Significant Accounting Policies." The Company evaluates its segments' performance based on revenues and gross profit, and the Company's management regularly evaluates the Company's segments in deciding how to allocate resources and assess performance. There are no inter-segment sales or transfers. Management does not review assets as part of the assessment of segment performance; as such, after integration of the TidalWire Distribution business, segment asset information is not available.

The following is a summary of the Company's operations by reporting segment (in thousands) based on product shipment location:

| | Years ended September 30, | | |
|---|---|---|---|
| | 2001 | 2002 | 2003 |
| OEM Appliance: | | | |
| Net revenues | $   13,515 | $14,534 | $43,289 |
| Gross profit (loss) | $  (19,444) | $ 2,058 | $ 9,241 |

```
Distribution:

Net revenues            $         -- $      --$37,954

                        ---------- --------------

Gross profit            $         -- $      --$ 7,496

                        ---------- --------------

Combined Segments:

Net revenues            $   13,515 $14,534$81,243

                        ---------- --------------

Gross profit (loss)$   (19,444)$ 2,058$16,737

                        ---------- --------------
```

86

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

All of the Company's long-lived assets were located in the United States as of September 30, 2002 and 2003.

The following summarizes the Company's revenues by geographic region, in thousands:

|  | Years ended September 30, | | |
|---|---|---|---|
|  | 2001 | 2002 | 2003 |
| United States | $  12,095 | $ 14,244 | $77,203 |
| Foreign countries | 1,420 | 290 | 4,040 |
|  | --------- | -------------- | |
| Total net revenues | $  13,515 | $ 14,534 | $81,243 |
|  | --------- | -------------- | |

16.  SUBSEQUENT EVENTS

On December 10, 2003, the Company amended its agreement with EMC regarding the distribution of EMC-approved Fibre Channel host bus adaptors ("HBAs"), effective January 1, 2004. This amendment extends the term of the agreement through December 2005 and requires the Company to pay a per-unit royalty to EMC for each EMC-approved HBA sold by the Company beginning in the quarter ending March 31, 2004. In the year ended September 30, 2003, sales of EMC-approved HBAs

represented 33% of the Company's total net revenues and 70% of the Company's Distribution segment revenues. Due to the expected decline in the Company's Distribution segment gross profits and operating results as a result of this amendment, the Company is currently evaluating the carrying value of the related goodwill and intangible assets to determine whether these assets are impaired. As of September 30, 2003, the net book value of goodwill and intangible assets was $7.8 million and $4.3 million, respectively. Any related impairment charge would be recorded as a charge to operations in the quarter ending December 31, 2003.

A purported class action lawsuit was filed on December 16, 2003 in the United States District Court in the District of Massachusetts against the Company, John H. Curtis, its President and CEO, Douglas G. Bryant, its CFO, Vice President, Treasurer and Secretary, and Lawrence A. Genovesi, its Chairman of the Board, relating to the timing of the announcement of the amendment of its agreement with EMC Corporation regarding the resale of EMC-approved host bus adapters (HBAs). The plaintiffs in the complaint claim that the Company and Messrs. Curtis, Bryant and Genovesi allegedly failed to disclose that the Company was in the process of renegotiating its distribution contract with EMC while issuing positive statements highlighting the Company's financial performance and related matters. The plaintiffs are seeking unspecified damages. The Company believes that the action is without merit, and it intends to vigorously defend against the suit. The Company is unable to predict the outcome of this suit and its ultimate effect, if any, on its financial condition, results of operations or cash flows.

87

--------------------------------------------------------------------------------

Table of Contents

NETWORK ENGINES, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS--(Continued)

17.  QUARTERLY FINANCIAL DATA (UNAUDITED)

The following information has been derived from unaudited consolidated financial statements that, in the opinion of management, include all recurring adjustments necessary for a fair presentation of such information.

|  | Three Months Ended | | | |
|  | December 31, 2002 | March 31, 2003 | June 30, 2003 | September 30, 2003 |
|---|---|---|---|---|
|  | (in thousands, except per share data) | | | |
| Net revenues | $ 5,988 | $ 19,427 | $ 27,003 | $ 28,825 |
| Gross profit | $ 1,352 | $ 4,061 | $ 5,555 | $ 5,769 |
| Net income (loss) | $ (2,179) | $ (684) | $ 408 | $ 1,069 |
| Basic net income (loss) per share | $ (0.07) | $ (0.02) | $ 0.01 | $ 0.03 |
| Diluted net income (loss) per share | $ (0.07) | $ (0.02) | $ 0.01 | $ 0.03 |

| | | | | |
|---|---|---|---|---|
| Basic weighted average shares outstanding | 30,590 | 33,524 | 33,749 | 34,648 |
| Diluted weighted average shares outstanding | 30,590 | 33,524 | 38,953 | 39,879 |

| | Three Months Ended | | | |
|---|---|---|---|---|
| | December 31, 2001 | March 31, 2002 | June 30, 2002 | September 30, 2002 |
| | (in thousands, except per share data) | | | |
| Net revenues | $    2,101 | $  3,034 | $  4,130 | $    5,269 |
| Gross profit (loss) | $      (44) | $     267 | $     723 | $    1,112 |
| Net loss | $   (7,191) | $ (2,896) | $ (2,419) | $   (1,619) |
| Basic and diluted net loss per share | $    (0.21) | $   (0.09) | $   (0.08) | $    (0.05) |
| Basic and diluted weighted average shares outstanding | 33,576 | 32,847 | 32,176 | 31,230 |

During the fourth quarter of fiscal 2003, the Company recorded a reversal of approximately $377,000 of restructuring and other charges related to revised estimates as to the vacancy of certain leased facilities. In addition, in the fourth quarter, the Company recorded the reversals of $175,000 of an estimated legal liability, which had been recorded in the third quarter.

88

--------------------------------------------------------------------------------

Table of Contents

ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

NONE

ITEM 9A.    CONTROLS AND PROCEDURES

Disclosure Controls and Internal Controls

The Company's disclosure controls and procedures (as defined in Rule 13a-14c) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") ("Disclosure Controls") are procedures that are designed with the objective of ensuring that information required to be disclosed in the Company's reports filed under the Exchange Act, such as this Annual Report, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure Controls are also designed with the objective of ensuring that this information is accumulated and communicated to the Company's management, including its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), as appropriate to allow timely decisions regarding required disclosure. Internal controls and procedures for financial reporting ("Internal Controls") are procedures that are designed with the objective of providing reasonable assurance that:

YTransactions are properly authorized;

YAssets are safeguarded against unauthorized or improper use; and

YTransactions are properly recorded and reported.

Evaluation of Disclosure Controls and Procedures

Within the past 90 days, the Company's management, with the participation of the Company's CEO and CFO, evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act). Based on this evaluation, the Company's CEO and CFO concluded that the Company's disclosure controls and procedures were effective to ensure that information required to be disclosed by the Company in its periodic reports is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC.

Limitations on the Effectiveness of Controls

The Company's management, including the CEO and CFO, does not expect that its Disclosure Controls or its Internal Controls will prevent all error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override

89

--------------------------------------------------------------------------------

Table of Contents

of the controls. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

In connection with the audit of its financial statements for 2003, the Company was advised by its independent auditors, PricewaterhouseCoopers LLP, that controls surrounding the recognition and reporting of the Company's Distribution segment revenues had a significant deficiency. These controls relate to the timing of revenue recognition on product sales where the risk and title to ownership of the goods sold does not pass to the customer until the goods are delivered to the customer ("FOB Destination"). Our standard sales terms and conditions include, among other items, a provision whereby risk and title to ownership of the goods sold passes to the customer upon shipment of the goods

sold to the customer. Certain of the Company's Distribution segment customers, however, have negotiated FOB Destination terms in sales agreements with the Company. Prior to the Company's 2003 financial statement audit, the Company had Internal Controls processes in place to detect FOB Destination sales and to ensure that these sales were properly recorded in the Company's financial statements. Nevertheless, these controls did not prevent errors in the Company's revenue reporting. As a result, the Company determined that approximately $168,000 of sales with FOB Destination sales terms had been improperly recorded in fiscal 2003. The Company reversed the related revenues and cost of revenues from its statement of operations for fiscal 2003. In addition, the Company has designed and implemented control procedures whereby the Company's finance organization will conduct a detailed examination of all sales transactions in the final five days of each of its future fiscal quarters to ensure that revenue is properly recorded and reported in the Company's financial statements.

Conclusions

The CEO and CFO have concluded that, subject to the limitations noted above, the Company's Disclosure Controls and Internal Controls provide reasonable assurance that the objectives of the control system are met and that the Disclosure Controls and Internal Controls are effective to prevent material misstatements of the Company's financial statements. In accordance with SEC requirements, the CEO and CFO note that, since the date of the controls evaluation to the date of this report, no change in the Company's Internal Controls over financial reporting occurred that has materially affected, or is reasonably likely to materially affect, the Company's Internal Controls over financial reporting, other than those noted above under the heading "Limitations on the Effectiveness of Internal Controls."

90

--------------------------------------------------------------------------------

Table of Contents

PART III

ITEM 10.    DIRECTORSAND EXECUTIVE OFFICERS OF THE REGISTRANT

The following table sets forth our executive officers and directors, including their age and the position held as of December 12, 2003:

| Name | Age | Position |
|------|-----|----------|
| John H. Curtis | 61 | President, Chief Executive Officer and Director |
| Douglas G. Bryant | 46 | Vice President of Finance and Administration, Chief Financial Officer, Treasurer and Secretary |
| Jeffrey A. Brandes | 37 | Vice President and General Manager of Distribution Operations |
| J. Donald Oldham | 61 | Vice President of OEM Appliance Sales |
| Michael D. Riley | 39 | Vice President of Marketing and Strategy |
| Richard P. Graber | 43 | Vice President of Engineering and Operations |
| Lawrence A. Genovesi | 45 | Chairman of the Board of Directors |

| | 61 | |
|---|---|---|
| John A. Blaeser | | Director |
| | 52 | |
| Gary E. Haroian | | Director |
| | 61 | |
| Dennis A. Kirshy | | Director |
| | 78 | |
| Frank M. Polestra | | Director |
| | 62 | |
| Fontaine Richardson | | Director |
| | 43 | |
| Robert M. Wadsworth | | Director |

Executive Officers of the Company

John H. Curtis

John H. Curtis joined the Company in March 2001 as President and Chief Executive
Officer. Mr. Curtis has served as a director of the Company since March 2001.
Prior to joining the Company, he was Vice President of Worldwide Sales at Artel
Video Systems, Inc.,from August 1996 to March 2001. Prior to Artel Video
Systems, Mr. Curtis served as Senior Vice President of Worldwide Operations at
Banyan Systems, Inc. from July 1995 to May 1996 and was Vice President of
Worldwide Sales at Intellution Inc. from September 1992 to May 1995. From 1980
to 1992, Mr. Curtis held several senior-level management positions at Stratus
Computer, Inc., including Chief Operating Officer, Vice President of Finance and
Vice President of International Sales.

Douglas G. Bryant

Douglas G. Bryant has served as Secretary and Vice President of Finance and
Administration since March 2000, Treasurer since January 1998 and Chief
Financial Officer since September 1997. Prior to joining the Company, Mr. Bryant
served as Chief Financial Officer of CrossComm Corporation, a manufacturer of
internetworking products, including routers and switches, from July 1996 to June
1997, and as Corporate Controller from September 1989 to June 1996.

91

--------------------------------------------------------------------------------

Table of Contents

Jeffrey A. Brandes

Jeffrey A. Brandes has served as Vice President and General Manager of
Distribution Operations since our acquisition of TidalWire Inc. in December
2002. Mr. Brandes joined TidalWire as its President and Chief Executive Officer
in May 2000. In 1997, Mr. Brandes co-founded and served as Director of Business
Development at WebSpective, a content distribution and tracking software
company. WebSpective was acquired by Inktomi Corporation in 1999. From November
1999 to May 2000, Mr. Brandes held a variety of sales and management positions
at Inktomi. Prior to WebSpective, Mr. Brandes held a number of enterprise
software senior sales and business development positions.

J. Donald Oldham

J. Donald Oldham joined the Company in October 2002 as Vice President of OEM
Appliance Sales. Prior to joining the Company, Mr. Oldham was Vice President of
Sales and Program Management at Manufacturers Services, Inc., a full-service

global electronic manufacturing services and supply-chain company, from February 2001 to March 2002. From 1985 to 1998, Mr. Oldham held multiple senior management positions with Stratus Computer, including Senior Vice President of Worldwide Sales from 1994 to 1998. Mr. Oldham also held a variety of sales management positions at International Business Machines Corporation, from 1969 to 1985.

Michael D. Riley

Michael D. Riley joined the Company in July 2002 as Vice President of Marketing. Prior to joining the Company, Mr. Riley was the Chief Marketing Officer at Sonexis, Inc., a provider of collaboration solutions, from July 2001 to May 2002. Prior to Sonexis, Mr. Riley held a variety of senior management positions with Artel Video Systems, Inc. from July 1998 to July 2001, including Senior Vice President of Marketing and Worldwide Sales and Vice President of Marketing. Prior to Artel Video Systems, Mr. Riley held senior sales and marketing positions at Premisys Communications from 1994 to 1997 and Newbridge Networks Corporation from 1988 to 1993.

Richard P. Graber

Richard P. Graber joined the Company in October 2003 as Vice President of Engineering and Operations. Prior to joining the Company, Mr. Graber was the Vice President of Engineering and Operations at Jedai Broadband Networks, Inc., a developer of access technology for broadband providers. Prior to Jedai Broadband Networks, Mr. Graber was Vice President of Engineering for ViaGate Technologies, Inc. from November 2000 to August 2001. Prior to joining ViaGate Technologies, Mr. Graber held senior engineering positions at Dialogic, an Intel company, from June 1988 to December 2000.

Board of Directors of the Company

Lawrence A. Genovesi

Lawrence A. Genovesi is a founder of the Company and has served as a director since October 1989. Mr. Genovesi is currently, and has been since 2001, President of Ammasso, Inc. a company in the communications and networking field. Mr. Genovesi was, from 1989 until 2001, President, Chief

92

--------------------------------------------------------------------------------

Table of Contents

Executive Officer and Chief Technology Officer of the Company. Mr. Genovesi also founded and served as Chief Executive Officer of New England Interconnection Devices, Inc., a contract manufacturer, from May 1985 to July 1988. From October 1982 to January 1983, Mr. Genovesi served as Vice President of Engineering for Microsystems International, Inc., a computer manufacturer. From June 1981 to December 1982, Mr. Genovesi served as Director of Engineering for CPU Systems, Corp., a computer manufacturer and reseller.

John A. Blaeser

John A. Blaeser has been a director of the Company since October 1999. Since January 1996, Mr. Blaeser has served as President, Chief Executive Officer and Chairman of the Board of Concord Communications Inc., a maker of e-business management solutions. Mr. Blaeser served as Managing General Partner of EG&G Venture Partners from January 1990 to December 1995.

Gary E. Haroian

Gary E. Haroian has served as a director of the Company since June 2003. From April 2000 to December 2002, Mr. Haroian held a variety of senior management positions, including roles as Chief Financial Officer, Chief Operating Officer and interim Chief Executive Officer, at Bowstreet Software, a leading provider of development tools for web applications. Prior to Bowstreet, he served as Senior Vice President of Finance and Administration and Chief Financial Officer at Concord Communications Inc., a maker of e-business management solutions, from February 1997 to April 2000. He also served as Chief Financial Officer, President and Chief Operating Officer, and Chief Executive Officer of Stratus Technologies Inc., a worldwide leader in fault-tolerant computers from 1983 to 1996. Mr. Haroian is a director of Aspen Technology, Inc., a publicly held company, and Silverback Technologies, Inc.

Dennis A. Kirshy

Dennis A. Kirshy has served as a director of the Company since July 1997. Mr. Kirshy is a private investor and has advised and invested in small technology companies in the networking, internetworking and computer industries since February 1993. Mr. Kirshy is Chairman of the Board of Seranoa Networks, Inc. and is also a director of several privately-held companies in the networking and computer peripherals arena.

Frank M. Polestra

Frank M. Polestra has served as a director of the Company since May 1997. Mr. Polestra has been Managing Director of Ascent Venture Management, Inc., a manager of venture funds and investor in early-stage companies in the northeastern United States, since March 1999. Mr. Polestra is a Managing Member or Managing Director of, or a Managing Member or Managing Director of the entity that controls, each of Ascent Venture Partners, L.P., Ascent Venture Partners II, L.P. and Ascent Venture Partners III, L.P., Ascent Management SBIC Corporation and Ascent Management LLC. Each of the Ascent entities is an affiliate of the Company (see "Security Ownership of Certain Beneficial Owners and Management"). Mr. Polestra is also a partner of Le Serre. Prior to his position with Ascent Venture

93

--------------------------------------------------------------------------------

Table of Contents

Management, Mr. Polestra was President, Director and General Partner of Pioneer Capital Corporation, a venture capital management firm, from 1981 to 1999. Mr. Polestra is a director of Embarcadero Technologies, Inc., a publicly held company.

Fontaine K. Richardson

Fontaine K. Richardson has served as a director of the Company since October 2002. Mr. Richardson is a consultant and private investor. From 1983 to 2000, Mr. Richardson was a General Partner of Eastech Management Company, a venture capital management company. Mr. Richardson also co-founded Applicon, Inc. and serves on the board of directors of Mentor Graphics Corporation and ePresence, Inc. (formerly Banyan Systems, Inc.), two publicly held companies.

Robert M. Wadsworth

Robert M. Wadsworth has served as a director of the Company since December 1999. He has been a Managing Director of HarbourVest Partners, LLC since January 1997 and Managing Director of Hancock Venture Partners, Inc. since 1998. Both HarbourVest Partners and Hancock Venture Partners are global private equity firms investing in industrial and information technology companies on a worldwide basis and are under common control. HarbourVest Partners is an affiliate of the Company (see "Security Ownership of Certain Beneficial Owners and Management"). Mr. Wadsworth is a member of the board of directors of several domestic and international private companies, as well as the following publicly held companies: Concord Communications, Inc., ePresence, Inc. (formerly Banyan Systems, Inc.), Switchboard, Inc., and Trintech Group PLC.

Classes of Directors

Our board of directors is divided into three classes, as nearly equal in size as possible, with staggered three-year terms. Messrs. Curtis, Haroian and Kirshy are Class I Directors and their terms expire in 2004. Messrs. Polestra and Richardson are Class II Directors and their terms expire in 2005. Messrs. Blaeser, Genovesi and Wadsworth are Class III directors and their terms expire in 2006.

Identification of Audit Committee

During Fiscal 2003 the Board of Directors of the Company had a separately-designated standing Audit Committee which consisted of Messrs. Haroian, Blaeser, Polestra and Richardson, each of whom is "independent," as defined by the applicable listing standards of the National Association of Securities Dealers. The Audit Committee (i) recommends the selection of the Company's independent auditors; (ii) reviews the effectiveness of the Company's accounting policies and practices, financial reporting and internal controls; (iii) reviews any transactions that involve a potential conflict of interest; (iv) reviews the scope of independent audit coverage and the fees charged by the independent accountants; and (v) reviews the independence of such accountants from the Company's management. The Audit Committee also reviews other matters with respect to its accounting, auditing and financial reporting practices and procedures as it may find appropriate or may be brought to its attention. On March 31, 2003, the Board of Directors adopted a new written charter for the Audit Committee replacing its existing charter.

94

--------------------------------------------------------------------------------

Table of Contents

Audit Committee Financial Expert

Our Board of Directors has determined that Mr. Haroian, the Chairman of the Company's Audit Committee, is an "audit committee financial expert" as defined under Item 401(h)(2) of Regulation S-K of the Securities Exchange Act of 1934, as amended.

Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires the Company's executive officers, directors, and persons who own more than ten percent (10%) of a registered class of the Company's equity securities to file reports of ownership on Forms 3, 4 and 5 with the Securities and Exchange Commission and the Company. Based on the Company's review of copies of such

forms, except as described below, each officer, director and 10% holder complied with his obligations in a timely fashion with respect to transactions in securities of the Company during the fiscal year ended September 30, 2003.

John A. Blaeser, Dennis A. Kirshy, Frank M. Polestra, and Robert M. Wadsworth, each a director of the Company, failed to timely file a Form 4 in connection with receipt of stock options pursuant to the Company's 2000 Director Stock Option Plan on March 15, 2003. Each director subsequently filed a Form 4 with the Securities and Exchange Commission on April 3, 2003 to report such transaction.

Frank M. Polestra, also failed to timely file a Form 4 to report the shares of our common stock he received as a stockholder of TidalWire Inc. in connection with our acquisition of TidalWire. Mr. Polestra subsequently filed a Form 4 with the Securities and Exchange Commission on January 10, 2003 to report such transaction and amended such filing on January 15, 2003.

Code of Ethics

The Company has adopted a code of ethics that applies to its principal executive officer, principal financial officer, principal accounting officer or controller, as well as all other employees and the directors of the Company.

95

---

Table of Contents


ITEM 11.    EXECUTIVECOMPENSATION

Summary Compensation

The following table sets forth information concerning the annual and long-term compensation in each of the last three fiscal years for each of the Named Executive Officers of the Company, comprised of (i) the Chief Executive Officer and (ii) the four most highly compensated executive officers of the Company other than the Chief Executive Officer who were serving as executive officers as of September 30, 2003, (collectively, the "Named Executive Officers").

| | | | | Long-Term Compensation Awards |
| | | Annual Compensation | | Number of Securities Underlying |
| Name and Principal Position | Year | Salary($) | Bonus($) (5) | Options/SARs |
|---|---|---|---|---|
| John H. Curtis (1) | 2003 | 210,846 | 129,547 | 200,000 |
| President and Chief Executive Officer, Director | 2002 | $ 200,000 | 97,771 | -- |
| | 2001 | $ 100,000 | -- | 1,225,526 |
| Douglas G. Bryant | 2003 | 169,631 | 85,604 | 200,000 |

| | | | | |
|---|---|---|---|---|
| Vice President of Finance and Administration, Chief Financial Officer, Treasurer and Secretary | 2002 | 154,000 | 89,283 | 50,000 |
| | 2001 | 151,846 | 16,875 | 50,000 |
| Michael D. Riley (2) | 2003 | 170,000 | 79,387 | -- |
| Vice President of Marketing and Strategy | 2002 | 32,692 | -- | 300,000 |
| | 2001 | -- | -- | -- |
| J. Donald Oldham (3) | 2003 | 156,731 | 70,569 | -- |
| Vice President of OEM Appliance Sales | 2002 | -- | -- | 300,000 |
| | 2001 | -- | -- | -- |
| Jeffrey A. Brandes (4) | 2003 | 157,383 | 202,603 | 300,000 |
| Vice President and General Manager of Distribution Operations | 2002 | -- | -- | -- |
| | 2001 | -- | -- | -- |

---------------------

(1) Mr. Curtis commenced employment with Network Engines in March 2001.

(2) Mr. Riley commenced employment with Network Engines in July 2002

(3) Mr. Oldham commenced employment with Network Engines in October 2002

(4) Mr. Brandes commenced employment with Network Engines in December 2002

(5) Other compensation in the form of perquisites and other personal benefits has been omitted because these perquisites and other personal benefits contributed less than $50,000 or 10% of the total salary and bonus for each Network Engines Named Executive Officer for that year.

96

--------------------------------------------------------------------------------

Table of Contents

Option Grants During FiscalYear 2003

The following table sets forth information concerning individual stock option grants made to each of the Named Executive Officers during Fiscal 2003:

| | Potential Realizable |
|---|---|
| Individual Grants | Value at Assumed Annual |
| ----------------------------------------------- | Rates of Stock Price |
| Percent of | Appreciation for Option |

|  | Number of Securities Underlying Options/SARs Granted | Total Options/SARs Granted to Employees in Fiscal Year | Exercise Price Per Share (4) | Expiration Date | Term (5) | |
|---|---|---|---|---|---|---|
|  |  |  |  |  | 5% | 10% |
| John H. Curtis | 200,000(1) | 8.5% | $0.98 | 12/30/2012 | $123,263 | $312,374 |
| Douglas G. Bryant | 200,000(1) | 8.5% | $0.92 | 4/22/2012 | $115,717 | $293,249 |
| Michael D. Riley | --(3) | -- | $-- | -- | $-- | $-- |
| J. Donald Oldham | 300,000(2) | 12.8% | $0.92 | 10/7/2012 | $173,575 | $439,873 |
| Jeffrey A. Brandes | 300,000(1) | 12.8% | $0.98 | 12/27/2012 | $184,895 | $468,560 |

---------------------

(1) Options vest over four years in equal quarterly installments.

(2) Options vest over four years with 25% of options vesting one year from date of grant and 6.25% of options vesting quarterly thereafter.

(3) Mr. Riley did not receive any stock compensation awards during Fiscal 2003.

(4) Options were granted at an exercise price equal to the last reported sale price of Network Engines' common stock, as reported on The NASDAQ National Market on the date of grant.

(5) The potential realizable value is calculated based on the term of the Network Engines stock option at the time of grant. Stock price appreciation of 5% and 10% is assumed pursuant to rules promulgated by the Securities and Exchange Commission and does not represent Network Engines' prediction of its stock price performance. The potential realizable values at 5% and 10% appreciation are calculated by assuming that the exercise price on the date of grant appreciates at the indicated rate for the entire term of the Network Engines stock option and that the Network Engines stock option is exercised at the exercise price and sold on the last day of its term at the appreciated price.

Options Exercised During Fiscal Year 2003

The following table sets forth information concerning options to purchase the Company's Common Stock exercised by the Named Executive Officers during the fiscal year ended September 30, 2003 and the number of securities underlying unexercised options that were held by each of the Named Executive Officers as of September 30, 2003.

|  |  | Number of Securities Underlying Unexercised Options at | Value of Unexercised |
|---|---|---|---|
| Shares Acquired on Exercise | Value Realized | September 30, 2003 | In-The-Money Options at September 30, 2003 (1) |
|  |  | ---------------------------------------------------- | |

|  | Exercisable | Unexercisable | Exercisable | Unexercisable | Exercisable | Unexercisable |
|---|---|---|---|---|---|---|
| John H. Curtis | --$ | -- | 803,451 | 622,075$ | 4,403,224 $ | 3,402,159 |
| Douglas G. Bryant | 96,671$524,601 | | 168,749 | 231,251$ | 833,557 $ | 1,254,443 |
| Michael D. Riley | --$ | -- | 75,000 | 225,000$ | 401,250 $ | 1,203,750 |
| J. Donald Oldham | --$ | -- | 56,250 | 243,750$ | 308,813 $ | 1,338,188 |
| Jeffrey A. Brandes | 37,500$116,981 | | 18,750 | 243,750$ | 101,813 $ | 1,323,563 |

--------------------

(1) Based on the closing sale price of Network Engines common stock on September 30, 2003 ($6.41), as reported by the NASDAQ National Market, less the option exercise price.

97

--------------------------------------------------------------------------------

Table of Contents

Compensation Committee Interlocks and Insider Participation

During Fiscal 2003, the members of the Compensation Committee were Messrs. Genovesi, Kirshy and Wadsworth. The issuance of options to such members of the Compensation Committee is discussed under the heading "Compensation of Directors" below. From 1989 until 2001, Mr. Genovesi was the President, Chief Executive Officer and Chief Technology Officer of the Company

Compensation of Directors

The Company reimburses directors for reasonable out-of-pocket expenses incurred in attending meetings of the Board of Directors. The Company also grants stock options to its non-employee directors pursuant to the Company's Director Stock Option Plan. The plan provides that any non-employee director first elected to the Board after the date that the plan was adopted will receive a stock option award of 50,000 shares. All current non-employee directors, with the exception of Mr. Richardson and Mr. Haroian, were elected to the Board prior to the adoption of the plan. The Plan further provides that each year, as of the Annual Meeting of Stockholders, each director shall receive a stock option award of 15,000 shares. The first of such annual grants took place as of the Fiscal Year 2000 Annual Meeting, on March 15, 2001.

From October 1, 2002 through June 16, 2003, directors were compensated $1,000 per Board meeting and $500 per Audit or Compensation Committee meeting. As a result of recent legislation and related regulations that require board members to devote more time to prepare for Board and Board Committee meetings and to the exercise of the attendant responsibilities as members of the Board and its committees, on June 16, 2003 director compensation was increased as follows: $1,500 per Board meeting attended in person and $1,000 per Board meeting conducted by telephone; $1,000 per Audit Committee meeting, $1,000 per Compensation Committee, Nominating Committee or Special Committee meeting attended in person and $500 per Compensation Committee, Nominating Committee or Special Committee meeting by telephone. In addition, the Audit Committee Chairman's compensation includes a fee of $3,000 per year.

Employment Contracts, Termination of Employment and Change-in-Control

On March 21, 2001, the Company entered into an employment agreement with John H. Curtis. The employment agreement provides that Mr. Curtis will serve as Chief Executive Officer and President (or in such other position as the Board may determine) and the Company will support his election to become a member of its Board.

Pursuant to the terms of the employment agreement, Mr. Curtis' base salary is subject to annual adjustment by the Board. Effective January 1, 2003, the Board increased Mr. Curtis' annual base salary from $200,000 per year to $215,000 per year. Mr. Curtis is also eligible to receive a bonus targeted at $130,000 per year or such additional amount as determined by the Board. This bonus is based upon performance targets mutually agreed upon by the Company and Mr. Curtis. During Fiscal 2003, Mr. Curtis' received a bonus of $129,547. Additionally, the employment agreement entitles Mr. Curtis to participate in all bonus and benefit programs the Company makes available to its employees and provides that he be granted options to purchase 525,225 shares of the Company's Common Stock subject to vesting as determined by the Board.

98

--------------------------------------------------------------------------------

Table of Contents

Mr. Curtis's employment is at will and may be terminated by him or the Company upon thirty (30) days prior written days notice. For a period of two years after termination or cessation of his employment for any reason, Mr. Curtis may not directly or indirectly compete with the Company. If the Company terminates Mr. Curtis's employment for Cause, Death or Disability (each as defined in the employment agreement), he will receive the compensation and benefits payable to him through the last day of his employment. If Mr. Curtis' employment with the Company is terminated by the Company Without Cause (as defined in the retention agreement below) or by Mr. Curtis for Good Reason (as defined in the retention agreement below), then he will receive the amounts as set forth in the executive retention agreement entered into by Mr. Curtis and the Company on April 12, 2002, which is described below.

The Company entered into retention agreements with Mr. Curtis, Mr. Bryant and Mr. Riley, in April 2002, November 2001 and July 2002, respectively, which have expiration dates in April 2004, November 2003 and July 2004, respectively. These retention agreements were entered into in order to reinforce and encourage the executives' continued employment and dedication to the Company by providing for acceleration of vesting of options and restricted stock and a six-month severance period in certain circumstances. Each retention agreement provides for full acceleration of all restricted stock and unvested options in the event the Company terminates the employee's employment Without Cause (as defined), or the employee terminates employment for Good Reason (as defined), if such termination occurs prior to or concurrent with a Change in Control of the Company (as defined) or an Acquisition Event (as defined). Alternatively, if employment is terminated by the Company in the absence of a Change in Control or an Acquisition Event, all restricted stock and/or unvested options will vest as if the employee were employed for a period of six months after such termination and all outstanding options will be exercisable for up to six months after the termination date. Further, the retention agreements provide for certain severance payments in the event of termination of employment. If the Company terminates the employee Without Cause or the employee terminates employment for Good Reason, the employee will receive: (1) a lump sum payment of any payments due to such employee plus six months salary (or in the case of Mr. Curtis' retention agreement, one-half of his highest base salary during the three year

period prior to the execution of the retention agreement), (2) continued benefits for a period of six months, and (3) in the event such termination follows or accompanies a Change in Control of the Company, an additional lump sum payment of a pro-rated bonus for the current fiscal year and one-half of the highest bonus received by such employee in the prior three years.

The Company entered into an Executive Retention Agreement with Jeffrey Brandes on November 11, 2002. The agreement expires on November 11, 2004. Pursuant to the terms of the agreement, if a Change in Control Date (as defined therein) or an Acquisition Event (as defined therein) occurs during the term of the agreement and Mr. Brandes' employment with the Company is terminated by the Company other than For Cause (as defined therein) or is terminated by Mr. Brandes for Good Reason (as defined therein) during the term of the agreement, then each outstanding stock option or restricted stock award held by Mr. Brandes will accelerate and be fully-vested. If neither a Change in Control Date nor an Acquisition Event occurs and Mr. Brandes' employment is terminated during the term of the agreement by the Company other than For Cause or by Mr. Brandes For Good Reason, then the vesting of each outstanding option and restricted stock award will be determined as though Mr. Brandes remained employed by the Company until six months after his date of termination and each

99

--------------------------------------------------------------------------------

Table of Contents

outstanding option will remain exerciseable (to the extent vested) for a period of six months after his termination date.

If Mr. Brandes' employment is terminated by the Company other than For Cause or by Mr. Brandes For Good Reason, then he will be entitled to receive: (1) a lump sum cash payment of any payments due to him including accrued vacation pay plus $100,000, and (2) continued benefits for a period of six months.

Report of the Compensation Committee

General.    The Compensation Committee of the Company's Board of Directors establishes compensation policies with respect to the Company's executive officers. The Company's executive compensation programs are intended to attract, retain and reward executive officers who contribute to the long-term success of the Company and enhance stockholder value. The Compensation Committee makes decisions each year regarding executive compensation, including annual base salaries, bonus awards and stock option grants. In future years, the Compensation Committee will gauge the success of the compensation program in achieving its objectives and will consider the Company's overall performance objectives. This report is submitted by the Compensation Committee and addresses the compensation policies for Fiscal 2002 as they affected Mr. Curtis in his capacity as President and Chief Executive Officer of the Company and the Company's executive officers.

Compensation Philosophy.    The Company's executive compensation philosophy is based on the belief that competitive compensation is essential to attract, motivate and retain highly qualified and industrious management. In executing its compensation policy, the Company has three objectives: (i) to align the interests of its executive officers with the interests of the Company's stockholders by basing a significant portion of an executive's compensation on the Company's performance, (ii) to attract and retain highly talented and productive executives, and (iii) to provide incentives for superior performance by the Company's executives. To achieve these objectives, the Compensation

Committee has designed a program that consists of base salary, short-term incentive compensation in the form of a cash bonus, and long-term incentive compensation in the form of stock options. These compensation elements are in addition to the general benefit programs that are offered to all of the Company's employees.

Base Salary.    In setting the annual base salaries for the Company's executives, the Compensation Committee reviews the aggregate salary and bonus compensation for individuals in comparable positions with other companies, including competitors of the Company, and adjusts such amounts to reflect individual performance. The Company regularly compares the salary levels of its executive officers with other leading companies in related industries through reviews of survey and other market data with a view toward setting compensation of its executives at comparable levels offered by other companies in these industries. However, while compensation surveys are useful guides for comparative purposes, the Company believes that a successful compensation program also requires the application of judgment and subjective determinations of individual performance. This is particularly the case when the Company seeks to attract and hire executive personnel from outside the Company, where the Company must directly address the market rate for compensation of highly qualified people. The Compensation Committee therefore applies judgment in reconciling the program's objectives with the realities of retaining valued employees.

100

---

Table of Contents

Increases in annual base salary are based on a review and evaluation of the performance of the department or activity for which the executive has responsibility, the impact of that department or activity on the Company, the skills and experience required for the job and the compensation level necessary to attract and retain key executives. The Compensation Committee also compares these elements with similar elements for other executives both inside and outside the Company.

Cash Bonus.    Cash bonuses are tied directly to the Company's achievement of its goals and objectives and the contribution of the executive to such achievements. The Company first began to utilize a cash bonus program in February 2000, and substantially revised its criteria in April 2001. Under the revised cash bonus program, the Company will pay to each of the executive officers, on a quarterly basis, a percentage of their annual base salaries if the Company achieves selected financial and operational targets for the quarter.

Equity Ownership.    Executive officer compensation includes long-term incentives in the form of options to purchase shares of Common Stock. Stock option grants are key components of the executive compensation program and are intended to provide executives with an equity interest in the Company and link a meaningful portion of the executives' compensation to the performance of the Company's Common Stock.

The number of shares of Common Stock subject to stock option grants is generally intended to reflect the significance of the executive's current and anticipated contributions to the Company. In determining the number and terms of options to grant an executive, the Compensation Committee primarily considers the executive's past performance and the degree to which an incentive for long-term performance would benefit the Company.

The Company's stock programs include long vesting periods to optimize the retention value of these options and to orient the interests of the Company's executive officers to longer-term success. Generally, stock options granted upon the commencement of employment vest as follows: 25% upon the first anniversary of the date of grant and approximately 6.25% each quarter thereafter over three years. Stock options granted in subsequent years vest over four years, in equal quarterly installments, beginning with the first quarter subsequent to the grant. In either case, if employees leave the Company before these vesting periods, they forfeit the unvested portions of these awards.

Although the Compensation Committee has discretion regarding the exercise price of any option, to date the exercise price of options granted by the Company has always been set at 100% of the fair market value of the stock on the grant date. The value realizable from exercisable options is dependent upon the extent to which the Company's performance is reflected in the price of the Company's Common Stock at any particular point in time. However, the decision as to whether such value will be realized through the exercise of an option in any particular year is primarily determined by each individual within the limits of the vesting schedule and not by the Compensation Committee.

101

--------------------------------------------------------------------------------

Table of Contents

**Chief Executive Officer Compensation.**    The Compensation Committee has set Mr. Curtis' total annual compensation, including compensation derived from the Company's cash bonus and stock option programs, at a level it believed to be competitive with the chief executive officers of similarly capitalized companies, at similar stages of development, in related markets. The Compensation Committee believes that the compensation of the Chief Executive Officer is consistent with the Company's general policies concerning executive compensation and is appropriate in light of the Company's financial objectives and performance. Mr. Curtis, in his capacity as Chief Executive Officer and President, was eligible to participate in the same executive compensation program available to the Company's other senior executives.

Effective January 1, 2003, Mr. Curtis' annual base salary was increased from $200,000 per year to $215,000 per year. For Fiscal 2003, Mr. Curtis was also awarded quarterly bonuses totaling $129,547 of a target of $130,000, which was based, in part, upon attainment of the Company's revenue and financial objectives.

During Fiscal 2003, under the leadership of Mr. Curtis as Chief Executive Officer, the Company completed its acquisition, and integration, of TidalWire Inc, which contributed an additional $38.0 million of revenues and $7.5 million of gross profit to the Company during Fiscal 2003 and helped the Company achieve profitability in its third and fourth fiscal quarters and reduce its Fiscal 2003 net loss by 90% versus Fiscal 2002. Under Mr. Curtis' leadership in Fiscal 2003, the Company also began distributing server appliances through its distribution channel while continuing to achieve sequential quarterly revenue growth in both of its OEM Appliance and Distribution segments. The Company also added five new OEM appliance software partners and added over 150 new Value-added Resellers and Systems Integrator customers during Fiscal 2003. During Fiscal 2003, Mr. Curtis also guided the Company through its ISO 9001: 2000 certification process, which was completed in October of 2003 whereby the Company received its certification.

**Compliance with Internal Revenue Code Section 162(m).**    Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), generally disallows a

tax deduction to public companies for compensation over $1 million paid to its chief executive officer and its four other most highly compensated executive officers. However, qualifying performance-based compensation will not be subject to the deduction limit if certain requirements are met. The Company currently intends to structure its stock option grants in a manner that complies prospectively with these performance-based requirements.

COMPENSATION COMMITTEE

Lawrence A. Genovesi

Dennis A. Kirshy

Robert M. Wadsworth

102

--------------------------------------------------------------------------------

Table of Contents

Comparative Stock Performance

The following graph compares the cumulative total return to holders of the Company's Common Stock for the period from July 13, 2000, the date the Company's common stock was first traded on the NASDAQ National Market, through September 30, 2003 with the cumulative total return over such period of the NASDAQ Stock Market (U.S.) Index, the JP Morgan H&Q Technology Index and the RDG Technology Composite.

The graph assumes the investment of $100 in the Company's Common Stock (at the initial public offering price) and in each of such indices (and the reinvestment of all dividends). The performance shown is not necessarily indicative of future performance. Notwithstanding anything to the contrary set forth in any of the Company's filings under the Securities Act of 1933 or the Securities Exchange Act of 1934 that might incorporate other filings with the SEC, including this proxy statement, in whole or in part, the Report of the Compensation Committee and the Comparison of Cumulative Total Return graph shall not be deemed to be incorporated by reference into any such filings.

103

--------------------------------------------------------------------------------

Table of Contents

ITEM 12.SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The following table sets forth information known to us regarding beneficial ownership of our common stock as of October 30, 2003 by:

Yeach person known by us to be the beneficial owner of more than 5% of our outstanding common stock;

Yeach named executive officer;

Yeach of our directors; and

Yall of our executive officers and directors as a group.

Unless otherwise noted below, and subject to applicable community property laws, to our knowledge, each person has sole voting and investment power over the shares shown as beneficially owned, except to the extent authority is shared by spouses under applicable law and except as set forth in the footnotes to the tables.

| Name and Address of Beneficial Owner | Number of Shares Beneficially Owned | Percentage of Common Stock Outstanding (1) |
|---|---|---|
| HarbourVest Partners LLC and affiliated entities (2) One Financial Center, 44th Floor Boston, Massachusetts 02111 | 5,890,926 | 16.5% |
| John H. Curtis (3) | 920,020 | 2.5% |
| Douglas G. Bryant (4) | 220,418 | * |
| Jeffrey A. Brandes (5) | 495,171 | 1.4% |
| Michael D. Riley (6) | 93,750 | * |
| J. Donald Oldham (7) | 89,854 | * |
| Richard P. Graber | -- | * |
| John A. Blaeser | 117,500 | * |
| Lawrence A. Genovesi (8) | 975,475 | 2.7% |
| Gary E. Haroian | -- | * |
| Dennis A. Kirshy (9) | 322,837 | * |
| Frank M. Polestra (10) | 1,534,070 | 4.3% |
| Fontaine K. Richardson (11) | 12,500 | * |
| Robert M. Wadsworth (112) | 5,933,426 | 16.6% |
| All directors and Named Executive Officers as a group (13 persons) (13) | 10,715,021 | 28.6% |

---------------------

*Less than one percent.

(1) The number of shares beneficially owned by each stockholder is determined under rules promulgated by the SEC. The information does not necessarily indicate beneficial ownership for any other purpose. Under these rules, shares of common stock that a person or group has the right to acquire beneficial ownership of within 60 days after October 30, 2003 are deemed outstanding for computing the percentage ownership of the person holding such right but are not deemed outstanding for computing the percentage ownership of any other person.

(2) Includes 4,964,540 shares owned by HarbourVest Partners VI--Direct Fund, L.P. and 926,386 shares owned by HarbourVest Partners V--Direct Fund, L.P.

(3) Includes 880,049 shares underlying options exercisable within 60 days of October 30, 2003.

(4) Includes 193,749 shares underlying options exercisable within 60 days of October 30, 2003 and 4,998 shares held in a trust fund for Mr. Bryant's children. Mr. Bryant disclaims beneficial ownership of all shares held in a trust for his children.

104

--------------------------------------------------------------------------------

Table of Contents

(5) Includes 28,125 shares underlying options exercisable within 60 days of October 30, 2003.

(6) Includes 93,750 shares underlying options exercisable within 60 days of October 30, 2003.

(7) Includes 75,000 shares underlying options exercisable within 60 days of October 30, 2003.

(8) Includes 390,000 shares underlying options exercisable within 60 days of October 30, 2003.

(9) Includes 15,000 shares underlying options exercisable within 60 days of October 30, 2003 and 8,500 shares owned by Mr. Kirshy's son, Wade G. Kirshy. Mr. Kirshy disclaims beneficial ownership of all shares owned by Wade G. Kirshy.

(10) Includes 122,038 shares owned by Ascent Venture Partners, L.P., 1,151,726 shares owned by Ascent Venture Partners II, L.P., 39,408 shares owned by Ascent Venture Partners III, L.P., 633 shares owned by Ascent Management SBIC Corporation, 21,571 shares owned by Ascent Venture Management, LLC and 41,017 shares owned by Le Serre. Mr. Polestra may be deemed to have or share voting or investment power with respect to these shares. Mr. Polestra is a managing member or managing director of, or a managing member or managing director of the entity that controls, each of Ascent Venture Partners, L.P., Ascent Venture Partners II, L.P., Ascent Venture Partners III, L.P., Ascent Management SBIC Corporation and Ascent Venture Management, LLC. Mr. Polestra is also a partner of LeSerre. Mr. Polestra disclaims beneficial ownership of these shares except to the extent of his pecuniary interest in the shares. Also includes 42,500 shares underlying options exercisable within 60 days of October 30, 2003.

(11) Includes 12,500 shares underlying options exercisable within 60 days of October 30, 2003.

(12) Includes 4,964,540 shares owned by HarbourVest Partners VI-Direct Fund, L.P. and 926,386 shares owned by HarbourVest Partners V-Direct Fund, L.P. Mr. Wadsworth may be deemed to have or share voting or investment power with respect to these shares. He is a Managing Director of HarbourVest Partners, LLC, which controls HarbourVest Partners VI-Direct Fund, L.P. and HarbourVest Partners V-Direct Fund, L.P. Mr. Wadsworth disclaims beneficial ownership of these shares except to the extent of his pecuniary interest in the shares. Also includes 42,500 shares underlying options exercisable within 60 days of October 30, 2003.

(13) Includes 1,773,173 shares underlying options exercisable within 60 days of October 30, 2003.

ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

In January 2001, we entered into a series of related agreements with Lawrence A. Genovesi, currently our Chairman of the Board and formerly our President, Chief Executive Officer and Chief Technology Officer. We entered these agreements to avoid significant sales of our common stock by Mr. Genovesi as a result of a margin call on a personal loan collateralized by his holdings of our common stock. We guaranteed a personal loan obtained by Mr. Genovesi from a bank through a deposit of $1,051,850 of our cash with the bank, which was to expire in January 2002. In January 2002, we extended the guarantee period to January 2003. Mr. Genovesi also entered into an agreement with us whereby he agreed to reimburse us for any obligations incurred by us under the guarantee. Any unpaid balances under this reimbursement agreement bore interest at a rate of 10% per year. On January 6, 2003, pursuant to the guarantee, the bank applied $968,596 of our cash deposit to the repayment of Mr. Genovesi's personal loan and refunded $83,254 to us. On January 27, 2003, Mr. Genovesi repaid us $974,168 to satisfy his obligations under the reimbursement agreement, including accrued interest. Of that amount, $456,276 was paid in cash and $517,892 was paid with the proceeds from the repurchase by us of 391,128 shares of our common stock owned by Mr. Genovesi. The purchase price was determined based on the average closing price of our common stock over the ten trading days prior to and including January 17, 2003.

In connection with our issuance of 375,000 shares of our common stock, Mr. Genovesi entered into a recourse note with us, in November 1999, in the principal amount of $90,000, bearing interest at an annual rate of 6.08% and payable upon the earlier of demand by us or November 18, 2004. In

105

--------------------------------------------------------------------------------

Table of Contents

addition, in January 2001, Mr. Genovesi executed a revolving promissory note of up to $210,000 with us. This note had an interest rate of 5.9% per year and was due and payable in full upon the earlier of January 9, 2002 or 30 days following the date Mr. Genovesi ceased to be our employee. In November 2001, we repurchased 234,822 shares of our common stock from Mr. Genovesi for $225,195 in a private transaction. The purchase price was determined based on the average closing price of our common stock over the ten trading days prior to the

purchase date. Mr. Genovesi used the proceeds to pay off all amounts outstanding under the promissory note of $140,343, to pay $39,813, including accrued interest, of the recourse note and to pay taxes incurred in connection with our repurchase of our common stock from him. Also in November 2001, we repurchased 93,750 shares of our common stock held by Mr. Genovesi as restricted stock for $22,500. The purchase price was equal to the price at which these shares were sold to Mr. Genovesi in November 1999. The proceeds were used to pay down $22,500 of the recourse note. At December 31, 2002, $22,500 remained outstanding under the recourse note, which Mr. Genovesi repaid on January 27, 2003 with the proceeds from the repurchase by us of 17,070 shares of our common stock owned by him. The purchase price was determined based on the average closing price of our common stock over the ten trading days prior to and including January 17, 2003. In conjunction with the guarantee, the reimbursement agreement and the note, Mr. Genovesi entered into a pledge agreement with us whereby he pledged to us all shares of our common stock owned by him as of the date of the agreement or subsequently acquired, and all options and other rights to acquire shares of our common stock owned by him as of the date of the agreement or subsequently acquired. Additionally, Mr. Genovesi pledged to us all additional securities or other consideration from time to time acquired by him in substitution for, or in respect of the pledged securities. If Mr. Genovesi had elected to sell any additional pledged securities during the term of the agreement, all proceeds of that sale would have been applied to any amounts payable under the reimbursement agreement. In addition to the pledged securities, the obligations of Mr. Genovesi under the reimbursement agreement were collateralized by a second mortgage on certain real property owned by him. As stated above, on January 27, 2003, Mr. Genovesi satisfied his obligations in full under each of the guarantee, the reimbursement agreement, the recourse note and the pledge agreement.

In April 2001, we entered into full recourse loan agreements with certain of our employees and officers, all of whom were our employees or officers at that time. We entered into these loan agreements to avoid substantial sales of our common stock by these employees and officers as a result of alternative minimum tax obligations incurred by these employees and officers in connection with their exercise of options to purchase shares of our common stock. The amount loaned to the employees and officers under the loan agreements was approximately $736,000, which was recorded net of approximately $228,000 of reserves for uncollectibility. Outstanding amounts under the loan agreements accrued interest at a rate of 4.63% per year and were originally due and payable in full upon the earlier of one year from the date of each individual agreement or thirty days after termination of employment with us, unless termination was involuntary and without cause. In conjunction with the loan agreements, each employee and officer pledged all shares of our capital stock, and options to purchase our capital stock, then owned, or acquired in the future, and any distributions on this pledged stock or proceeds from their sale. We included amounts due under these loan agreements in the balance sheet as notes receivable from stockholders.

In April 2002, one former officer's loan was repaid in full, including accrued interest of approximately $2,500, through a payment to us of $29,727 of cash and a sale to us of 30,000 shares of

--------------------------------------------------------------------------------

Table of Contents

our common stock in exchange for the retirement of $27,000 of the former officer's note payable. The price per share of our common stock was based on the

market price as of the close of business on the date of the repurchase. Because the amounts outstanding under certain of the loan agreements exceeded the value of our common stock pledged as collateral, in January 2002, we extended the repayment dates to September 2002 for loans with an aggregate principal amount of $226,996 due from one of our current officers and one of our former officers, and in March 2002 we extended the repayment dates to July 2002 for the remaining loans with a net principal amount of $255,000. Subsequently, in early July 2002, we also extended the repayment dates for these remaining loans to September 2002. In September 2002, loans to one current officer and one former officer totaling approximately $240,000 were repaid in full, including accrued interest of approximately $13,000, through sales to us of 230,777 shares of our common stock in exchange for the retirement of these loans. The remaining loans due from one former officer and one former employee totaling approximately $489,000 as of December 31, 2002, were repaid in full, including accrued interest of approximately $33,000, in January 2003 through the repurchase by us of 278,600 shares of our common stock. For all purchases noted above, the price per share of our common stock was based on the market price as of the close of business on the dates of these repurchases. As of December 31, 2002, we determined that there was no need for reserves for the uncollectibility of these stockholder notes receivable and reversed reserves of $228,000 as a decrease to general and administrative expenses during the three months ended December 31, 2002. As a result of company policy, as well as the Sarbanes-Oxley Act of 2002, we will not provide guarantees in any form to officers or directors in the future. In addition, current company policy prohibits officers from collateralizing personal debt with company stock.

We recorded all shares of our common stock repurchased under these related party agreements as treasury stock at the cost to repurchase.

In connection with our acquisition of TidalWire, we paid $1,144,615 to Ascent Venture Partners and $2,205,828 to HarbourVest Partners, two of our substantial stockholders. At the time of the acquisition, Ascent and HarbourVest owned approximately 18.1% and 16.3% of our outstanding common stock, respectively. Ascent and HarbourVest also owned 12.9% and 24.9% of the outstanding common stock of TidalWire, respectively. Pursuant to the terms of the merger agreement, we issued 480,706 shares and 926,386 shares of our common stock previously held as treasury stock to Ascent and HarbourVest, respectively, and made the cash payments mentioned above to Ascent and HarbourVest in exchange for all of the TidalWire common stock held by Ascent and HarbourVest. The consideration paid to Ascent and HarbourVest may be deemed to have been indirectly paid to Frank M. Polestra and Robert M. Wadsworth, two of our directors. As a managing member or general partner of each of the general partners that control Ascent, Mr. Polestra may be deemed to have indirectly received the $1,144,615 of cash paid to Ascent as well as beneficial ownership of 480,706 shares of our common stock issued to Ascent. As a managing director of the limited liability corporation that controls HarbourVest, Mr. Wadsworth may be deemed to have indirectly received the $2,205,828 of cash paid to HarbourVest as well as beneficial ownership of 926,386 shares of our common stock issued to HarbourVest.

In connection with the TidalWire acquisition, we have engaged Akibia, Inc. to provide certain customer support and warranty fulfillment services. Akibia charges us a fee for these services based

--------------------------------------------------------------------------------

Table of Contents

upon sales of certain of our products. One of our directors, Robert M.