## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____ )
)
In Re:  NETWORK ENGINES INC.               )
SECURITIES LITIGATION                      )    **CA NO. 03-12529-JLT**
)
)
_____ )

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

**MOULTON & GANS, P.C.**
Nancy Freeman Gans
33 Broad Street, Suite 1100
Boston, MA  02109-4216
(617) 369-7979

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
Rachel S. Fleishman
Carlos F. Ramirez
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

**LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP**
Samuel H. Rudman
David A. Rosenfeld
200 Broadhollow Road, Suite 406
Melville, NY 11747
(631) 367-7100

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF THE CASE ....................................................................................... 2

ARGUMENT ............................................................................................................... 5

I.     THE RELEVANT LEGAL STANDARDS .......................................................... 5

II.    PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT DEFENDANTS MADE
       MATERIALLY FALSE AND MISLEADING STATEMENTS ........................... 6

       A.     Defendants Had A Duty to Speak Completely and Accurately ................. 6

       B.     "Literally Accurate" Reports of Past Results Can Be Actionable .............. 7

       C.     Defendants' Statements During the Class Period Were Not Vague, General
              or Loosely Optimistic But Were Sufficiently Concrete to Be Actionable .. 9

       D.     Defendants' Statements Are Not Forward-Looking And Are Not Protected
              Under The PSLRA's Safe Harbor Provision........................................... 11

              1.     Defendants' Statements Were Not Forward-Looking ................... 12

              2.     Defendants' Statements Were Not Accompanied by Meaningful
                     Cautionary Language .................................................................... 12

       E.     DEFENDANTS' HAD A DUTY TO DISCLOSE ITS CONTRACT
              NEGOTIATIONS WITH EMC ............................................................ 13

III.   THE COMPLAINT ADEQUATELY PARTICULARIZES ITS
       ALLEGATIONS ........................................................................................... 15

IV.    THE COMPLAINT PLEADS FACTS GIVING RISE TO A STRONG INFERENCE
       OF SCIENTER ............................................................................................. 17

              1.     Defendants Possessed Actual Knowledge of the Fraud ............... 18

              2.     Defendants' False and Misleading Statements Concerned the
                     Company's Core Operations and Products................................... 18

              3.     The Proximity Between Defendants' False and Misleading
                     Statements And the Company's Bad News Establishes A Strong
                     Inference of Scienter .................................................................... 19

V.     PLAINTIFFS' HAVE STATED A CLAIM UNDER SECTION 20(A) ............. 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adams v. Kinder-Morgan, Inc.,*
    340 F.3d 1083 (10th Cir. 2003) ........................................................................... 17

*Aldridge v. A.T. Cross. Corp.,*
    284 F.3d 72 (1st Cir. 2002) ........................................................................... 17, 20

*In re Allaire Corp. Sec. Litig.,*
    224 F. Supp. 2d 319 (D. Mass. 2002) ........................................................... 10, 17

*In re Alliance Pharma. Corp. Sec. Litig.,*
    279 F. Supp. 2d 171 (S.D.N.Y. 2003) ................................................................ 13

*In re Ancor Communications Inc. Sec. Litig.,*
    22 F. Supp. 2d 999 (D. Minn. 1998) .................................................................. 18

*In re APAC Teleservices, Inc. Sec. Litig.,*
    No. 97-9145  1999 U.S. Dist. LEXIS 17908 (S.D.N.Y. Nov. 19, 1999) ........... 11

*In re Apple Computer Sec. Litig.,*
    886 F.2d 1109 (9th Cir. 1989) ............................................................................ 12

*Barron v. Smith,*
    285 F. Supp. 2d 96 (D. Mass. 2003) .................................................................... 8

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ............................................................................................ 14

*In re Biogen Sec. Litig.,*
    179 F.R.D. 25 (D. Mass. 1997) ............................................................................ 7

*In re Boston Tech. Sec. Litig.,*
    8 F. Supp. 2d 43 (D. Mass. 1998) ...................................................................... 13

*Broudo v. Dura Pharms., Inc.,*
    339 F.3d 933 (9th Cir. 2003) (emphasis added) ................................................ 17

*In re Cabletron Sys.,*
    311 F.3d 11 (1st Cir. 2002) ......................................................................... *passim*

*Carney v. Cambridge Technology Partners, Inc.,*
    135 F. Supp. 2d 235 (D. Mass. 2001) ................................................................ 16

*Casella v. Webb,*
    883 F.2d 805 (9th Cir. 1989) ................................................................................ 9

*Castellano v. Young & Rubicam, Inc.,*
    257 F.3d 171 (2d Cir. 2001) ............................................................................... 14

*In re Cephalon Sec. Litig.,*
    No. 96-0633, 1997 U.S. Dist. LEXIS 13840 (E.D. Pa. Aug. 29, 1997) ............ 16

*Chavelrus v. Pegasystems, Inc.,*
    59 F. Supp. 2d 226 (D. Mass. 1999) .................................................................. 18

*In re Chronimed, Inc. Sec. Litig.,*
No. 01-1092, 2002 U.S. Dist. LEXIS 8962 (D. Minn. May 16, 2002) ............................ 17

*Conley v. Gibson,*
355 U.S. 41 (1957) ................................................................................................... 5

*Cosmas v. Hassett,*
886 F.2d 8 (2d Cir. 1989) .......................................................................................... 18

*In re Digi Int'l Sec. Litig.,*
6 F. Supp. 2d 1089 (D. Minn. 1998) .......................................................................... 16

*Epstein v. Itron, Inc.,*
993 F. Supp. 1314 (E.D. Wash. 1998) ....................................................................... 18

*Evanowski v. Bankworcester Corp.,*
788 F. Supp. 611 (D. Mass. 1991) ............................................................................. 15

*In re Fidelity/Micron Sec. Litig.,*
964 F. Supp. 539 (D. Mass. 1997) .............................................................................. 7

*In re First Chicago Corp. Sec. Litig.,*
769 F. Supp. 1444 (D. Ill. 1991) ............................................................................... 11

*Florida State Bd. Of Admin. v. Green Tree Fin. Corp.,*
270 F.3d 645 (8th Cir. 2001) ............................................................................... 17, 19

*Freedman v. Value Health, Inc.,*
958 F. Supp. 745 (D. Conn. 1997) ............................................................................. 9

*Friedman v. Rayovac Corp.,*
295 F. Supp. 2d 957 (W.D. Wis. 2003) ................................................................ 11, 13

*Gelfer v. Pegasystems,*
96 F. Supp. 2d 10 (D. Mass. 2000) ........................................................................... 20

*Glazer v. Formica Corp.,*
964 F.2d 149 (2d Cir. 1992) ..................................................................................... 15

*In re Globalstar Sec. Litig.,*
No. 01-1748, 2003 U.S. Dist. LEXIS 22496 (S.D.N.Y. Dec. 12, 2003) ..................... 9

*In re Grand Casinos Sec. Litig.,*
988 F. Supp. 1273 (D. Minn. 1997) ......................................................................... 19

*Greebel v. FTP Software, Inc.,*
194 F.3d 185 (1st Cir. 1999) .............................................................................. 11, 17

*Harris v. Ivax Corp.,*
182 F.3d 799 (11th Cir. 1999) ........................................................................... 11, 13

*Huddleston v. Herman & MacLean,*
640 F.2d 534 (5th Cir. 1981) ................................................................................... 13

*In re Humana Sec. Litig.,*
No. 99 -0398, 2000 U.S. Dist. LEXIS 21671 (W.D. Ky. Nov. 7, 2000) .................... 15

*LaSalle v. Medco Research, Inc.,*
  54 F.3d 443 (7th Cir. 1995) ........................................................................................ 16

*Lirette v. Shiva,*
  999 F. Supp. 164 (D. Mass. 1998) ............................................................................... 16

*Lucia v. Prospect Street High Income Portfolio,*
  36 F.3d 170 (1st Cir. 1994) ................................................................................ 6, 7, 14

*Manavazian v. ATEC Group, Inc.,*
  160 F. Supp. 2d 468 (E.D.N.Y. 2001) ........................................................................ 14

*McMahan & Co. v. Wherehouse Entm't,*
  900 F.2d 576 (2d Cir. 1990) ......................................................................................... 7

*In re MobileMedia Sec. Litig.,*
  28 F. Supp. 2d 901 (D.N.J. 1998) ............................................................................... 10

*In re Next Level Systems, Inc. Sec. Litig.,*
  No. 97-7362, 1999 U.S. Dist. LEXIS 5653 (N.D. Ill. Mar. 31, 1999) ............................ 7

*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000) ....................................................................................... 16

*In re Number Nine Visual Tech. Corp. Sec. Litig.,*
  51 F. Supp. 2d 1 (D. Mass. 1999) ......................................................................... 12, 13

*In re Oxford Health Plans, Inc. Sec. Litig.,*
  187 F.R.D. 133 (S.D.N.Y. 1999) ................................................................................. 10

*In re Pemstar, Inc. Sec. Litig.,*
  No. 02-1821, 2003 U.S. Dist. LEXIS 14452 (D. Minn. Aug. 15, 2003) ........................ 17

*In re Peritus Software Services, Inc.,*
  52 F. Supp. 2d 211 (D. Mass. 1999) ........................................................................... 15

*Powers v. Eichen,*
  977 F. Supp. 1031 (S.D. Cal. 1997) ............................................................................ 19

*Reyes v. Supervisor of Drug Enforcement Admin.,*
  834 F.2d 1093 (1st Cir. 1987) ..................................................................................... 20

*Roeder v. Alpha Indus., Inc.,*
  814 F.2d 22 (1st Cir. 1987) ........................................................................................... 5

*Rosen v. Textron,*
  321 F. Supp. 2d 308 (D.R.I. 2004) .............................................................................. 12

*S.E.C. v. Texas Gulf Sulphur, Co.,*
  401 F.2d 833 (2d Cir. 1968) ....................................................................................... 13

*Schaffer v. Timberland,*
  924 F. Supp. 1298 (D.N.H. 1996) ................................................................................. 9

*Scheuer v. Rhodes,*
  416 U.S. 232 (1974) ...................................................................................................... 5

*In re Scholastic Corp. Sec. Litig.,*
    252 F.3d 63 (2d Cir. 2001) ..........................................................................5

*Scritchfield v. Paolo,*
    274 F. Supp. 2d 163 (D.R.I. 2003) ..........................................................9

*Serabian v. Amoskeag Bank Shares,*
    24 F.3d 357 (1st Cir. 1994) ......................................................................8

*In re Tel-Save Sec. Litig.,*
    No. 98-3145, 1999 U.S. Dist. LEXIS 16800 (E.D. Pa. Oct. 19, 1999)............18

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438, 449 (1976) ........................................................................14

*In re Vivendi Universal, S.A. Sec. Litig.,*
    No. 02-5571, 2003 U.S. Dist. LEXIS 19431 (S.D.N.Y. Nov. 3, 2003) ........9-10

*Zoghlin v. Renaissance Worldwide, Inc.,*
    No. 99-1965, 1999 U.S. Dist. LEXIS 20815 (D. Ill. Nov. 4,1999)..................16

## STATUTES AND OTHER AUTHORITIES

15 U.S.C. §§ 77z-2(c)(1), 78u-5(c)(1)..............................................................11

Fed. R. Civ. P. 9(b) ..........................................................................................20

Fed. R. Civ. P. 15(a) ........................................................................................20

Fed. R. Civ. P. 15(a) ........................................................................................20

SEC Release No. 33, 6504
    3 Fed. Sec. L. Rep. (CCH) ¶23,120B, at 17,095-3 (Jan. 13, 1984). ..................6

WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1427 (2nd Ed. 1983)............7

Lead Plaintiffs, Wing Kam Yu, Blake Kunkel, Thomas Cunnigham, Sergio Guerra and Ricardo Guerrera ("Plaintiffs") respectfully submit this Memorandum in Opposition to Defendants' Motion to Dismiss the Amended Consolidated Complaint brought by John Curtis ("Curtis"), Douglas G. Bryant ("Bryant"), Lawrence A. Genovesi ("Genovesi") (collectively "Individual Defendants") and Network Engines, Inc. ("Network Engines" or the "Company") (collectively "defendants").[1]

## STATEMENT OF THE CASE

Network Engines is a provider of server appliance hardware and custom integration services for computers. ¶21. The Company went public in mid-2000, and, by September 2002, 83% of Network Engine's net revenues were generated from a single customer, EMC Corporation ("EMC"). ¶23.

In November 2002, Network Engines acquired TidalWire, Inc. ("TidalWire"), a company engaged in the distribution of storage networking products, including Host Bus Adapters ("HBA"), which are used to connect data storage systems to computer networks. ¶24. TidalWire distributed HBAs for use in EMC storage systems. *Id*. Historically, TidalWire had been provided favorable pricing by EMC, which had enabled TidalWire to enjoy high gross margins. ¶25. In addition, TidalWire had received "reference sales" from EMC, meaning that EMC had referred customers to TidalWire to purchase authorized products for use in EMC data storage networks. ¶24. As alleged in the Complaint, defendants described TidalWire's distribution business as a key component of Network Engine's growth in 2003. ¶33.

On November 6, 2003, the first day of the Class Period,[2] defendants made the following highly positive and purportedly factually-based statements about the Company's business:

- "[T]he Company continued to develop its relationships with new partners and *strengthen relationships with existing partners.* We are seeing *increasing acceptance of our unique value* proposition by our customers and software partners." ¶27.[3]

---

[1] At all relevant times, Curtis was the Company's President and Chief Executive Officer; Bryant was the Company's Chief Financial Officer and Vice President, Finance and Administration and Genovesi was the founder of Network Engines and the Chairman of its Board of Directors. Genovesi also previously served as the Company's President, CEO and Chief Technology Officer. ¶8. (Citations to "¶__" are to paragraphs of the Amended Consolidated Complaint, dated June 4, 2004 (the "Complaint")).

[2] The Class Period is November 6, 2003 through December 10, 2003, inclusive.
[3] All emphasis added, unless otherwise noted.

- "*The results for our fiscal year 2003 reflect a dramatic turnaround for Network Engines*. Our results reflect the continuing *success of our business strategy*." *Id.*

- "We consider our acquisition of TidalWire to be a core success for our company. In our Q4, *we benefited from the surge in demand for storage networking products distributed by our TidalWire distribution*." ¶30.

- "Gross margins for the fiscal year were 20.6% compared to 14.2% in fiscal 2002. During fiscal 2003, *the distribution business contributed 19.8% gross margin. This improvement is directly related to the growth of our revenues which was driven by our acquisition of TidalWire* and the growth in our OEM appliance business, while maintaining control over our operating expenses." ¶33.

- In response to a question concerning whether the Company was experiencing pricing pressure from EMC in light of a 7% drop in revenues from that customer, defendant Bryant stated, "*I think we've stated in the past that you, you know, it's really difficult to correlate, you know, what we report versus what our partner reports, and you know, all we can tell you that, you know, we ship it when they ask for it*." ¶35.

However, as set forth in the Complaint with particularity, and detailed below, defendants knew, prior to November 6th, that EMC had demanded a steep price increase for EMC-approved products distributed by TidalWire, and that this price increase was going to erode TidalWire's gross margins on sales of such items. ¶26. By the start of the Class Period, it was clear to each and every defendant that TidalWire would have to pay increased prices to EMC to continue to sell EMC-approved products. *Id.*

The Complaint provides detailed accounts by former Network Engines employees concerning the negotiations between Network Engines and EMC that establish the defendants' knowledge. *Id.* A former TidalWire Territory Manager (the "Former Territory Manager"), who worked with the Company for approximately three years, stated that Network Engines and EMC were in negotiations prior to the Class Period and that the "negotiations weren't going well." ¶26(a). The Former Territory Manager recounted that EMC called an "emergency meeting" in October or November 2003, and that for EMC to call such a meeting, "was not a good sign." *Id.* The Former Territory Manager, who reportedly directly to the Vice President of Sales for the Company and was responsible for managing a major geographic region of the United States, was a high-level employee in a position to have knowledge of the EMC negotiations. *Id.* The Former Territory Manager left no doubt that the EMC negotiations had already turned south by the start of the Class Period, saying that the October/November time frame was when "the sh*t hit the fan." *Id.* Thus, the Former Territory

Manager described a reality that was known to all of the defendants and which was quite different from the picture painted by defendants' rosy Class Period statements.

The Complaint also sets forth the account of another former Company employee, TidalWire's Director of Channel Marketing during the Class Period (the "Former Director of Channel Marketing"). The Former Director of Channel Marketing confirmed that the Company and EMC were in negotiations prior to the Class Period and that, during those negotiations, EMC demanded a price increase of as much as 50%. ¶26(b). The Former Director of Channel Marketing learned the substance of the negotiations directly from a Company Vice President, who in turn, had received the information from Mike Riley, the Company's Vice President of Marketing, who sat "on the executive team" and was defendant Curtis's "right hand man." *Id.* The Former Director of Channel Marketing also confirmed that the entire Network Engines executive team was involved in "emergency meetings" in early November 2003 concerning EMC's pricing demands. *Id.* Echoing the same phrase used by the Former Territory Manager, the Former Director of Channel Marketing said that, "the [C]ompany knew what was happening with EMC well before the sh*t hit the fan…" *Id*.

On December 10, 2003, defendants issued a press release (the "December 10th Press Release") in which they finally disclosed what they had known for months, *i.e.,* that the Company's distribution business was going to be adversely affected by changes in its relationship with EMC:

> The amendment extends the term of the agreement until the end of 2005 and ***provides for increased costs to Network Engines relating to the sale of EMC-approved host bus adapters (HBAs)***. TidalWire, Network Engines' distribution operation, has been an authorized distributor of EMC-approved HBAs since 1997.
>
> * * *
>
> To date, sales of EMC-approved HBAs have provided a substantial portion of the revenue generated from the company's distribution operation. Because of the amendment, there will be ***a decline in the gross profit related to the sale of EMC-approved HBAs, which will in turn have a negative impact on the company's distribution operations gross profit***. This decline in distribution operations gross profit is expected to have ***a negative impact on consolidated gross profit and operating margins*** beginning in the quarter ending March 31, 2004.

4

In that same press release, defendant Bryant, the Company's Chief Executive Officer, who had issued glowing statements (which he knew to be misleading) about Network Engines in a press release and on an investor conference call just one month earlier, finally confessed that:

> The amendment **will reduce our gross profit on the sale of EMC-approved HBAs** to be more in line with our gross profit on the distribution of other third party storage networking products, which has ranged from 7% to 12% of net revenues . . . .

*Id.* These belated disclosures were unmistakably material. Following the December 10th Press Release, the price of common shares of Network Engines fell $3.92 per share, or 39%, to close at $6.10 per share, on volume of more than 14.396 million shares traded, or almost fourteen times the average daily volume. By December 15, 2003, the share price had fallen an additional 26.8%, to close at $4.46. ¶38.

## ARGUMENT

### I.     THE RELEVANT LEGAL STANDARDS

In considering defendants' motion to dismiss, the Court must presume that the allegations of the complaint are true, read the complaint as a whole and give plaintiffs the benefit of every favorable inference that can be drawn from their allegations. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987). It is well-settled that a "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [the plaintiff's] claim which would entitle [the plaintiff] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

The Complaint is not required to plead evidence to survive defendants' motion to dismiss, a fundamental precept that the First Circuit has repeatedly emphasized: "[T]his Court has said repeatedly that the rigorous standards for pleading securities fraud ***do not require a plaintiff to plead evidence***. . . . Defendants' argument that even more detail be required, ***before there is any discovery***, here amounts to requiring plaintiffs to plead evidence." *In re Cabletron Sys.*, 311 F.3d 11, 33 (1st Cir. 2002) (emphasis added, internal citation omitted). *See also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)("Even with the heightened pleading standard under Rule 9(b) and the [PSLRA] we do not require the pleading of detailed evidentiary matter in securities litigation.").

## II.    PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.    Defendants Had A Duty to Speak Completely and Accurately

It is well-established that once a company makes a disclosure, it is under a duty to make the disclosure "**complete and accurate**." *Lucia v. Prospect Street High Income Portfolio,* 36 F.3d 170, 175 (1st Cir. 1994). The anti-fraud provisions of the federal securities laws are intended to ensure "complete and accurate information about companies whose securities are publicly traded," and apply to any statement made by a public company "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience." SEC Release No. 33, 6504, 3 Fed. Sec. L. Rep. (CCH) ¶23,120B, at 17,095-3 (Jan. 13, 1984).

Here, the defendants spoke in highly positive and misleading half-truths while in possession of adverse facts concerning the Company's then-current financial condition and business prospects. Having chosen to speak on topics like the strength of the Company's distribution business and its gross margins, the Company was obligated to make its statements "complete and accurate," which it failed to do. (*E.g.*, the Company was positioned "to address the growing demand for network appliance solutions in these markets," ¶30; the Company's improvement in gross margins for fiscal year 2003 was "directly related to the growth of our revenues which was driven by [the Company's] acquisition of TidalWire and the growth in our OEM appliance business, while maintaining control over our operating expenses." ¶33.) Indeed, even when defendant Bryant was asked a direct question during the November 6th Conference Call about the pricing pressure that EMC was placing on Network Engines, he did not disclose that the fact of a substantial cost increase had already been established in the negotiations and, instead, attempted to side-step the matter by telling the analyst who posed the question to talk directly with EMC about the matter. ¶35.

The statements cited in the Complaint were false and misleading when made because, as detailed by former Company employees in positions of knowledge, the statements failed to disclose: (i) that the Company and its largest customer, EMC, had been engaging in price negotiations and that, during those negotiations, EMC had insisted on a dramatic increase of as much as 50% to the prices it charged the Company's TidalWire distribution operation and (ii) that defendants knew that the price

increases which EMC had demanded would substantially reduce the Company's gross margins and would have a significant negative impact on the Company's future performance. ¶¶28, 31.[4]

**B.    "Literally Accurate" Reports of Past Results Can Be Actionable**

It is well-settled in this Circuit that statements that are "literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Lucia*, 36 F.3d at 175.[5] Thus, allegedly false and misleading statements must be "read as a whole, [and in context, to determine whether] defendants' representations connoted a richer message than that conveyed by a literal reading of the statements." *McMahan & Co. v. Wherehouse Entm't*, 900 F.2d 576, 579 (2d Cir. 1990), *aff'd in part*, 65 F.3d 1044 (2d Cir. 1995).

Like defendants here, the defendants in *In re Next Level Systems, Inc. Sec. Litig.*, No. 97-7362, 1999 U.S. Dist. LEXIS 5653, at *18 (N.D. Ill. Mar. 31, 1999), a case from outside this district which is closely analogous to this one, argued that "[the company's] press releases detailing quarterly operating results and its announcements of product orders by third party companies," were not actionable because they were statements of "past results." The plaintiffs in *Next Level* argued that, "by announcing the signing of contracts with new customers, defendants painted a deceptive picture of high demand for its products and continued growth. ... As such, investors and shareholders were forced to base their investment decisions on a false picture of Next Level's future growth and stability." *Id.* at *18-19. In finding that statements that reported "past performance" could be

---

[4]  Defendants accuse plaintiffs of not knowing that, "Network Engines did not pay any amount to EMC so there was no 'price' that could be increased." DM at 14 n.15. ("DM" refers to Defendants' Motion to Dismiss the Amended Consolidated Complaint). This is a mis-guided attempt to split hairs. The Complaint is written in plain English and its allegations are accurate. WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1427 (2nd Ed. 1983) defines "price" as "the amount of money, etc. asked or given for something; cost; charge." In the December 10th Press Release, defendants announced that the amendment to the EMC agreement provided for "increased ***costs***." The Complaint, like the December 10th Press Release, does not go into the details about the components of those "costs," but instead, uses "price" in its most commonly understood way, *i.e.*, as synonymous with "total cost." Defendants' argument that the Complaint incorrectly alleges the "wrong outcome" of the negotiations, and that plaintiffs' confidential sources lacked knowledge of the EMC situation because they used the word "price" rather than "cost," is thus wholly without merit.

[5]  *See also In re Biogen Sec. Litig.*, 179 F.R.D. 25, 34 (D. Mass. 1997) (finding that accurate statements can nevertheless mislead investors); *In re Fidelity/Micron Sec. Litig.*, 964 F. Supp. 539, 547 (D. Mass. 1997) ("A corporation, in other words, has a duty to ensure that material information is disclosed in such a way that it can be understood by the investing public in essentially the same way as it would be perceived by corporate insiders.").

actionable, the court held that, "[i]f true, plaintiffs' allegations that while defendants reported acquisition of new customers, they failed to report significant declines in orders from other customers, would render defendants' statements of past results false, or at the very least, misleading." *Id.* at *20.

The "past performance statements" included in the November 6th Press Release and Conference Call are actionable because the context in which the statements were made rendered them misleading. *See Serabian v. Amoskeag Bank Shares*, 24 F.3d 357, 365 (1st Cir. 1994) (statements actionable where complaint pled "a contrast between what company officials were hearing internally about their loan review effectiveness and the adequacy of their [allowance for loan losses] and what the company was telling the public at the same time."). Thus, the statements that "[t]he results for our fiscal year 2003 reflect a dramatic turnaround for Network Engines, . . . which reflect the continuing success of our business strategy," (¶27); the Company "benefited from the surge in demand for storage networking products distributed by . . . TidalWire," (¶30); and that the Company's "improvement [was] directly related to the growth of our revenues which was driven by our acquisition of TidalWire," (*id.*), when read as a whole, fostered a misleading impression concerning the Company's then-current financial condition and business prospects.[6] Indeed, even the statement that "the distribution business contributed a 19.8% gross margin," ¶33, is actionable in this context because the defendants' failure to report the inevitable decrease to gross margins that would result from the steep price increases that EMC had demanded rendered their positive statements about the Company's past performance, at a minimum, misleading.[7]

---

[6] Defendants rely on *Barron v. Smith*, 285 F. Supp. 2d 96 (D. Mass. 2003), for the proposition that "merely alleging the 'fostering' of 'impressions' does not adequately plead securities fraud." DM at 16. However, the purported omissions in *Barron*, unlike the omitted information here, were not actionable because (i) the fact that defendants' bankruptcy would constitute a default under a loan guaranty was widely known to the securities market, (ii) plaintiffs' allegation that a receivable was out of the company's creditors' reach was incorrect "as a matter of fact" and (iii) synthetic leases held by defendant company were not required to be disclosed under "principles generally accepted at the time . . . ." *Id.* at 103-05.

[7] Unlike in *Serabian*, where certain "misleading positive" statements were held not actionable because the allegations of falsity were conclusory and not supported by specific facts, this Complaint pleads a specific, credible factual basis for the falsity of the challenged statements.

**C.    Defendants' Statements During the Class Period Were Not Vague, General or Loosely Optimistic But Were Sufficiently Concrete to Be Actionable**

Whether or not a statement is mere puffery requires a consideration of the context in which the statements were made. *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175-176 (D.R.I. 2003). Defendants' statements, therefore, must not be "assessed in a vacuum. . . . The statements are properly interpreted only by reference to the relevant circumstances that underlie their meaning." *Id*. Rather, the statements must be ***viewed in the context of the full range of information allegedly available to the defendants during the class period***." *Schaffer v. Timberland,* 924 F. Supp. 1298, 1214 (D.N.H. 1996) (statements that "'a brand remains strong,' and that 'a majority of this inventory consists of classic Timberland models in oversupply that Management expects will be sold in the normal course of business'" actionable where defendants had an "internal plan to sell 126,000 units of excess, obsolete, and defective inventory at between 20% and 60% below cost"). *See also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989)("[w]hat might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact").[8]

None of the statements challenged in this Complaint, in this context, can be protected behind a puffery shield. For instance, in the November 6th Press Release, defendant Curtis stated, "[t]he results for our fiscal year 2003 reflect a dramatic turnaround for Network Engines." ¶27. Curtis specifically attributed those results to "the continuing success of our business strategy," which included, *inter alia*, "strengthening relationships with existing partners." *Id*. As everyone knew, the Company had no more important "existing partner" than EMC, the company responsible for 83% of Network Engine's net revenue by September 2002. ¶23. Interpreted "by reference to the relevant circumstances that underlie their meaning," *Scritchfield*, 274 F. Supp. 2d at 176, these representations are precisely the types of factual statements that go beyond the vague, general and loose optimism associated with puffery. The press release provides a precise explanation for why the 2003 results had improved, *i.e.*, the Company's "strengthening" of its relationships with "existing partners," such as

---

[8] Several courts have held that a determination of whether or not statements may be classified as mere puffery "is generally not an appropriate basis on which to dismiss a complaint at this stage of the action." *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-5571, 2003 U.S. Dist. LEXIS 19431, at *63-64 (S.D.N.Y. Nov. 3, 2003); *In re Globalstar Sec. Litig.*, No. 01-1748, 2003 U.S. Dist. LEXIS 22496, at *23-24 (S.D.N.Y. Dec. 12, 2003). *See also Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 761 (D. Conn. 1997) (deferring making "puffery" determination until after discovery has been gathered).

EMC.[9]  What this explanation fails to disclose are the facts undermining its accuracy; namely, that Network Engines was not "strengthening" its relationship with EMC, but rather was facing a whopping price increase on the EMC goods sold by its TidalWire subsidiary.  *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 334 (D. Mass. 2002) (rejecting defendants' argument that statement was puffery when "facts pled indicate that at the time of the statement the Defendants . . . omitted the current truth."); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (citation omitted) (even "[a]n opinion may . . . be actionable . . . if it is without a basis in fact . . . [or if] the speakers were aware of any facts undermining the accuracy of these statements.").

During the November 6th Conference Call, defendants made additional actionable false and misleading statements.  For example, defendant Curtis stated, in pertinent part, that the Company was "optimistic that in coming quarters, there will be more opportunities to partner with ***existing*** and the newly signed software companies to develop, market and distribute new appliances into the storage and security markets."  ¶30.  Again, what defendant Curtis failed to say was that the opportunity represented in the past by EMC was going to be vastly changed, much to the Company's detriment, by the price increases demanded by EMC.

In an analogous case, statements similar to those made by defendant Curtis were found actionable.  In *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901 (D.N.J. 1998), the court found that the statement, "'MobileMedia believes the MobileComm acquisition will enhance its competitive position' [was] not a general, non-specific statement [because it] specifically dr[ew] a link between future success and the acquisition of MobileComm. … Accordingly, if as [plaintiffs] allege, MobileMedia could have no reasonable basis for this belief, given the problems it was experiencing integrating Dial Page, then [the] statement may serve as the basis for liability."  *Id*. at 928.  Here, defendant Curtis's statement that the Company was optimistic that there would be more opportunities to partner with "existing" companies, *i.e.*, EMC, is not unlike the statement found actionable in

---

[9] Defendants insist that this statement (and Bryant's response to an analyst's question during the November 6th Conference Case) is technically correct because, they argue, it relates to Network Engines's OEM business and not to the Company's distribution business.  DM at 6, 16-17.  Defendants' argument should be rejected because it amounts to a plea for the Court to make improper findings of fact concerning what the statements "sought to address," DM at 17, or whether an investor must have understood that, as defendants now spin, certain statements were confined to apply only to a certain segment of the Company's business.  DM at 6.  Of course, on this motion to dismiss, the Court must reject such improper factual arguments.

*MobileMedia* because it drew a link between the Company's future business opportunities and the Company's continued relationship with EMC without revealing the poor state of the negotiations with EMC.  Similarly, defendant Curtis's statements that the Company, "consider[ed its] ***acquisition of TidalWire to be a core success***," and that the Company had "benefited from the ***surge in demand for . . . products distributed by our TidalWire distribution operation***," (¶30) (emphasis added), drew a link between the Company's success and the distribution operations of TidalWire.  Both statements are actionable because defendants had no reasonable basis to believe that the touted "success" could continue, but rather, knew that TidalWire would not continue to experience the same level of success in light of the substantial erosion in its margins that would result from the price increases demanded by EMC.[10]

### D.    Defendants' Statements Are Not Forward-Looking And Are Not Protected Under The PSLRA's Safe Harbor Provision

The PSLRA exempts certain forward-looking statements from liability if "the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . ."  15 U.S.C. §§ 77z-2(c)(1) (A)(i), 78u-5(c)(1)(A)(i).[11]  Even where a statement is forward-looking and accompanied by sufficient language, liability for securities fraud will still attach if the statements were knowingly false and misleading when made, as is the case here.  As the First Circuit explained in *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 194 (1st Cir. 1999), the safe harbor provision "precludes liability for a forward-looking statement ***unless*** the maker of the statement had actual knowledge it was false or misleading."  (Citation omitted, emphasis added).  As demonstrated below, the false and misleading statements alleged in the Complaint do not qualify for protection under the PSLRA's safe harbor provision.

---

[10]  *See, e.g., In re APAC Teleservices, Inc. Sec. Litig.*, 97-9145 (BSJ), 1999 U.S. Dist. LEXIS 17908, at *25-26 (S.D.N.Y. Nov. 19, 1999) (statements that company "growth . . . is the direct result of our track record in contributing superior value to clients" and that company distinguished itself by "generating increased sales and improved customer service" not puffery); *In re First Chicago Corp. Sec. Litig.*, 769 F. Supp. 1444, 1452 (D. Ill. 1991) (statement that "our excellence in relationship banking and credit risk assessment, coupled with rapidly improving product skills, make us confident that First Chicago will experience continued success and achievement in the 1990s," not puffery).

[11]  "The Court of Appeals for the Eleventh Circuit has summarized the definition of a forward-looking statement as one whose truth cannot be determined until after the statement is made."  *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 990 (W.D. Wis. 2003), *citing Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999).

### 1.    Defendants' Statements Are Not Forward-Looking

Defendants' statements are not forward-looking. Each of defendants' statements describes a historical or present "fact" concerning the Company. As explained in *Rosen v. Textron,* 321 F. Supp. 2d 308 (D.R.I. 2004), "[t]he allegedly misleading statements set forth in the press releases involve statements of either current or past earnings – ***not the type of financial information subject to different results based on unforeseen or unexpected circumstances***. Accordingly, [such] statements are not exempt from liability under the PSLRA as forward-looking statements and therefore are actionable." *Id.* at 321 (emphasis added).

For example, the statement that, "[t]he Company ***continued to develop*** its relationships with new partners ***and strengthen*** relationships with existing partners," (¶27), described past conduct, not planned future conduct. The statement purported to tell the market about things the Company had already done. Similarly, the statement that, "[t]he ***results*** for our fiscal year 2003 ***reflect*** a dramatic turnaround for Network Engines. Our ***results reflect*** the continuing success of our business strategy," (*id.*), trumpets a turnaround that the Company had supposedly ***already*** experienced. "We consider our acquisition of TidalWire to be a core success for our company. . . . we ***benefited*** from the surge in demand for storage networking products distributed by our TidalWire distribution," (¶30), and "[the] improvement [in gross margins] is directly related to the growth of our revenues which ***was driven by*** our acquisition of TidalWire," (¶33), likewise refer to past successes and the reasons for those successes. In sum, there is nothing contingent, speculative, predictive, or hypothetical about any of the challenged statements, and none require the passage of time to determine whether they were accurate when made.

### 2.    Defendants' Statements Were Not Accompanied by Meaningful Cautionary Language

Corporations and their officers may not warn investors that something ***may*** happen when it has ***already*** happened or, as in this case, is ***already happening***. *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 24  (D. Mass. 1999) ("Warning of past and future memory shortages is actionably misleading when a recent memory shortage remains undisclosed").[12] For cautionary

---

[12] *See also In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989) ("There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already

language to be meaningful, "the warned risk must be sufficiently similar to the subsequent adverse events to provide 'notice of the danger of the investment' so that the investor can make an 'intelligent decision about it according to her own preferences for risk and reward.'" *Friedman*, 295 F. Supp. 2d at 990 (*quoting Harris*, 182 F.3d at 805). *See also In re Boston Tech. Sec. Litig.*, 8 F. Supp. 2d 43, 61 (D. Mass. 1998) (safe harbor will apply only if "cautionary words are sufficiently strong in both tone and substance to counter whatever significance investors might reasonably attach to the prediction").

Here, defendants' purported "cautionary language" in SEC filings and press releases warned investors only that "actual results ***could*** differ materially from those stated or implied in forward-looking statements due to a number of factors." DM at 9. These boilerplate cautions are grossly inadequate here, where defendants already ***knew*** that the Company's gross margins ***would*** decline materially because of the steep price increases that EMC had demanded.  ¶34.  Likewise, the language that "dependence on EMC – including the risk that EMC could cancel or otherwise modify its contract with Network Engines, and that '[i]f [the company] were to lose these reference sales or if margins [it] derive[d] from such sales were reduced to any significant degree, the Company's results of operations and financial condition would suffer," (*id*.), was not sufficient because these statements are a near-textbook example of warnings that the untoward may happen when it has, in fact, already happened.  *Number Nine*, 51 F. Supp. 2d at 14, n.12 ("To the extent that plaintiffs allege . . . representation of present fact, and that such a representation was false or misleading when made, the surrounding cautionary language could not have rendered the statement immaterial as a matter of law.") (citations and quotations omitted).

### E.     DEFENDANTS' HAD A DUTY TO DISCLOSE ITS CONTRACT NEGOTIATIONS WITH EMC

"[T]he law does not require that a contract be finalized in order for it to be material." *See In re Alliance Pharma. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 196 (S.D.N.Y. 2003).  Material facts include those that "affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities." *S.E.C. v. Texas Gulf Sulphur, Co.*, 401 F.2d 833, 849 (2d

---

developed problems so significant as to require months of delay."); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."), *aff'd in relevant part and rev'd in part on other grounds*, 459 U.S. 375 (1983).

Cir. 1968). Moreover, an event need not be finalized to be material. "When contingent or speculative events are at issue, the materiality of those events depends on 'a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (*quoting Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). The duty to disclose information – here, contract negotiations – arises whenever "the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic*, 485 U.S. at 231-32, (*quoting TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Materiality is normally a jury question that is not appropriate for resolution on a motion to dismiss. *Lucia*, 36 F.3d at 176.

The Complaint pleads that the "indicated probability" of EMC's inflicting price increases upon the Company was certain, ¶¶25, 26, and that the "magnitude of the event" was substantial. Not only were the price increase and its impact on gross margins important enough to warrant explicit statements in the Company's belated disclosure of these items in the December 10th Press Release, but the market's reaction to the announcement confirms their magnitude and materiality. The Complaint pleads that the price of Network Engines shares dropped 39% following the December 10th Press Release. *See Manavazian v. ATEC Group, Inc.*, 160 F. Supp. 2d 468, 483 (E.D.N.Y. 2001) ("A dramatic change in the value of a company's stock following a company announcement regarding the prospects of a merger supports the materiality of the announcement.").

Defendants' argument that the contract negotiations did not have to be disclosed rests on an improper factual presumption and relies on inapposite and non-precedential cases. First, defendants blithely assert that the "status of the contract negotiations was [not] certain . . . [until] December 10, 2003, when negotiations were completed and the contract amendment was signed." DM at 14. Without coming out and saying so, what defendants have actually done is argue in favor of having this Court jump to the improper factual conclusion in their favor that the contract negotiations were not "certain" until December 10th. The Complaint clearly pleads that, in the relevant respects, *i.e.,* as pertains to whether there would be a substantial cost increase, the outcome of the negotiations was clear much earlier than December 10th. *E.g.*, ¶¶ 25-26. By arguing that the contrary is true,

defendants are simply inviting this Court into the error of resolving a disputed factual issue on a motion to dismiss.

In any event, as made clear by the authorities cited above, the legal standard is not that a contract must be "certain" and "executed" before a duty to disclose can arise. The lone case from this district cited by defendants does not hold to the contrary. *Evanowski v. Bankworcester Corp.*, 788 F. Supp. 611 (D. Mass. 1991), did not involve a defendant's failure to disclose incomplete contract negotiations, but rather the renegotiation of a merger price. *Id.* at 612-13. In that case, the plaintiffs knew that there were merger negotiations, but did not know that the merger price was being renegotiated. *Id.* at 613. Compare that to here, where the defendants did not disclose that they were in contract negotiations with their largest and most important client, nor that it was already clear that the outcome of those negotiations would adversely affect the Company's financial condition.[13]  ¶¶27-36.

## III.    THE COMPLAINT ADEQUATELY PARTICULARIZES ITS ALLEGATIONS

The Complaint adequately particularizes the circumstances constituting defendants' fraud. The allegations of fraud are pled upon information provided by knowledgeable former employees. As noted by Chief Judge Young, in *In re Peritus Software Services, Inc*., 52 F. Supp. 2d 211 (D. Mass. 1999), a complaint so pled does not have to meet the heightened pleading standard that is required by the PSLRA for cases pled on information and belief:

> [B]ecause the Class has based its allegations on interviews with former Peritus sales and marketing personnel . . . a different standard applies. The allegations offered to show why a particular statement is false or misleading must be accepted as true even without a supporting factual predicate when based on something other than information and belief. That is the heightened standard of the PSLRA only attaches when allegations are based on information and belief.

*Id*. at 227-28.

---

[13]  The other cases cited by defendants, *In re Humana Sec. Litig*., No. 99 –0398, 2000 U.S. Dist. LEXIS 21671 (W.D. Ky. Nov. 7, 2000) and *Glazer v. Formica Corp*., 964 F.2d 149 (2d Cir. 1992), are also wholly distinguishable from the present case. *Humana* supports plaintiffs' position that a duty to disclose contract negotiations arises when a party makes "an affirmative statement which would have been misleading without [the undisclosed] information." *Id*. at *12. (In *Humana*, no such statements were alleged). In *Glazer*, unlike here, defendants had already disclosed in a press release that the Company would "consider any legitimate acquisition proposal." *Id*. at 152. As such, plaintiffs could not maintain a claim for the Company's failure to disclose negotiations for an LBO.

Thus, because the Complaint is not pled on information and belief, defendants are wrong that "plaintiffs are required to set forth the sources and reasons for their belief with particularity." DM at 10.[14] (Although, as set forth within, even if the Complaint were held to this standard, it would pass muster.)

Plaintiffs' particularized allegations of fraud are based on knowledgeable sources who have every indicia of reliability. The sources – the Former Territory Manager and the Former Director of Channel Marketing – were high-level employees at the Company during the Class Period. Each reported to a Vice President of Sales. ¶26. The indicia of reliability as to the Former Territory Manager's account of the fraud is particularly great because he learned of the EMC negotiations *directly* from a Company Vice President, who obtained the information from Mike Riley, who was a member of the Company's "executive team" and defendant Chris's "right hand man." *Id.*

Defendants are also mistaken when they attempt to denigrate the specificity of the Complaint by referring to one allegation as "third-level hearsay." DM at 11-12. Plaintiffs are not required to plead trial evidence. *Cabletron*, 311 F.3d at 33.[15] A complaint is not analyzed on a motion to dismiss against the strictures of the Federal Rules of Evidence. Judged by the proper standards, *see supra* Sec. I, this Complaint is more than adequately pled. As noted by the First Circuit, "[t]he approach we take, similar to Novak, is to look at all of the facts alleged to see if they '***provide an adequate basis for believing that the defendants' statements were false***.'" *Cabletron*, 311 F.3d at 29 (emphasis added) quoting *Novak*, 216 F.3d at 314. *See also Zoghlin v. Renaissance Worldwide, Inc.*, No. 99-1965, 1999 U.S. Dist. LEXIS 20815, at *10 (D. Ill., Nov. 4,1999) ("The court will deny a Rule 12(b)(6) motion to dismiss where the defendant merely "attempts to nit-pick the complaint to death.") *citing LaSalle v. Medco Research, Inc.*, 54 F.3d 443, 447 (7th Cir. 1995). Indeed, so long as the Complaint pleads the

---

[14] In *Carney v. Cambridge Technology Partners, Inc.*, 135 F. Supp. 2d 235, 246-47 (D. Mass. 2001), relied on by defendants, the complaint was based solely on the investigation of counsel, unlike this Complaint, which is supported with accounts from potential witnesses. More to the point is *Lirette v. Shiva*, 999 F. Supp. 164, 165 (D. Mass. 1998), upon which *Carney* relied, which held that a complaint supported "by some document or statement on personal knowledge by a potential witness," does not have to meet the PSLRA's heightened pleading standard required of complaints pled on information and belief.

[15] *See also Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (plaintiffs not required to plead "all" facts); *In re Digi Int'l Sec. Litig.*, 6 F. Supp. 2d 1089, 1096-1097 (D. Minn. 1998) (plaintiffs' allegations need not be supported by "underlying documentary evidence"), *aff'd*, Nos. 00-3162, 00-3227, 201 U.S. App. LEXIS 15095 (8th Cir. June 11, 2001); *In re Cephalon Sec. Litig.*, No. 96-0633, 1997 U.S. Dist. LEXIS 13840, at *5 (E.D. Pa. Aug. 29, 1997) (PSLRA "does not require pleading all the evidence and proof thereunder supporting a plaintiff's claim").

"who, what, when, where and why" relating to the statements alleged to be false, which here it does with particularity, nothing else is required from plaintiffs under the law. *Allaire*, 224 F. Supp. at 325.

The Complaint pleads defendants' fraud with sufficient particularity. The Complaint identifies defendants' false and misleading statements, including the speaker of each statement, and where and when the statements were made, and provides the accounts of reliable confidential sources with knowledge of the negotiations between the Company and EMC to demonstrate that the challenged statements were false when made. ¶¶26-36. No more is required. Though the defendants argue that the Complaint must provide all manner of exquisite detail, DM at 10-14, it is patently not necessary for a complaint to plead every single detail that might have been involved in the contract negotiations to plead fraud with the requisite particularity. *Cabletron*, 311 F.3d at 33.

## IV.    THE COMPLAINT PLEADS FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

"Liability under section 10(b) and Rule 10b-5 also requires scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Cabletron*, 311 F.3d at 38 (citation omitted). *Greebel* reaffirmed that the only change made by the PSLRA to First Circuit scienter jurisprudence is that a plaintiff must now allege a "strong inference" rather than a "reasonable inference" that the defendants acted with the required state of mind. 194 F.3d at 96. "The inference of scienter must be reasonable and strong, ***but need not be irrefutable***." *Aldridge v. A.T. Cross. Corp.*, 284 F.3d 72, 82 (1st Cir. 2002) (emphasis added). Allegations of scienter must be judged in their entirety and not in isolation. *Florida State Bd. Of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001) (court must determine whether complaint's allegations "collectively add up" to strong inference of scienter).[16] Finally, scienter is sufficiently pled where, as here, contradictory facts were either known to the defendant or so obvious that defendant must have been aware of them. *See Aldridge*, 284 F.3d at 83

---

[16] *Broudo v. Dura Pharms., Inc.*, 339 F.3d 933, 940 (9th Cir. 2003)("This court has made clear that allegations of scienter must be collectively considered:  Beyond each individual allegation we also consider whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.") (citation omitted) (emphasis added).  *See also Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003)(same); *In re Pemstar, Inc. Sec. Litig.*, No. 02-1821, 2003 U.S. Dist. LEXIS 14452, at *20-21 (D. Minn. Aug. 15, 2003) (same); *In re Chronimed, Inc. Sec. Litig.*, No. 01-1092, 2002 U.S. Dist. LEXIS 8962, at *17-18 (D. Minn. May 16, 2002) (same).

("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter.").

### 1.    Defendants Possessed Actual Knowledge of the Fraud

Defendants obviously knew that they were locked in intense negotiations that would affect the Company's bottom line. *See* ¶26(a)-(b). Indeed, the Complaint pleads with particularity that defendants were engaged in price negotiations as far back as October 2003, and that they knew that those negotiations would result in a decrease in the Company's gross margins. *Id.*

### 2.    Defendants' False and Misleading Statements Concerned the Company's Core Operations and Products

The alleged misstatements and omissions concerned the Company's core operations and products. As alleged in the Complaint, Network Engines's relationship with EMC was absolutely mission-critical: EMC-related business contributed at least 83% of the Company's revenues. ¶¶23, 43. Likewise, TidalWire was an important part of the Company's business, according to defendants' own statements. (*E.g.*, TidalWire a "core success" for Network Engines, ¶30, which fueled the "growth of [the Company's] revenues." ¶33.) The importance of TidalWire to defendants' business was confirmed by two high-level former employees of the Company. ¶26.

The Complaint alleges matters that go to the core of Network Engines's operations, which may properly be attributed to the corporation's and its key officers' knowledge. *Chavelrus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999) (noting that facts critical to an important transaction may be attributed to the company and its key corporate officers). *See also Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (attributing knowledge of recent adverse information that directly affected company's self-described "important" revenue source); *In re Tel-Save Sec. Litig.*, No. 98-3145, 1999 U.S. Dist. LEXIS 16800, at *14 (E.D. Pa. Oct. 19, 1999) (scienter attributed to defendant for statements concerning transactions that were significant part of company's business); *In re Ancor Communications Inc. Sec. Litig.*, 22 F. Supp. 2d 999, 1004 (D. Minn. 1998) (knowledge of incompatibility of the company's technology with a key customer may be imputed to defendants and supports strong of inference of scienter under the strictest interpretation of PSLRA); *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998)("[F]acts critical to a business's core operations or an

important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers.").

The Complaint does not merely rely on the individual defendants' senior positions in the Company to establish scienter, as defendants reflexively argue, DM at 17, but rather provide detailed allegations concerning the importance of EMC and TidalWire to Network Engines's business, ¶24, in addition to details about the "emergency meetings" held to discuss the EMC contract, ¶26(b), and the clear difference between what defendants were telling the public and the true state of the negotiations between the Company and EMC. ¶26. *Green Tree*, 270 F.3d at 665 ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.").

### 3. The Proximity Between Defendants' False and Misleading Statements And the Company's Bad News Establishes A Strong Inference of Scienter

Proximity of bad news to optimistic statements is circumstantial evidence that defendants knew that their optimistic statements were false. *Powers v. Eichen*, 977 F. Supp. 1031, 1039 (S.D. Cal. 1997) (finding that three week lapse of time between optimistic statements and bad news is circumstantial evidence of falsity); *see also In re Grand Casinos Sec. Litig.*, 988 F. Supp. 1273, 1284 n.16 (D. Minn. 1997)("Where, as here, the type of problems at issue likely did not come to light all at once, revelations shortly thereafter can support an inference of earlier knowledge.").

Here, defendants made unqualified, positive statements on November 6th concerning, among other things, the surge in the growth of Network Engines's business, which was specifically attributed to the TidalWire subsidiary, and the Company's robust margins. ¶¶30, 33. Only one month later, on December 10th, the Company revealed that its distribution agreement with EMC had been amended and that, as a consequence, the TidalWire distribution operation "*would*" incur "*increased costs*," which would "*in turn have a negative impact on the company's distribution operations gross profit*." ¶37. The negotiations over pricing between defendants and EMC did not occur overnight. As set forth in the Complaint, the "sh*t hit the fan" before December 10th. Emergency meetings were held at least one month prior. This lapse in time of merely several weeks between defendants' highly

19

positive statements and the subsequent bad news concerning the Company's business, combined with the allegations that establish that this bad news did not suddenly materialize overnight, establish the defendants' scienter.[17]

## V.    PLAINTIFFS' HAVE STATED A CLAIM UNDER SECTION 20(A)

Defendants do not and cannot dispute that the Individual Defendants are control persons of Network Engines pursuant to §20(a) of the Exchange Act.  Rather, defendants rely solely on their argument that plaintiffs have not established a primary violation of §10(b) in seeking dismissal of plaintiffs' §20(a) claim.  As demonstrated above, plaintiffs have adequately alleged a primary liability against the Company and the Individual Defendants.  Thus, to the extent that the Court finds a primary violation, it should also find a violation of §20(a).  *Gelfer v. Pegasystems*, 96 F. Supp. 2d 10, 18 (D. Mass. 2000).

### CONCLUSION

WHEREFORE, defendants' motion to dismiss the amended consolidated complaint should be denied in its entirety.[18]

Date: October 12, 2004

By: /s/ Nancy Freeman Gans
Nancy Freeman Gans
**MOULTON & GANS, P.C.**
33 Broad Street, Suite 1100
Boston MA  02109-4216
(617) 369-7979

---

[17] Insider trading of stock is not *per se* required to establish motive.  *Aldridge*, 284 F.3d at 84.

[18] As demonstrated herein, the Complaint states actionable claims under the federal securities laws and amply satisfies the pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA.  However, in the event that the Court determines that there are any deficiencies in the Complaint as to any of the named defendants, plaintiffs respectfully request that they be granted leave to replead.  *See* Fed. R. Civ. P. 15(a) (leave to replead shall be freely given); *Reyes v. Supervisor of Drug Enforcement Admin.*, 834 F.2d 1093, 1097 (1st Cir. 1987).

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
Rachel S. Fleishman
Carlos F. Ramirez
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

**Lead Counsel For Plaintiffs**

**LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP**
Samuel H. Rudman
David A. Rosenfeld
200 Broadhollow Road, Suite 406
Melville, NY 11747
(631) 367-7100

**Attorneys for Plaintiffs Sergio and Ricardo
Guerrera**

## CERTIFICATE OF SERVICE

I, Nancy Freeman Gans, hereby certify that a true copy of the above document was served upon the attorney of record for each party on October 12, 2004.

/s/ Nancy Freeman Gans
Nancy Freeman Gans