UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: NETWORK ENGINES, INC.<br>SECURITIES LITIGATION | Civil Action No. 03-12529-JLT |

# REPLY IN SUPPORT OF DEFENDANTS' MOTION
# TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

Jeffrey B. Rudman
Daniel W. Halston
John A. Litwinski
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000

Robin L. Alperstein (*pro hac vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800

Dated: November 12, 2004

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................ii

I.   THE COMPLAINT DOES NOT RAISE A STRONG INFERENCE OF SCIENTER ..... 1

   A.   Plaintiffs Do Not Rely On Any Stock Sales To Support Scienter .......................... 1

   B.   Plaintiffs Fail To Plead Any Particularized Facts To Support A
        "Strong Inference" That Defendants Knew The Outcome Of The
        EMC Negotiations Prior To The November 6, 2003 Statements ............................ 1

II.  THE COMPLAINT FAILS TO PLEAD WITH PARTICULARITY THAT ADVERSE
     FACTS EXISTED ON NOVEMBER 6, 2003 ................................................................. 6

III. DEFENDANTS' STATEMENTS ARE INACTIONABLE AS A MATTER OF LAW ... 7

   A.   Defendants' Statement About Strengthening Relationships With Existing
        Partners Did Not Concern The Distribution Business ........................................... 7

   B.   Defendants' Other Statements Are Non-Actionable As Either True Statements
        Of Past Success Or Puffery ................................................................................... 10

IV.  THERE WAS NO DUTY TO DISCLOSE UNCERTAIN CONTRACT
     NEGOTIATIONS EVEN IF THEY HAD BEEN ONGOING PRIOR
     TO NOVEMBER 6, 2004 ................................................................................................ 12

CONCLUSION ........................................................................................................................ 14

# TABLE OF AUTHORITIES

**Cases**   Page

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) .................................................................................... 3, 4

*Backman v. Polaroid Corp.*,
  910 F.2d 10 (1st Cir. 1990) ....................................................................................... 10

*Baron v. Smith*,
  285 F. Supp. 2d 96 (D. Mass. 2003), *aff'd*, 380 F.3d 49 (1st Cir. 2004) .................... 11

*Castellano v. Young & Rubicam, Inc.*,
  257 F.3d 171 (2d Cir. 2001) ....................................................................................... 13

*Colby v. Hologic, Inc.*,
  817 F. Supp. 204 (D. Mass. 1993) ............................................................................. 14

*Evanowski v. Bankworcester Corp.*,
  788 F. Supp. 611 (D. Mass. 1991) ............................................................................. 13

*Fleming v. Commonwealth*,
  419 S.W.2d 754 (Ky. Ct. App. 1967) ........................................................................... 3

*Glazer v. Formica Corp.*,
  964 F.2d 149 (2d Cir. 1992) ....................................................................................... 13

*Greebel v. FTP Software, Inc.*,
  182 F.R.D. 370 (D. Mass. 1998), *aff'd*, 194 F.3d 185 (1st Cir. 1999) ....................... 14

*Keane v. Village of Waterfund*,
  130 N.Y. 188 (N.Y. 1891) ............................................................................................ 3

*In re Alliance Pharmaceutical Corp. Securities Litigation*,
  279 F. Supp. 2d 171 (S.D.N.Y. 2003) ........................................................................ 13

*In re Boston Technology, Inc. Securities Litigation*,
  8 F. Supp. 2d 43 (D. Mass. 1998) ................................................................................ 9

*In re Cabletron Systems, Inc.*,
  311 F.3d 11 (1st Cir. 2002) .......................................................................................... 4

*In re Grand Casinos, Inc., Securities Litigation*,
  988 F. Supp. 1273 (D. Minn. 1997) ............................................................................. 5

*In re Humana Securities Litigation*,
   No. 3:99-CV-0398-S, 2000 U.S. Dist. LEXIS 21671 (W.D. Ky. Nov. 7, 2000),
   *aff'd sub nom. Freeburg v. Wolf*, 42 Fed. Appx. 715, 2002 U.S. App. LEXIS 15710
   (6th Cir. July 31, 2002) ............................................................................................. 12, 13

*In re MobileMedia Securities Litigation*,
   28 F. Supp. 2d 901 (D.N.J. 1998) ..................................................................................... 12

*In re Next Level Systems, Inc. Securities Litigation*,
   No. 97 C 7362, 1999 U.S. Dist. LEXIS 5653 (N.D. Ill. Mar. 31, 1999) .......................... 10

*In re Peritus Software Services, Inc. Securities Litigation*,
   52 F. Supp. 2d 211 (D. Mass. 1999) ................................................................................... 5

*Langadinos v. American Airlines, Inc.*,
   199 F.3d 68 (1st Cir. 2000) ................................................................................................. 6

*Manavazian v. ATEC Group, Inc.*,
   160 F. Supp. 2d 468 (E.D.N.Y. 2001) .............................................................................. 13

*Perry v. United States*,
   18 Cust. Ct. 350 (1947) ....................................................................................................... 3

*Powers v. Eichen*,
   977 F. Supp. 1031 (S.D. Cal. 1997) .................................................................................... 5

*Romani v. Shearson Lehman Hutton*,
   929 F.2d 875 (1st Cir. 1991) ............................................................................................. 14

*Serabian v. Amoskeag Bank Shares, Inc.*,
   24 F.3d 357 (1st Cir. 1994) ............................................................................................ 9, 10

*Shaw v. Digital Equipment Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ............................................................................................. 10

BOSTON 2318236v5

Plaintiffs' complaint has numerous deficiencies, but none more fatal than its failure to allege facts giving rise to a "strong inference" of scienter. Indeed, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Consolidated Complaint ("Opp.") makes clear that Plaintiffs case survives or falls based on whether one paragraph in their Complaint (¶ 26) adequately pleads facts giving rise to a "strong inference" of scienter. It does not. Faced with no stock sales, no internal reports, and no other factual allegations to support scienter, Plaintiffs instead rely solely on ambiguous statements from two former mid-level employees, neither of whom can support a "strong inference" that any Defendant knew of "the negotiations [with EMC that] would result in a [50%] decrease in the Company's gross margins" prior to the statements of November 6, 2003, which are the centerpiece of the Complaint. Without such a showing, the Complaint fails not only on scienter grounds, but for lack of any "false" statements.

## I.  THE COMPLAINT DOES NOT RAISE A STRONG INFERENCE OF SCIENTER

### A.  Plaintiffs Do Not Rely On Any Stock Sales To Support Scienter

Plaintiffs apparently concede that their allegations about defendant Genovesi's trades cannot support a strong inference of scienter, as their Opposition makes no reference to that allegation. *See* Opp. at 17-20. Nor could they, for the reasons discussed in Defendants' Opening Brief ("Op. Br.") at 18-19. Instead, Plaintiffs simply abandon this argument by noting that allegations of insider trading are *not* necessary to establish scienter. *See* Opp. at 20 n.17.

### B.  Plaintiffs Fail To Plead Any Particularized Facts To Support A "Strong Inference" That Defendants Knew The Outcome Of The EMC Negotiations Prior To The November 6, 2003 Statements

Plaintiffs plead no facts from which it may be strongly inferred that Defendants were engaged in "intense negotiations [with EMC]" on or before November 6, 2003, much less that the outcome of such negotiations was certain by that time. Plaintiffs' case rests on vague

allegations by two former mid-level employees (one of whom worked at Network Engines for a mere eight months) about information allegedly received second- and third-hand and fails to plead with particularity any basis for the former employees' knowledge. *See* Op. Br. at 11-13.

Though Plaintiffs contend that these former employees provided "detailed accounts" of the negotiations, the Complaint reveals nothing of the kind. *See* Op. Br. at 3. The allegations attributed to these former employees are limited to stating that the "sh*t hit the fan" during an ill-defined time frame, that EMC demanded a price increase of 50%, and that there were negotiations. *See* Compl. ¶ 26. Neither an account, much less any detail, is provided: no names of those who participated in these alleged negotiations; no dates on which the negotiations occurred; no location for the negotiations; no date when the "emergency meeting" was called or who at EMC called it; no indication that the alleged 50% "price" increase was demanded prior to November 6, 2003. Thus, contrary to the law of this jurisdiction, Plaintiffs have failed entirely to plead with particularity that Defendants' statements were false when made.

Plaintiffs do not even attempt to refute Defendants' argument that both "October or November" and "early November" include dates after November 6, 2003. Instead, they argue that knowledge may be attributed to the individual Defendants based on their positions within the Company. *See* Opp. at 18. But Plaintiffs' entire attribution argument rests upon the *conclusion* — unsupported by particularized facts — that Defendants were engaged in negotiations with EMC prior to November 6, 2004. Plaintiffs have no answer to Defendants' arguments that the Amended Complaint does not allege *when* "the sh*t hit the fan," when EMC demanded a royalty payment that would decrease margins by 50%, or when the outcome of the

BOSTON 2318236v5

negotiations became as certain as hard fact. *Compare* Opp. at 18 *with* Op. Br. at 13-14.[1] Given that Plaintiffs have built their entire case around the supposedly "false" statements made on November 6, 2003, Plaintiffs must have asked their sources whether the "intense negotiations [with EMC]" occurred before (or after) November 6th. The only logical, reasonable inference for their failure to allege a specific date before November 6th is that their sources would not support any such date.[2]

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002) on which Plaintiffs rely, does not support their scienter argument. *See* Opp. at 17-18. There, the Court reiterated that a complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *See Aldridge*, 284 F.3d at 78 n.2. The plaintiffs in *Aldridge* met the particularity requirement because they alleged specific facts showing that the defendants knew their statements were false at the time they made them: these facts consisted of admissions by the defendants themselves about their "original" plan and "plan from the get go," *id.* at 80, which raised a strong inference that the company offered price protection before the public statements from which the existence of that protection was omitted. In addition, the plaintiffs alleged other circumstances that provided factual evidence of knowledge and intent, including the existence of particular financial incentives to load sales and earnings that went "far beyond the usual arrangements of compensation." *Id.* at 83-84.

---

[1] Plaintiffs' assertion that Defendants were engaged in price negotiations with EMC "as far back as October 2003," Opp. at 18, only highlights their pleading deficiency. The sole allegation in the Complaint concerning the October time frame is entirely equivocal, alleging merely "October or November" and the "October/November" time frame. *See* Compl. ¶ 26(a). Further, the "October" part of this allegation is contradicted by the allegation in ¶26(b) that the negotiations began in November 2003. These contradictions preclude a strong inference that the negotiations occurred in October 2003.

[2] Viewing the allegations in the light most favorable to Plaintiffs, the most that the Court may infer is that there *could have been* negotiations in November prior to November 6th. This inference is far from "strong," as "early" encompasses dates after November 6th. *See Perry v. United States*, 18 Cust. Ct. 350, 352 (1947) (the "early part of that month" includes February 10); *Fleming v. Commonwealth*, 419 S.W.2d 754, 755 (Ky. Ct. App. 1967) ("early in the month [of December includes] the *tenth* of December") (emphasis added); *Keane v. Village of Waterfund*, 130 N.Y. 188, 192 (N.Y. 1891) ("*early* part of the month" included "between the fifth and the eighth") (emphasis added).

*Aldridge* stands in sharp contrast to the allegations here, where the sole basis for Plaintiffs' contention that contract negotiations existed prior to November 6, 2003 does not come from statements or admissions made by Defendants, from contemporaneous internal records, or even from particularized allegations of statements made by persons with reason to have personal knowledge of the alleged negotiations. It comes from two former employees with no personal knowledge who heard third-hand from others – others who themselves are not alleged to have participated in the alleged contract renegotiations – that the "sh*t hit the fan" in "October *or* November." *See* Compl. ¶ 26 (indicating that neither former employee participated in or spoke directly with anyone who participated in the negotiations). Plaintiffs fail even to allege a single detail about what the Company Vice President or Vice President of Sales is alleged to have told to the former employees (or some intermediary), or when the latter were told. *Id.* Thus, though Plaintiffs contend that these former employees "have every indicia of reliability," (Opp. at 16), they are inherently unreliable precisely because they were remote from the events they purport to report and their accounts are based on second- and third-level hearsay.[3]

First Circuit law is clear that to establish scienter, more is required. *See, e.g., In re Cabletron Sys., Inc.*, 311 F.3d at 24 (because there were six former employees with personal knowledge, as well as "significant stock sales by corporate insiders" of over $180 million during the class period, the sheer quantum of alleged facts was sufficient to raise a strong inference of scienter); *Aldridge,* 284 F.3d 72 (defendants' admissions coupled with contemporaneous internal reports gave rise to strong inference of scienter); *see also In re Peritus Software Serv., Inc. Sec.*

---

[3] Plaintiffs are mistaken that in characterizing these allegations as "third level-hearsay," Defendants have attempted to force them to meet an inapplicable evidentiary burden. *See* Opp. at 16. The case law of this Circuit is clear that the Court must determine whether the heightened pleading standards of the PSLRA are met by considering, among other things, the reliability of the sources of the allegations in the Complaint. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002). The hearsay issue is relevant here because allegations based on statements of persons without personal knowledge of "facts" they learned from others who learned them from yet others, are not reliable and thus cannot raise a strong inference of scienter. Moreover, contrary to Plaintiffs' argument (*see* Opp. at 7 n.4), the former employees' use of the term "price increase" to describe the introduction of a royalty payment casts further doubt on their reliability because it reflects a lack of knowledge of the underlying contract and changed terms.

*Litig.*, 52 F. Supp. 2d 211, 225 (D. Mass. 1999) (plaintiffs failed to raise strong inference of scienter even though allegations were based on interviews of employees who were former sales and marketing personnel who stated that "sales were floundering," that large numbers of the sales force resigned immediately following the merger, and that the existing sales force was unable to successfully replicate the sales techniques of the other company).

Plaintiffs' final effort to bolster their claim by suggesting that "proximity" is circumstantial evidence of scienter fails because they rely on distinguishable authority from other jurisdictions.[4] In *In re Grand Casinos, Inc., Securities Litigation*, 988 F. Supp. 1273, 1284 (D. Minn. 1997), there were insider stock sales and other indications to support scienter. In addition, the Court found that revelations shortly after a positive public statement could support an inference of earlier knowledge where the type of problems at issue likely did not come to light all at once. *See id.* Here, by contrast, the sole "problem" at issue was a demand for a change to the terms of a contract, which was likely to have come to light at once, and which could easily have arisen and been negotiated in a matter of days or weeks before it was announced on December 10, 2003.[5] Thus, the disclosure of a renegotiated contract on December 10, 2003 cannot support an inference that the statements on November 6, 2004 were false.[6]

---

[4] In light of Plaintiffs' failure to allege specific facts from which it may be strongly inferred that Defendants were in fact engaged in negotiations with EMC on or before November 6, 2003, or that Defendants knew what the outcome of those negotiations would be, Plaintiffs also cannot bolster scienter with allegations that the claimed omissions concerned Network Engines' core operations and products. *See* Opp. at 18-19 (citing only cases in which the court first determined that the plaintiffs had adequately alleged that adverse information existed).

[5] Of course, even if the "[e]mergency meetings were held at least one month prior to December 10th," as Plaintiffs elsewhere argue, *see* Opp. at 19, the emergency meetings could have occurred on November 10th. This would have provided Defendants ample time to renegotiate the EMC contract, while leaving the November 6th statements accurate when made.

[6] *Powers v. Eichen*, 977 F. Supp. 1031, 1039 (S.D. Cal. 1997), a case in which a court also found proximity could bolster plaintiffs' scienter allegations, is likewise distinguishable because there were insider stock sales. The plaintiffs also alleged 14 different problems with the production of the defendant's product, including part supply shortages, which the defendants allegedly knew about at the same time they predicted that production volume would increase. Here, only one event has been identified by Plaintiffs.

## II. THE COMPLAINT FAILS TO PLEAD WITH PARTICULARITY THAT ADVERSE FACTS EXISTED ON NOVEMBER 6, 2003

Plaintiffs contend they are not "required to set forth the sources and reasons for their belief with particularity," asserting that they are relieved from the PSLRA's heightened pleading requirement because the Complaint includes an allegation at ¶ 26 based on interviews with former employees. *See* Opp. at 15-17 (citing *Peritus*, 52 F. Supp. 2d at 227-28). The First Circuit, however, follows Rule 9(b)'s requirement that "[i]n all averments for fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 73 (1st Cir. 2000) (citing Fed. R. Civ. P. 9(b)). The First Circuit has never lowered the particularity requirement where allegations are predicated upon individual sources. Indeed, in *Cabletron*, 311 F.3d 11, on which Plaintiffs inexplicably rely, the Court evaluated the plaintiffs' allegations based upon the heightened pleading standards of the PSLRA, even though the plaintiffs had based their allegations on interviews with six former employees – three times the number upon which Plaintiffs here rely. *Id.* at 21.[7]

In fact, in *Cabletron*, the First Circuit provided guidelines for plaintiffs to meet the particularity requirement of the PSLRA where plaintiffs "rely [not only] on confidential personal sources but *also on other facts*." *Cabletron*, 311 F.3d at 29 (emphasis added). Whether the alleged facts provide "an adequate basis for believing that the defendants' statements were false" involves "an evaluation, inter alia, of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.* at 29-30 (emphasis added).

---

[7] Plaintiffs' reliance on *Peritus*, which precedes the controlling First Circuit authority of *Cabletron*, to avoid their obligation to particularize their allegations of fraud is thus misplaced. In any event, *Peritus dismissed* the plaintiffs' claims because their allegations lacked the requisite specificity. *See Peritus*, 52 F. Supp. 2d at 226.

-6-

Plaintiffs here allege no "other facts" that "corroborate" the statements of the two former employees – no documentary evidence or other sources which, taken together, could provide an adequate basis for believing that Defendants' statements were false (*i.e*, for believing that contract negotiations accompanied by a demand for a royalty payment occurred prior to November 6, 2003, or that that outcome was certain before November 6, 2003). This is in sharp contrast to *Cabletron*, where the plaintiffs met the particularity standard because their allegations were based on six confidential sources who possessed personal knowledge of the practices complained of. *See Cabletron*, 311 F.3d at 24. The Court noted that "the *number* of different sources helps the complaint meet the standard. Their consistent accounts reinforce one another and undermine any argument that the complaint *relies unduly on the stories of just one or two former employees.*" *Id.* at 30 (emphasis added).

None of the factors that enabled the *Cabletron* plaintiffs to survive a motion to dismiss is present here. To the contrary, Plaintiffs "re[ly] unduly on the stories or one or two former employees" – the very situation that *Cabletron* identified as an example of an insufficient pleading. *Id.* Likewise, Plaintiffs' sources are not alleged to have any personal knowledge of the existence, timing, or purpose of the EMC contract negotiations – they rely on the claimed accounts of others (including one alleged to have heard it elsewhere from still others). *See* Compl. ¶ 26(b). This contrasts with *Cabletron*'s finding of falsity because plaintiffs' sources were employees "who were familiar with the activities discussed.... [T]he sources have a *strong basis of knowledge* for the claims *they make*." *Id.* (emphasis added).

### III. DEFENDANTS' STATEMENTS ARE INACTIONABLE AS A MATTER OF LAW

#### A. Defendants' Statement About Strengthening Relationships With Existing Partners Did Not Concern The Distribution Business

The cornerstone of Plaintiffs' argument that Defendants' statements are actionable, are not puffery, and are not forward looking is their contention that Defendants claimed to be

-7-

strengthening relationships with existing partners at the same time that EMC purportedly was demanding a 50% price increase. *See* Opp. at 9-10 and 12.[8] Plaintiffs insist that "[w]hether or not a statement is mere puffery requires a consideration of the context in which the statements were made," Opp. at 9, yet base their argument of falsity on statements taken entirely out of context. The press release itself reveals that Defendants' statements about "strengthening relationships with existing partners" were made about the OEM Appliance business, not the HBA distribution business that was the subject of the December 10, 2003 disclosure and the renegotiations with EMC:

> OEM Appliance Achievements
>
> Revenues from the *OEM Appliance business* were $14.0 million, compared to $14.4 million in the prior quarter, with the decrease primarily due to the timing of shipments to the Company's largest customer. Additionally, *the Company continued to develop its relationships with new partners and strengthen relationships with existing partners*. Achievements during the quarter included:
>
> - Further diversification of its revenue base with shipments to two new OEM customers.
>
> - One of the new OEM customers was BorderWare Technology, Inc. ....

*See* Litwinski Decl. Ex. 1 (emphasis added). The Company listed, in similar bullet points, its "Distribution Operations Achievements" under a separate heading in the press release. *Id.* The Complaint contains no allegations about the Company's OEM business, and, accordingly, there is "nothing actionable in th[is] statement[], which simply reports" accurately on a line of business that Plaintiffs do not even contend was affected by the renegotiated EMC contract.[9] *See*

---

[8] The Defendants will not restate here all the reasons the challenged statements are not actionable, but instead refer the Court to their Opening Brief at 5-9.

[9] Nor could the Complaint contain such allegations, as OEM, and HBA distribution, are two distinct lines of business, each with a separate contract with EMC. *See* Litwinski Decl. Ex. 3. Thus, The OEM business had nothing to do with and was unaffected by the imposition of royalties in the renegotiated EMC contract on the distribution side. *See* Op. Br. at 2; *see also* Litwinski Decl. Ex. 2. Plaintiffs' allegations all concern the EMC TidalWire contract governing the distribution business, not the OEM business.

*Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 362 (1st Cir. 1994); *In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 60 (D. Mass. 1998).

Plaintiffs' attempt to show falsity based on Bryant's Response on the November 6, 2003 investor call fails for the same reason. Again, Plaintiffs have taken Bryant's Response – which on its face pertains solely to the OEM Appliance business – out of context and attributed it to the HBA distribution business that TidalWire engaged in:

> Q: [by Omar Almadanni]: Just a question about your largest *OEM customer* here, from my estimate, it looks like it dropped 7% sequentially in terms of revenues ... how much of that [delta] is coming from the consignment issue?
>
> A: [by Doug Bryant]: I think we've stated in the past that, you know, it's really difficult to correlate, you know, what we report versus what our partner reports and all we can tell you [is] that *we ship it when they ask for it.*

Litwinski Decl. Ex. 6 (emphasis added). The analyst's question concerned the OEM Appliance business – a business line completely distinct from the HBA distribution business. *See* Litwinski Decl. Ex. 3. The Bryant Response thus *had nothing to do with* the EMC Tidalwire contract and cannot support a fraud claim regarding negotiations of a contract in a separate line of business.

Plaintiffs cannot evade this reality by characterizing as "spin" (Opp. at 10 n.9) Defendants' right to place the allegedly false statements in context. This Court may consider the allegedly actionable statements in context, and such consideration does not constitute improper fact finding by the Court, but rather simply reflects the necessary consideration of the circumstances surrounding the alleged fraud. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) (court may properly consider "the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint.").

BOSTON 2318236v5

## B. Defendants' Other Statements Are Non-Actionable As Either True Statements Of Past Success Or Puffery

In response to Defendants' argument that the complained-of statements are either literally true and/or nonactionable puffery, Plaintiffs acknowledge their literal truth (*see* Opp. at 7-8), but contend that these accurate statements are nonetheless actionable because the Complaint pleads a "contrast between what company officials were hearing internally ... and what the company was telling the public at the same time." Opp. at 8 (citing *Serabian*). Plaintiffs ignore that *Serabian* affirmed the dismissal of most of the allegations in the plaintiffs' complaint and expressly *rejected* the argument that accurate reports of past success are actionable when present circumstances are less rosy – the precise situation Plaintiffs present here. *See* 24 F.3d at 361.[10]

Moreover, the *Serabian* court found the remaining statement actionable because the plaintiffs presented a contrast between what company officials were *specifically* hearing internally about the effectiveness of their loan review policy and the adequacy of their collateralization, and their public statements that their lending practices were "conservative" and their collateralization "adequate." *Id.* at 365 (emphasis added). The court explained that "[b]y addressing the quality of a particular management *practice*, a defendant declares the subject of its representation to be material to the reasonable shareholder."[11] *Id.* (emphasis added).

The Past Performance Statements that Plaintiffs identify here did not contrast with "what company officials were hearing internally." *Id.* at 365. Indeed, Plaintiffs do not even argue that the Past Performance Statements explaining that results "reflect a dramatic turnaround"; that the Company's improvement was "directly related to the growth of our revenues which was driven

---

[10] Plaintiffs likewise fail to distinguish *Backman v. Polaroid Corp.*, 910 F.2d 10, 17 (1st Cir. 1990), which held there was no duty disclose to market buyers information simply because it was material, or to amplify what was said, unless the omitted matter caused what was said to be misleading.

[11] *In re Next Level Sys., Inc. Sec. Litig.*, No. 97 C 7362, 1999 U.S. Dist. LEXIS 5653 (N.D. Ill. Mar. 31, 1999) – which is *not* "analogous to this one" (Opp. at 7) – does not hold differently. There, the defendants' statements were actionable because they failed to disclose a decline in their business that had *already occurred*, rendering their financial disclosure misleading because it disclosed good past results while it omitted poor results. The plaintiffs' allegations of falsity were alleged with particularity because they were premised on financial data.

by our acquisition of TidalWire" and that the Company "benefited from the surge in demand for storage networking products distributed by .... TidalWire" were inconsistent with what Defendants were specifically hearing "internally."[12] *See* Opp. at 9-11. Plaintiffs instead argue that several Past Performance Statements, "read as a whole, fostered a misleading impression concerning the Company's then-current financial condition and business prospects." *See* Opp. at 8. Plaintiffs thus allege not a contrast between what the Company was specifically reporting and what it knew at the time, but a contrast between the Company's past accurate results, and an allegedly likely less rosy future – the very contrast *Serabian* held could not provide the basis for a fraud claim.[13]

Curtis' Optimistic Statement about future opportunities to "partner with existing and newly signed software companies" is likewise not actionable as a matter of law. Even were it not clearly forward looking and protected by the Safe Harbor,[14] *see* Opp. at 11-13, this is the type of statement that the First Circuit has repeatedly held nonactionable as a matter of law. *See* Op. Br. at 7-8 (citing cases). Further, under the analysis outlined in *Serabian*, Curtis' Optimistic Statement lacks any specific reference to what the Company had allegedly learned internally and what the Company was telling the public: Curtis' Optimistic Statement makes no specific reference to EMC; and the statement of optimism regarding more *opportunities* to *partner* with existing and newly-signed companies does not refer to or comment on the terms of current opportunities with EMC or make any representations about their status or continuation, but hopes

---

[12] Nor could they. Plaintiffs do not contend that the Company *had not* had a dramatic turnaround at the time that the Company reported one; that the Company's improvement was *not* directly related to the growth of revenues driven by the acquisition of TidalWire or that the Company *had not* benefited from the surge in demand for storage networking products distributed by TidalWire. *See* Compl. ¶¶ 27-29, 33.

[13] Plaintiffs offer no authority for their "misleading impression" argument, which is contrary to the law of this jurisdiction. *See, e.g., Baron v. Smith*, 285 F. Supp. 2d 96 (D. Mass. 2003), *aff'd*, 380 F.3d 49 (1st Cir. 2004). Their contention that "even the statement that 'the distribution contributed a 19.8% gross margin ... is actionable in this context" also runs squarely contrary to *Serabian*.

[14] Plaintiffs' argument that Defendants' statements are not entitled to safe harbor protection (*see* Opp. at 11-13) is dependent on the alleged "fact" that the negotiations with EMC had occurred and were of certain outcome prior to November 6, 2003. *See* Compl. ¶¶ 26, 28, 31. This argument thus too fails for lack of particularized facts. *See* discussion *supra* at 6-7.

-11-

for new transactions in the future. Moreover, Plaintiffs' allegations regarding the renegotiated EMC contract concern a decrease in gross profit margins, not a decrease in opportunities to partner with EMC or other customers.[15]

### IV. THERE WAS NO DUTY TO DISCLOSE UNCERTAIN CONTRACT NEGOTIATIONS EVEN IF THEY HAD BEEN ONGOING PRIOR TO NOVEMBER 6, 2004

Plaintiffs' effort to manufacture a duty to disclose the existence or status of alleged contract negotiations between Network Engines and EMC also fails. If, as Plaintiffs allege, negotiations between Network Engines and EMC had been ongoing since 2002, *see* Compl. ¶¶ 25-26, apparently without resolution and without any "price increase," there was no basis for Defendants to have known that any particular demand by EMC at any particular time would yield a result as certain as hard fact. Indeed, while they allege that there were months of negotiations, Plaintiffs provide no information about who was involved in the negotiations, how often they took place, or what was discussed "for months"; thus, they include no allegations that would raise an inference that any particular negotiation posture by EMC was in any way different or more likely to result in a price increase than any prior negotiation postures. It is because the outcomes of ongoing negotiations are uncertain that courts have held that a duty to disclose does not arise until the outcome of the negotiations is as certain as hard fact. *See In re Humana Sec. Litig.*, No. 3:99-CV-0398-S, 2000 U.S. Dist. LEXIS 21671, at *11-12 (W.D. Ky. Nov. 7 2000), *aff'd sub nom. Freeburg v. Wolf*, 42 Fed. Appx. 715, 2002 U.S. App. LEXIS 15710 (6th Cir. July 31, 2002) (explaining that requiring disclosure of all contract negotiations

---

[15] The District of New Jersey case *In re MobileMedia Securities Litigation*, 28 F. Supp. 2d 901 (D.N.J. 1998), on which Plaintiffs rely, allowed a fraud claim based on a statement of the company's "belief" that an acquisition would enhance its competitive position because the company "*specifically* dr[ew] a link between future success and the acquisition" at a time that it had internal information about problems resulting from that acquisition. *Id.* at 928 (emphasis added). By contrast, Curtis' Optimistic Statement makes no such specific link between the terms of Network Engines' contract with EMC and *future* opportunities to "partner" with EMC or other companies.

-12-

would result in confusion to stockholders and the market and harm to the overall position and interest of the corporation).[16]

Despite Plaintiffs' effort, *Humana* is not distinguishable. *See* Opp. at 15 n.13. Like Plaintiffs here, the plaintiffs there alleged that the defendants' statements were misleading in the absence of disclosure about the status of Humana's tense contract renewal negotiations with a longstanding major customer, and even alleged that Humana "knew from the outset that it 'was unlikely to win the sweetheart terms of years past' and that 'it wasn't going to be as good a contract as in the past.'" *Freeburg*, 42 Fed. Appx. at 715. The court found that the defendants had "no legal duty to inform the public of these developments until the outcome of the negotiations became as certain as hard facts. *Even then*, they had no duty to announce the terms of the deal unless they made an affirmative statement which would have been misleading without that information." *Humana*, 2000 U.S. Dist. LEXIS 21671, at *12 (emphasis added). Thus, Plaintiffs' failure here to allege facts indicating that the outcome of the alleged negotiations was "as certain as hard facts" by November 6, 2003 requires dismissal of their claims.[17]

---

[16] Plaintiffs' decry Defendants' reliance on *Humana*, a case with facts nearly identical to those here, because it is from outside this jurisdiction, yet themselves rely exclusively on authority from other jurisdictions in support of their position that negotiations should be disclosed prior to their outcome being certain. *See* Opp. at 13-15. Those cases, moreover, are not inconsistent with *Humana* and support Defendants' position. *In re Alliance Pharmaceutical Corp. Securities Litigation*, 279 F. Supp. 2d 171, 195-96 (S.D.N.Y. 2003) *dismissed* the plaintiffs' claims because they failed to show that the contract had been negotiated during the relevant period. *Castellano v. Young & Rubicam Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) was an appeal from summary judgment of a contract negotiation between two insiders in a close corporation (not a fraud-on-the-market case) in which the defendants did not dispute its duty to disclose based on a fiduciary relationship. *Manavazian v. ATEC Group, Inc.*, 160 F. Supp. 2d 468 (E.D.N.Y. 2001) is a duty to correct case and is inapposite.

[17] Plaintiffs' attempts to distinguish *Evanowski v. Bankworcester Corp.*, 788 F. Supp. 611, 614-15 (D. Mass. 1991) and *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) because they concerned, respectively, renegotiation of a merger price and a leveraged buyout, miss the central point: in both situations, the court held that the company was under no duty to disclose the status of negotiations whose outcome was uncertain – the same circumstances as alleged here. Plaintiffs, moreover, themselves rely on authority concerning possible mergers and cite no cases involving contract negotiations. *See* Opp. at 13-14.

## CONCLUSION

For the reasons set forth above and in the Memorandum of Law in Support of Defendant's Motion to Dismiss the Amended Consolidated Complaint, the Court should dismiss this case with prejudice.[18]

NETWORK ENGINES, INC., JOHN CURTIS, DOUGLAS G. BRYANT, and LAWRENCE A. GENOVESI,

By their attorneys,

_/s/ Jeffrey B. Rudman_
Jeffrey B. Rudman (BBO #433380)
Daniel W. Halston (BBO #548692)
John A. Litwinski (BBO #650603)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000

Robin L. Alperstein (*pro hac vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, New York 10022
(212) 230-8800

Dated: November 12, 2004

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on _Nov. 12, 2004_
_/s/_

---

[18] Where Plaintiffs have had nearly one year in which to come forth with sufficient allegations to state a claim and have failed to do so, they should not, as they now seek, *see* Opp. at 20 n.18, be granted leave to replead their deficient allegations. *Greebel v. FTP Software, Inc.*, 182 F.R.D. 370, 376 (D. Mass. 1998), *aff'd*, 194 F.3d 185 (1st Cir. 1999) (dismissing claim with prejudice where plaintiffs failed to plead *particular facts* sufficient to show their case had merit as required under the PSLRA). Dismissal without leave to amend is appropriate because Plaintiffs have utterly "failed to indicate *specifically* how [they] would amend the complaint so as to comply with Rule 9(b)." *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 881 (1st Cir. 1991) (emphasis added). Moreover, dismissal without leave to amend is appropriate because Plaintiffs have entirely "failed to outline what facts might be discovered to support [their] securities fraud allegations." *Colby v. Hologic, Inc.*, 817 F. Supp. 204, 217 (D. Mass. 1993).