# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

———————————————————————

In Re:  NETWORK ENGINES INC.
SECURITIES LITIGATION

)
)
)
)
)

**CA NO. 03-12529-JLT**

———————————————————————

## JOINT DECLARATION OF PLAINTIFFS' COUNSEL IN SUPPORT OF THE PROPOSED CLASS ACTION SETTLEMENT AND PETITION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

We, GEORGE A. BAUER III and DAVID A. ROSENFELD, hereby jointly declare:

1.      George A. Bauer III is a member of the firm of Milberg Weiss Bershad & Schulman LLP (previously known as Milberg Weiss Bershad Hynes & Lerach LLP) ("Milberg Weiss"), Counsel for Lead Plaintiffs Wing Kam Yu, Blake Kunkel, and Thomas Cunningham and the Class as defined below. David A. Rosenfeld is a member of Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin"), counsel for Plaintiffs Sergio and Ricardo Guerrera.  We submit this declaration in support of (i) the final certification of the Class for purposes of the settlement; (i) the proposed $2,875,000 cash settlement of this litigation (the "Settlement"), (ii) the proposed Plan of Allocation for distributing the net settlement fund to Class Members, and (iii) the application of Lead Counsel for an award of attorneys' fees and reimbursement of litigation expenses.  Milberg Weiss and Lerach Coughlin actively participated in all aspects of this litigation, and, based on the work conducted by attorneys for those firms and our communications with them, we are familiar with the facts set forth in this declaration.

2.      On March 29, 2006, Lead Plaintiffs Wing Kam Yu, Blake Kunkel, and Thomas Cunningham and plaintiffs Sergio and Ricardo Guerrera (collectively "Plaintiffs"), on the one hand, and Defendants Network Engines, Inc. ("Network Engines"), John Curtis, Douglas

Bryant, and Lawrence Genovesi (collectively "Defendants"), on the other hand entered into a Stipulation and Agreement of Settlement which, if approved by the Court, will completely resolve this litigation.

3.    This Settlement was achieved after informal discovery that illustrated the strengths and weaknesses of Lead Plaintiffs' case. Defendants produced, and Plaintiffs' Counsel reviewed, tens of thousands of pages of relevant documents, including, among other things, Network Engines' internal e-mails. Further, the Settlement occurred only after extensive, arm's-length negotiations, including an in-person session mediated by the Honorable Nicholas H. Politan, retired Judge of the United States District Court for the District of New Jersey. In obtaining this recovery for the Class, Plaintiffs did not have the benefit of any prior governmental investigation or prosecution, or any voluntary restatement of defendants' financial reports. Lead Plaintiffs built their own case.

4.    Lead Plaintiffs respectfully submit that the Court should finally certify the Class for purposes of this Settlement. Lead Plaintiffs satisfy the prerequisites of Rule 23(a) and the requirements of Rule 23(b)(3) that a class action is superior to alternative methods for fairly and efficiently adjudicating defendants' alleged violations of the securities laws. Accordingly, class certification is appropriate and should be granted for purposes of this Settlement.

5.    As show in the Affidavit Of Kim R. Schmidt Re: (A) Mailing Of The Notice And The Proof of Claim, and (B) Report On Receipt Of Exclusion Requests (the "Schmidt Affidavit"), submitted herewith, over eight thousand copies of the Notice of Pendency of Class Action and Proposed Settlement, Motion For Attorneys' Fees and Settlement Fairness Hearing (the "Notice") were distributed to potential Class Members, and, as shown in the Affidavit Of John J. Mills Re: Publication Of The Summary Notice Of Proposed Settlement Of

Class Action And Settlement Hearing (the "Mills Affidavit"), submitted herewith, a summary notice of the Settlement was published. No Class Member has objected to the Settlement, nor has any Class Member requested exclusion from the Class. In view of the wide dissemination of the Notice, the absence of any objection indicates the approval of the Settlement by the Class and helps demonstrate that the Settlement is fair, reasonable and adequate, and should be approved by the Court.

6.      It is also respectfully submitted that the Court should approve the proposed Plan of Allocation for distributing the net proceeds of the Settlement. The proposed Plan of Allocation is set forth in the Notice. The Plan provides for a proportionate distribution of the net settlement proceeds to Class Members based on their "Recognized Claims." The Recognized Claim formula generally provides that Class Members who purchased Network Engines common stock during the Class Period and held that stock through the corrective disclosure made at the end of the Class Period will have a claim for the $3.92 per share, the amount by which Plaintiffs contend that the stock was artificially inflated. Smaller amounts are allowed if the claimant's out of pocket loss was less that this amount or if the 90-day holding value under the PSLRA limited their loss, and only 10% of any losses are realized before the end of the Class Period. It is respectfully submitted that the proposed Plan of Allocation is a fair and reasonable method for allocating the net settlement fund, and should be approved. Again, no objection has been raised against the proposed Plan of Allocation.

7.      This Declaration is also submitted in support of the application by Lead Counsel for an award of attorneys' fees, on behalf of Plaintiffs' Counsel, in the amount of one-third (33-1/3%) of the Gross Settlement Fund and reimbursement of $36,566.54 in litigation expenses. The fee application includes the work of Milberg Weiss; Lerach Coughlin; Moulton

& Gans, P.C. ("Moulton & Gans"); and Brower Piven, a Professional Association (formerly known as The Law Offices of Charles J. Piven, P.A.) ("Brower Piven"), (hereafter collectively referred to as "Plaintiffs' Counsel").

8.     Plaintiffs' Counsel worked on an entirely contingent basis without any compensation whatsoever, shouldering the risk of committing resources to the litigation, notwithstanding significant uncertainty as to whether their efforts would succeed.  Plaintiffs' Counsel's efforts have produced an excellent result for the Class, especially in light of the fact that Network Engines never restated its financial statements or admitted wrongdoing and no government action was ever taken against any of the Defendants.  As discussed below, the requested fees falls well within the parameters recognized as appropriate in federal securities class actions such as this, regardless of whether the proposed fee is evaluated as a percentage of the amount recovered through the efforts of Plaintiffs' Counsel or as a multiple of their lodestar. It is respectfully submitted that requested fees and expenses are fair and reasonable, and should be approved.  Again, no objection has been to raised against the award of the requested fees or expenses.

9.     For the reasons discussed below, it is respectfully submitted that the Class should be finally certified for settlement purposes, that the Settlement is worthy of immediate approval, that the proposed Plan of Allocation is equitable and just, and that the requested fees and expenses should be awarded in full.  The relevant law supporting approval of the Settlement and the Plan of Allocation and Plaintiffs' Counsel's application for an award of attorneys' fees and reimbursement of expenses is set forth in the accompanying Memorandum Of Law In Support Of Final Approval Of Class Action Settlement And Plan Of Allocation (the "Settlement

Memorandum") and Memorandum Of Law In Support Of Plaintiffs' Counsel's Application For

An Award of Attorneys' Fees And Reimbursement Of Expenses (the "Fee Memorandum").

## BACKGROUND AND HISTORY OF THE LITIGATION

### A.    Factual Background

10.    As alleged in the Amended Consolidated Complaint dated June 4, 2004

(the "Complaint"), Network Engines is a provider of server appliance hardware and custom

integration services for computers.  Complaint ¶21.  Network Engines went public in mid-2000,

and, by September 2002, 83% of Network Engine's net revenues were generated from a single

customer, EMC Corporation ("EMC").  Complaint ¶23.  In November 2002, Network Engines

acquired TidalWire, Inc. ("TidalWire"), a company engaged in the distribution of storage

networking products, including Host Bus Adapters ("HBA"), which are used to connect data

storage systems to computer networks.  Complaint ¶24.  TidalWire distributed HBAs for use in

EMC storage systems.  *Id.*  Historically, TidalWire had received favorable pricing from EMC,

enabling TidalWire to enjoy high gross margins.  Complaint ¶25.  In addition, TidalWire had

received "reference sales" from EMC, meaning that EMC had referred customers to TidalWire to

purchase authorized products for use in EMC data storage networks.  Complaint ¶24.

Defendants described TidalWire's distribution business as a key component of Network

Engine's growth in 2003.  Complaint ¶33.

11.    The Complaint alleges that on November 6, 2003, the first day of the

Class Period, Defendants made positive and purportedly fact-based statements about Network

Engines' business in a press release (The "November 6th Press Release") and during an investor

conference call, including the following:

- "[T]he Company continued to develop its relationships with new partners and strengthen relationships with existing partners. We are seeing increasing acceptance of our unique value proposition by our customers and software partners." ¶27.

- "The results for our fiscal year 2003 reflect a dramatic turnaround for Network Engines. Our results reflect the continuing success of our business strategy." *Id.*

- "We consider our acquisition of TidalWire to be a core success for our company. In our Q4, we benefited from the surge in demand for storage networking products distributed by our TidalWire distribution." ¶30.

- "Gross margins for the fiscal year were 20.6% compared to 14.2% in fiscal 2002. During fiscal 2003, the distribution business contributed 19.8% gross margin. This improvement is directly related to the growth of our revenues which was driven by our acquisition of TidalWire and the growth in our OEM appliance business, while maintaining control over our operating expenses." ¶33.

- In response to a question concerning whether the Company was experiencing pricing pressure from EMC in light of a 7% drop in revenues from that customer, defendant Bryant stated, "I think we've stated in the past that you, you know, it's really difficult to correlate, you know, what we report versus what our partner reports, and you know, all we can tell you that, you know, we ship it when they ask for it." ¶35.

12.     Lead Plaintiffs allege in the Complaint that these positive statements were actually misleading half-truths, made by Defendants who knew or recklessly disregarded materially adverse facts concerning Network Engines' then-current financial condition and business prospects. Indeed, Defendants were allegedly aware, prior to November 6th, that TidalWire would be forced to pay a steep price increase for EMC-approved products distributed by TidalWire, and that this price increase would erode TidalWire's gross margins on sales of such items. Complaint ¶26.

13.     On December 10, 2003, Defendants issued a press release (the "December 10th Press Release") in which they finally disclosed what they had allegedly known for more than

a month, i.e., that Network Engines' distribution business was going to be adversely affected by changes in its relationship with EMC.  Specifically, Network Engines announced that, as a result of amendments to its distribution agreement with EMC, it would incur increased costs on the sale of EMC-approved HBAs, causing gross profits to decline dramatically.  *Id.*  ¶ 37.

14.    In the December 10th Press Release, Defendant Bryant, Network Engines' Chief Executive Officer, who had issued glowing statements (which he allegedly knew to be misleading) about Network Engines in the November 6th Press Release and investor conference call, finally revealed that the amendment would bring gross profits on the sale of EMC-approved HBAs "more in line with our third-party storage networking products, which as ranged from 7%-12% of net revenues."  *Id.*  These disclosures were unmistakably material and the market swiftly reacted.

15.    Prior to the December 10th disclosure, Defendant Genovesi sold 75,000 shares of his personally-held stock at artificially inflated prices for gross proceeds of $783,300.  *Id.* ¶¶14, 44 and 49.

16.    Following the December 10th Press Release, the price of common shares of Network Engines fell $3.92 per share, or some 39%, to close at $6.10 per share, on volume of some 14.4 million shares traded, or almost fourteen times the average daily volume.

**B.      History of Proceedings**

> **(1)      The Appointment of Lead Plaintiff and Lead Counsel and the Filing
> of the Consolidated Amended Complaint**

17.      Beginning on or about December 17, 2003, eight class actions alleging

violations of federal securities laws were filed in this Court,[1] all of which were subsequently

consolidated under the above-captioned Action.  By Order dated March 17, 2004, the Court

appointed Wing Kam Yu, Blake Kunkel, and Thomas Cunningham as Lead Plaintiffs.  The

Court also approved the law firms of Milberg Weiss Bershad Hynes & Lerach LLP (now known

as Milberg Weiss Bershad & Schulman LLP) as Lead Counsel for the Class and Moultan & Gans

as Liaison Counsel for the Class.

18.      On June 4, 2004, Lead Plaintiffs filed the Complaint, which asserted

claims against all Defendants for violations of Section 10(b) of the Securities Exchange Act of

1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  The Complaint further

alleged that Defendants John Curtis, Douglas G. Bryant, and Lawrence A. Genovesi

(collectively, the "Individual Defendants") were liable under Section 20(a) of the Exchange Act.

19.      On August 13, 2004, Defendants filed a motion to dismiss the Complaint

on the grounds that Lead Plaintiffs had failed to state a claim for relief because Plaintiffs failed

to allege, inter alia, (a) any misstatement as required to state a claim under the federal securities

laws; (b) a duty under the securities laws to disclose information beyond that which Defendants

---

[1] *I.e., Timothy Morgan v. Network Engines, Inc.*, No. 03-12529-JLT;  *Edwin Powell Miller v.
Network Engines, Inc.*, No. 04-10022-JLT; *David Dubrow v. Network Engines, Inc.*, No. 04-
10096-JLT; *Wing Kam Yu v. Network Engines, Inc.*, No. 04-10238-DPW; *Herbert A. Reitzel v.
Network Engines, Inc.*, No. 04-10288-JLT; *Nitin Subandh v. Network Engines, Inc.*, No. 04-
10332-JLT; *Gordon A. Price v. Network Engines, Inc.*, No. 04-10008-JLT; and *Kevin Denha v.
Network Engines, Inc.*, No. 04-10228-JLT.

did, in fact disclose; (c) any facts indicating that adverse circumstances existed at the time

Defendants made their challenged statements; or (d) any facts giving rise to a strong inference of

*scienter* under the PSLRA.  Following full briefing of the issues, the Court denied Defendants'

motion to dismiss by Order dated November 22, 2004.

**(2)    Discovery**

20.    On February 1, 2005, Rachel Fleishman and Andrew Wilmar of Milberg

Weiss and David Rosenfeld of Lerach Coughlin, met with Daniel Halston and Rachel Alperstein

of WilmerHale, Defendants' Counsel, at the offices of Milberg Weiss.  At this meeting,

Defendants made a presentation regarding what they believed the evidence in the case would

demonstrate.  Lead Counsel asked many questions, and sought copies of all the relevant

documents, including internal e-mail.  The parties agreed to engage in an expedited informal

discovery process.

21.    On June 10, 2005, as part of the informal discovery process, Defendants

produced over 50 thousand pages of internal company documents, including e-mails of the

following four key Network Engines employees for the period October 15, 2003 to December

15, 2003: John Curtis, Douglas Bryant, Don Oldham, and Jeff Brandes.  Also included in

Defendants' informal production were copies of the Distribution Agreement between TidalWire

and EMC, the First Amendment to that Distribution Agreement, and multiple drafts of the

Second Amendment, and the December 10th Press Release.  Lead Counsel closely reviewed

Defendants' document production.

22.    Plaintiffs' Counsel believe the documents support a claim that, as early as

October 17, 2003, Defendants knew or should have known that EMC would require a re-

negotiation of the Distribution Agreement and price concessions.  Plaintiffs' Counsel believe the

documents support a finding that the President of TidalWire was aware by October 17, 2003 that EMC had already begun re-negotiating with HBA vendors and could expect that EMC would require the same of TidalWire.

23.    Further documents indicate that as of October 28th, Bill Rafferty, the Vice President of Global Financial Services for EMC, had contacted Defendant Curtis to set up a meeting, which was ultimately set for Tuesday, November 11th (after the November 6th Press Release had been released).  Plaintiffs would contend that the documents would show that Defendants knew, well in advance of the meeting on November 11th, what the topic for discussion would be.  Plaintiffs' Counsel that could argue that additional e-mails during this time demonstrate an awareness on Defendants part that there was a likelihood that EMC would seek to renegotiate the terms on which it dealt with TidalWire and Network Engines.  Thus, well in advance of the November 6th Press Release, there was evidence that could support Plaintiffs' claims that Defendants knew that EMC wanted to discuss HBA pricing with Network Engines and that EMC had demanded price re-negotiations and concessions from others.

24.    The documents produced further indicate that Defendants closely followed EMC's renegotiation with McData, a Network Engines competitor and was aware by November 4, 2003 of McData's statement that their October quarter would fall short of views on EMC negotiations.  Plaintiffs' Counsel could use this to support the claim that the November 6 Press Release was material and that it was made recklessly or with knowledge that it was potentially misleading.

25.    Finally, internal company e-mails support Plaintiffs' claim that Defendant Genovesi sold 75,000 shares of stock for gross proceeds of $783,300 in late November/early

December 2003, at a time when he was or should have been aware of undisclosed adverse information about Network Engines' contract with EMC.

26.    In addition to the foregoing informal discovery, the parties also served, and responded and objected to, formal discovery.  On July 14, 2005, Defendants served document requests and interrogatories, and on July 28, 2005, Lead Plaintiffs did the same.  On August 29, 2005, Lead Plaintiffs served their responses and objections to Defendants' requests and interrogatories, and produced responsive documents to Defendants.  On September 13, 2005, Defendants did likewise, with the parties agreeing that Defendants' informal discovery would serve as their initial production of documents to Plaintiffs.

### (3)    Settlement Negotiations

27.    Following Lead Plaintiffs' Counsel's review of Defendants' informal production, Counsel for both sides conducted a series of meet-and-confers, including one in-person, on September 13, 2005, at the offices of WilmerHale in Boston.  These meetings confirmed that the parties remained far apart in terms of their respective assessments of both the merits of Lead Plaintiffs' claims and the amount of damages suffered by Class Members.

28.    The parties agreed to engage in mediation, and retained the Honorable Nicholas Politan, a retired federal judge, as a mediator.  In advance of the mediation session, the parties prepared confidential mediation statements for Judge Politan.

29.    On October 12, 2005, Counsel for Lead Plaintiffs, Defendants, and Defendants' insurer conducted a mediation before Judge Politan at the offices of Lead Counsel in New York.  During this mediation, both sides presented their opposing views of the case.

Finally, after intensive negotiation lasting the better part of a day, a settlement was tentatively reached.

30.    Over the next several months, the parties negotiated definitive settlement documentation, including the Stipulation and Agreement of Settlement, a proposed Preliminary Order for Notice and Hearing in Connection With Settlement Proceedings, the Notice, a Proof of Claim form, a Summary Notice for publication and a proposed Order and Final Judgment.  The settlement documents were filed with the Court on March 31, 2006, along with Lead Plaintiffs' motion for preliminary approval of the Settlement.  On April 4, 2006, the Court entered the Preliminary Order for Notice and Hearing in Connection With Settlement Proceedings preliminarily approving the proposed Settlement, approving the form of the Notice, and directing that the Notice be sent to Class Members.

31.    In accordance with the Court's Preliminary Order for Notice and Hearing in Connection With Settlement Proceedings, over eight thousand copies of the Notice have been mailed to potential Class Members.  *See* Schmidt Aff. at ¶ 11, submitted herewith.  The Court-approved Notice describes the action, the terms of the proposed Settlement (including the releases to be given to Defendants), and the Plan of Allocation.  The Notice also informs Class Members that Plaintiffs' Counsel intend to move the Court for an award of attorney's fees not to exceed one-third (33-1/3%) of the Gross Settlement Fund, and for reimbursement of expenses in the approximate amount of $35,000.  Class Members were also advised of their right to object to the Settlement, the Plan of Allocation, or the application for attorneys' fees and expenses.

32.    In addition, a summary notice of the Settlement was published in the national edition of *Investor's Business Daily* on April 27, 2006.  *See* Mills Aff. at ¶ 2 submitted herewith.

## TERMS OF THE SETTLEMENT

33.     In full and complete settlement of the Settled Claims that have or could

have been asserted against Defendants in this action, and subject to the terms and conditions of

the settlement agreement, $2,875,000 was paid into escrow by Defendants' insurance carrier on

April 3, 2006 for the benefit of the Class.  The $2,875,000 settlement amount, plus any interest

earned thereon is referred to as the "Gross Settlement Fund."  As of June 30, 2006, $31,720 of

interest has accrued to the Gross Settlement Fund.

34.     The Gross Settlement Fund, less all taxes, approved costs, fees and

expenses (the "Net Settlement Fund") shall be distributed on a *pro rata* basis, as described in the

Plan of Allocation discussed below, to members of the Class who submit timely and valid Proofs

of Claim.  Class Members have until August 18, 2006 to submit their Proofs of Claim to Rust

Consulting, Inc., the Court-appointed claims administrator.

35.     Upon the Court's approval of the Settlement, Lead Plaintiffs and members

of the Class will release, and shall be enjoined from prosecuting, Defendants and related parties

for any and all "Settled Claims" which term is defined in the Notice and in the Settlement

Stipulation as:

> any and all direct, individual or class claims (including Unknown Claims, as
> defined in the Stipulation), debts, demands, rights or causes of action or liabilities
> whatsoever (including, but not limited to, any claims for compensatory damages,
> punitive damages, interest, attorneys' fees, expert or consulting fees, and any
> other costs, expenses, liability or relief, monetary, injunctive, or otherwise),
> whether based on federal, state, local, statutory or common law or any other law,
> rule or regulation, whether fixed or contingent, accrued or un-accrued, liquidated
> or un-liquidated, at law or in equity, matured or un-matured, whether class or
> individual in nature, including both known claims and unknown, pleaded or
> unpleaded, suspected or unsuspected claims, (i) that have been asserted in this
> Action by the Lead Plaintiffs, Class Members or any of them against any of the
> Released Parties, (ii) that could have been, or could in the future be, asserted in

any forum by the Lead Plaintiffs, Class Members or any of them against any of the Released Parties which arise out of or are based upon or relate in anyway to the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the Complaint and that relate to the purchase, sale or acquisition of shares of the common stock of Network Engines by the Lead Plaintiffs, Class Members or any of them during the Class Period, or (iii) that arise out of or relate in any way to the defense or settlement of this Action (except for claims to enforce this Settlement). Expressly excluded from this Settlement and any release contained herein are any and all claims that have been asserted or could be asserted under the Securities Act of 1933, the Securities Exchange Act of 1934, the Sherman Act, New York General Business Law § 340 (or any similar law of any other state), or any other laws, for any conduct complained of in (i) In re Network Engines, Inc. Initial Public Offering Securities Litigation, 01 Civ. 10894 (SAS), as coordinated for pretrial purposes in In re Initial Public Offering Securities Litigation, Master File No. 21 MC 92 (SAS), pending in the United States District Court for the Southern District of New York, and (ii) In re Initial Public Offering Antitrust Litigation, 01 Civ. 2014 (WHP), on appeal to the United States Court of Appeals for the Second Circuit as Case No. 03-9284(L), 03-9288 (CON).

It should be noted that the above Settled Claim definition was negotiated so as to exclude the release of claims that Class Members might have in separately pending litigation relating to the initial public offering of Network Engines common stock which claims are unrelated to the time period or statements involved in this action.

## THE PLAN OF ALLOCATION

36.    Under the Plan of Allocation, the Court-appointed claims administrator, Rust Consulting, Inc., will calculate each Authorized Claimant's "Recognized Claim," based on the information supplied with the Claimant's proof of claim. Each claimant's *pro rata* share of the Net Settlement Fund shall be based upon the claimant's Recognized Claim from transactions in Network Engines common stock during the Class Period, as compared to the total of all accepted claimants' Recognized Claims.

37.    The Plan and the "Recognized Claim" formula here were prepared in such a way as to fairly allocate the recovery among Class Members in accordance with Lead Plaintiffs' theories of damages in the action and reflect Lead Counsel's evaluation of the

strengths and weaknesses of the claims of Class Members.  Thus, as set forth in the Plan, a claimant's Recognized Claim is based upon Lead Plaintiffs' contention of the estimated artificial inflation in the price paid for shares of Network Engines common stock taking into account the limitations on damages imposed under the PSLRA.  This estimated inflation is the excess amount that Class Members allegedly paid over fair market value for their common stock.  For most Class members who purchased their stock during the Class Period, and held it as of the December 10 2003 disclosure, this loss in inflation amounted to $3.92 per share.  To the extent that Class Members sold their Network Engines common stock at a loss prior to the disclosures on December 10 at a still-inflated, but lower price, the Recognized Claim is reduced to just 10% of the loss under the Plan.  Losses are also limited to a claimant's out of pocket loss and are limited for shares held after the end of the Class Period by a $6.10 holding value per share, the value of the shares at the lose of trading on December 10, 2003.

38.     To the extent a Claimant had a gain from his, her or its overall transactions in Network Engines common stock during the Class Period, the value of the Recognized Claim will be zero.  To the extent that the Claimant suffered an overall loss on his, her or its overall transactions in Network Engines common stock during the Class Period, but that loss was less than the Recognized Claim calculated under the Plan of Allocation formula, then the Recognized Claim shall be limited to the amount of the actual loss.  The Plan is similar in structure to numerous other such plans which have been utilized in securities class action cases.  Lead Plaintiff submits that the Plan has a reasonable and rational basis and is fair and equitable to Class Members and should be approved by the Court.

**THE CLASS SHOULD BE FINALLY CERTIFIED FOR PURPOSES
OF THE SETTLEMENT**

39.    The Preliminary Order for Notice and Hearing in Connection With

Settlement Proceedings entered by this Court on April 4, 2006, preliminarily certified the

following Class for settlement purposes pursuant to Rules 23(a) and 23(b)(3):

> All Persons who purchased or otherwise acquired Network Engines common
> stock during the period between November 6, 2003 and December 10, 2003,
> inclusive.  Excluded from the Class are the Defendants, the officers and directors
> of Network Engines during the Class Period, members of their immediate families
> (parents, siblings, spouses and children) and their heirs, successors or assigns, and
> any entity in which Defendants have or had a controlling interest at any time
> during the Class Period.

40.    The Class, defined in that Order, should now be finally certified.

**A.    The Requirements of Rule 23(a) Are Satisfied**

41.    The four prerequisites of Rule 23(a) are that:

> a.    the class be so numerous that joinder of all members is
> impracticable;
>
> b.    there be questions of law or fact common to the class;
>
> c.    the claims or defenses of the representative parties be typical of the
> claims or defenses of the class; and
>
> d.    the representative parties will fairly and adequately protect the
> interests of the class.

**1.    Numerosity**

42.    Rule 23(a)(1) requires that the class be so numerous that joinder of all

class members is impracticable.  Here, where it is estimated that the number of persons who

purchased Network Engines common stock is in the thousands, numerosity is satisfied.

## 2.    Commonality

43.    Rule 23(a)(2) provides that a suit may be maintained as a class action if "there are questions of law *or* fact common to the class." (emphasis added).  There are substantial common questions of law and fact present here.  The following issues are common to all Class Members: (a) Did Defendants' statements and omissions violate the federal securities law? (b) Did Defendants misrepresent material facts about the business relationships, financial condition, and business prospects of Network Engines? (c) Did Defendants act knowingly or recklessly in issuing their November 6th Press Release? (d) Was the price of Network Engines common stock artificially inflated during the Class Period? (e) Was such inflation the result of Defendants' material misrepresentations and non-disclosures? and (e) What is the proper measure of those damages?

## 3.    Typicality

44.    Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class."  The typicality requirement is satisfied as long as Lead Plaintiffs and the Class point to the same events or course of conduct to support a claim for relief and where they stem from the same legal theory.  Here, the typicality requirement is satisfied because Lead Plaintiffs are purchasers of Network Engines common stock who are seeking to prove Defendants' liability based on the same legal theories as the other Class Members and based on the exact same set of facts as set forth in the Complaint and discussed herein.

## 4.    Adequacy of Representation

45.    Rule 23(a)(4) is satisfied if (i) the class representatives' interests are not antagonistic to those of other members of the class that they seek to represent; and (ii) the class

representatives' attorneys are qualified, experienced and generally able to conduct the litigation. These requirements are satisfied here.

46.    First, Lead Plaintiffs are adequate representatives of the Class. There are no antagonisms between Lead Plaintiffs on the one hand and the Class Members on the other. Lead Plaintiffs have acted, and continue to act, as fiduciaries of the Class, and their interests are directly aligned with other members of the Class. Therefore, they are clearly adequate under Rule 23.

47.    Second, Plaintiffs' Counsel are highly experienced in class action litigation and has successfully prosecuted numerous class actions throughout the United States. Plaintiffs' Counsel diligently and aggressively represented their clients and the Class before this Court, including by briefing, arguing, and defeating the motion to dismiss; reviewing tens of thousands of pages of documents; preparing for and attending the mediation before Judge Politan; and negotiating the terms of the proposed Settlement.

**B.    The Requirements of Rule 23(b)(3) Are Satisfied**

48.    In addition to satisfying the requirements of Rule 23(a), plaintiffs must also satisfy at least one of the three subsections of Rule 23(b). Rule 23(b)(3) provides that an action may be maintained as a class action if:

> The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

49.    There are virtually no questions relevant to this litigation that do not apply to all Class Members. Clearly common questions predominate in this action.

50.    It is respectfully submitted that all of the requirements of Rule 23(a) and (b)(3) are met here and the Class should be finally certified for purposes of this Settlement.

## EVALUATION OF THE PROPOSED SETTLEMENT

51.    The Settlement is the result of litigation, discovery, analysis and a mediation presided over by a former federal judge.  Lead Plaintiffs, Lead Counsel and Plaintiffs' Counsel have concluded that the Settlement is fair, reasonable and adequate and should be approved by the Court.  Further, no Class Member has objected to the Settlement or requested exclusion from the Class.  Settlement at this time avoids the significant risks and costs of trial and subsequent appellate proceedings, which trial could have resulted adversely for the Class, and/or delayed final resolution of these claims for years.  Although Lead Plaintiffs and Plaintiffs' Counsel believe that this case was strong on the merits, they are aware that certain difficult issues of law and fact make trial of Lead Plaintiffs' claims a risky and uncertain proposition. The Settlement, on the other hand, provides an immediate benefit to the Class.  It is the informed opinion of Lead Counsel and Plaintiffs' Counsel that the significant risks involved in taking this case to trial justify this Settlement.

52.    A proposed class action settlement enjoys a strong presumption that it is fair, reasonable and adequate where, as here, it was the product of arm's-length negotiations conducted by capable counsel, who are experienced in class action litigation pursuant to the federal securities laws.  Indeed, absent fraud or collusion, the Court should rarely substitute its judgment for that of the parties who negotiated the settlement.  This presumption is especially applicable here where the arm's-length negotiations were assisted by mediation by the Honorable Nicholas H. Politan, retired Judge of the United States District Court for the District of New Jersey.

53.     As set forth in the accompanying Memorandum Of Law In Support Of Final Approval Of Class Action Settlement And Plan Of Allocation, in the First Circuit, the pertinent factors for evaluating the fairness of a proposed class action settlement are the following:  (1) the potentially significant obstacles to a recovery; (2) the likely expense and duration of the litigation; (3) the stage of the proceedings at which the settlement was reached; (4) the amount of the settlement in light of the risks of litigation; (5) whether the settlement was reached after arm's-length negotiations and the opinion of qualified counsel; and (6) the reaction of the Class to the proposed settlement.  For the reasons set forth below, it is the informed opinion of Lead Plaintiff and Co-Lead Counsel that each of these factors warrants granting final approval to the proposed Settlement.

A.     **The Potentially Significant Obstacles To Recovery**

54.     There were significant risks in proceeding with a trial of Lead Plaintiffs' claims.  Throughout the litigation, Defendants vigorously contested issues of liability and damages and advanced arguments that, while unsuccessful at the motion to dismiss stage, might have succeeded at summary judgment, or which might have persuaded a jury to find in their favor.

55.     At the time the proposed Settlement was reached, Lead Plaintiffs were concerned they would have particular difficulty demonstrating that Defendants made material misrepresentations and omissions with the requisite degree of scienter.  Defendants made it clear, in their motion to dismiss and subsequent negotiations, that they would vigorously contest scienter at summary judgment and trial.  *See, e.g.*, Defs.' Mem. of Law in Supp. of Mot. to Dismiss the Complt. ("Defs' MTD Mem."), at 17-19.

56.    As discussed above, Plaintiffs' Counsel believe that internal company documents obtained by Plaintiffs' Counsel as part of the informal discovery process, confirm that, in the two weeks prior to the November 6 Press Release, Defendants were aware that EMC's renegotiation with a major Network Engines competitor had resulted in far less favorable terms to the latter.  The documents could be used to support Plaintiffs' Counsel's contention that Network Engines feared it would suffer the same fate as its rival.  Lead Plaintiffs were thus confident they could demonstrate some evidence that Defendants knew (based on EMC's request for a meeting and its recent renegotiation with a  Network Engines' rival) EMC planned to renegotiate its distribution agreement with Network Engines on less favorable terms, and that Defendants expected the impact be materially adverse.  However, it is not clear that they could show, on the basis of these documents, that Defendants knew what the actual terms of EMC's renegotiation with them would be.

57.    This concern was compounded by uncertainty surrounding Defendant Genovesi's sales of his Network Engines shares in late November and early December.  The e-mails discussed above confirm that these sales were made during the time when EMC informed Defendants that EMC wanted to discuss or renegotiate its contract with Network Engines.  Yet Defendants have consistently contended since the motion to dismiss that Genovesi's sales were made pursuant to a "pre-existing SEC Rule 10b5-1 plan," and are thus irrelevant to any inference of scienter.  Defs.' MTD Mem. at 18-19.

58.    Lead Plaintiffs contend that Defendant Genovesi's status as an insider with knowledge of the EMC contract renegotiation obligated him not to sell his shares of stock unless and until the inside information that he knew was made public.  *See Vandenberg v. Adler*, 2000 U.S. Dist. LEXIS 4050, 20-21 (S.D.N.Y. 2000) (holding that liability under section 10(b) is

not limited to only those who make statements or omit information which should properly be disclosed).  Lead Plaintiffs further believe that any Rule 10b5-1 plan (if one existed) only further contributed to Defendant Genovesi's incentive to delay disclosure of the renegotiation until after his preset sales occurred.  Nevertheless, Lead Plaintiffs are cognizant that this Court might disagree with their appraisal of the law and facts, leaving proof of scienter a risk.

59.     Lead Plaintiffs were similarly concerned they would face difficulty rebutting Defendants' contention that the challenged statements amounted to non-actionable puffery.  Defendants argued in their motion to dismiss that the comments in question were merely general expressions of optimism, which cannot give rise to liability under the federal securities laws.  *See* Defs.' MTD Mem., at 7 (citing *Grebel*, 194 F.3d at 207; *Carney*, 135 F. Supp. 2d at 245).

60.     Lead Plaintiffs countered that puffery is an inherently contextualized inquiry, and that Defendants' statements had clear meaning when read in context.  Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss the Complt., at 9 (citing *Schaffer v. Timberland*, 924 F. Supp. 1298, 1214 (D.N.H. 1996).  More specifically, Defendants expressed optimism about continuing to "strengthen relationships with existing partners."  Lead Plaintiffs believe that the "existing partners" reference, taken in context, was clearly to EMC, then responsible for 83% of Network Engines' net revenue.  Defendants apparently made this statement despite their knowledge that, far from "strengthening" the relationship between the two companies, the negotiations with EMC promised to yield price increases that would materially and adversely impact the Network Engines' distribution business.  Although the Compliant survived a motion to dismiss, Lead Plaintiffs were mindful of the risk that this Court, or a jury, might well disagree with this assessment of the relevant law and facts on a motion for summary judgment or at trial.

61.    In sum, taking this case through summary judgment and trial presented very significant risks with respect to establishing liability and damages.  When measured against the $2,875,000 Settlement obtained, the foregoing risks strongly favored settlement of this action.

## B.    The Likely Expense and Duration of the Litigation

62.    As the preceding has shown, this action presents many complex issues with respect to establishing Defendants' liability and in proving damages.  Completion of pre-trial proceedings and trial of these claims would have required thousands of hours of additional work by Lead Counsel.  Moreover, whatever the outcome of the trial, the stakes in this case would inevitably have led to post-trial motions, as well as appeals to the First Circuit.  All of the foregoing would have significantly added to the expense of this litigation and delayed, potentially for years, any recovery to Class Members (with no assurance, of course, that Lead Plaintiffs would ultimately prevail).  Settlement at this juncture results in a tangible present recovery, without the attendant risk and delay of trial and post-trial proceedings.  In sum, the "complexity, expense and likely duration of continued litigation" factor weighs strongly in favor of approving the proposed Settlement.

## C.    The Stage of the Proceedings And The Amount of Discovery Completed

63.    Having produced and reviewed well over fifty thousand pages of discovery, having engaged in numerous negotiations both in-person and telephonically, and having conducted a day-long mediation before Judge Politan, in which Counsel for Plaintiffs, Defendants, and Defendants' insurers strongly advocated their clients' respective positions, Lead Counsel were well informed of the strengths and weaknesses of Lead Plaintiffs' claims and Defendants' defenses.  Thus, Lead Plaintiff and Lead Counsel had a thorough understanding of

the relative merits of each side's case with respect to both liability and damages when the settlement was reached.

**D.    The Amount of the Settlement In Light of The Likely Recovery and All the Attendant Risks of Litigation**

64.    As demonstrated by the foregoing, this was a case involving significant risks and challenges.  Lead Plaintiffs submit that the evidence supports its allegations that Defendants committed securities fraud.  Defendants did and would argue to the contrary.  The outcome of summary judgment and trial was uncertain.  The measure of damages was another issue of contention between Plaintiff and Defendants.  While Plaintiffs contend that the $3.92 drop in the price of Network Engines common stock upon the December 10, 2003 disclosure is a good measure of the damages and could result in Class-wide measure of damages of many times the amount of the Settlement, some part of the $3.92 drop could be attributed to adverse information revealed in the Press Release that was not corrective of the alleged prior misstatements or omissions but was subsequent news.  The measure of damages was certain to become a battle of the experts and it may well have been the case that if Lead Plaintiffs were successful on liability, that damages would not have been much different than the amount of the Settlement.

65.    There was no governmental investigation of any kind into these matters, nor did Network Engines restate any financial statements, so Lead Plaintiffs did not have the benefit of such factors to help make their case.

66.    Notwithstanding these significant risks and uncertainties, Lead Plaintiffs and Lead Counsel have obtained a substantial recovery for the Class.  In light of the risks, and

the amount recovered, the Settlement represents a fair, reasonable and adequate recovery for the Class and should be approved.

**E.      The Settlement Was Reached After Arm's-Length Negotiations**

67.      When a proposed settlement is the result of arm's length negotiations among experienced counsel and parties, there is an initial presumption that the proposed settlement is fair and reasonable.  Qualified and experienced counsel for both sides, who were intimately familiar with the facets of this case negotiated the Settlement here.  The negotiations here were assisted by the mediation efforts of a retired United States District Judge.  Collusion is definitely not an issue with respect to this Settlement.  As explained herein, the parties fought hard for almost three years.  Plaintiffs overcame Defendants motion to dismiss the Complaint.  Formal and informal discovery were conducted, and numerous meetings were held, in-person and telephonically.  This Settlement is accordingly entitled to a presumption of fairness based on the negotiations.

**F.      The Reaction of the Class To The Settlement**

68.      More than 8,000 copies of the Notice, in the form approved by the Court, were mailed to potential Class Members and their nominees.  *See* Schmidt Affidavit ¶11, submitted herewith.  In addition, a summary notice was published in the *Investors' Business Daily* on April 27, 2006.  See Mills Affidavit ¶2, submitted herewith.  Class Members had until June 19, 2006, to file any objections to the Settlement.  To date, not even a single individual shareholder has objected to the Settlement or the Plan of Allocation on any grounds.  The absence of objections from any of the potential Class Members (including numerous sophisticated financial institutions) who received notice in this case is further support for finding

that the Settlement is fair, reasonable and adequate, and that the proposed Plan of Allocation has

a reasonable and rational basis, and should be approved by the Court.

**THE FEE PETITION**

**A.    The Requested Fee Is Reasonable Under Both The Percentage And
Lodestar/Multiplier Methods**

69.    Plaintiffs' Counsel respectfully request a fee of one-third (33-1/3%) of the

Gross Settlement Fund.  A fee of one-third of the recovery is merited here in view of the work

done and the amount recovered.  Fee awards of one-third of the gross recovery are legion for

class recoveries in the range of the recovery here and such a fee is particularly appropriate here

in view of services performed.  As set forth in the Fee Memorandum, the First Circuit and other

circuits have held that the simple and direct percentage method of computing fees, which is

supported by the PSLRA,[2] is available to this Court in awarding fees in common fund cases.

However, if the Court elects to also consider the lodestar/multiplier method in awarding

counsel's fees, the appropriate information is presented herein and also supports the requested

fee.  (It should be noted that the lodestar figures do not include the time which plaintiffs'

attorneys have expended in preparing the Fee Application).

70.    Submitted herewith is a separate Compendium of Plaintiffs' Counsel's

Affidavits in Support of an Award of Attorneys' Fees and Reimbursement of Expenses (the

"Compendium") by the plaintiffs' law firms who performed services in this litigation: Milberg

Weiss; Lerach Coughlin; Brower Piven; and Moulton & Gans.  As summarized in the

Compendium, Plaintiffs' Counsel have devoted a total of more than 1,357.15 hours to this action

---

[2]    The PSLRA, 15 U.S.C. § 78u-4(a)(6), provides:  "Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a *reasonable percentage* of the amount of any damages and prejudgment interest actually paid to the class . . . ." (Emphasis added.)

resulting in a total lodestar of $493,615.50. The requested one-third fee represents a lodestar multiplier of approximately 1.94.

71.    As shown in the accompanying Fee Memorandum, percentage-based awards equal to one third of the recovery are well within the range awarded by this Courts and other courts in this and other districts across the country that rely primarily on the percentage-of-recovery fee award methodology. Similarly, a lodestar multiplier of 1.9 is also well within the range of multipliers typically awarded by Courts in this Circuit and elsewhere in cases such as this.

72.    The Notice mailed to Class members states that Plaintiffs' Counsel are moving the Court to award attorneys' fees not to exceed one-third (33-1/3%) of the Gross Settlement Fund and for reimbursement of their expenses in the approximate amount of $35,000. Pursuant to this Court's Order, any objections to the application for fees and reimbursement of expenses were to be served and filed no later than June 19, 2006. To date, there have been ***no*** objections to Plaintiffs' Counsel's request for a fee award.

73.    As set forth in the Fee Memorandum, courts have examined a variety of factors to determine whether a fee request is merited, including: (i) the amount of the recovery obtained; (ii) the skill and efficiency of counsel; (iii) the complexity of the litigation; (iv) the risk of non-payment; and (v) the amount of time devoted. As set forth below, each of these factors weighs in favor of Plaintiffs' Counsel's fee request in this case:

### (1)    The Benefit Conferred On The Class

74.    As discussed above, the benefit conferred on the Class is substantial - $2,785,000 – in a case in which there was no restatement of financial statements, no admission of wrongdoing by Defendants, and no government investigation.

### (2)    The Skill Of The Lawyers

75.    Plaintiffs' Counsel have great experience in complex federal civil litigation, particularly the litigation of securities and other class actions, and have achieved significant acclaim for their work, as set forth in the exhibits accompanying the fee affidavits in the Compendium.  Our experience in the field allowed us to identify the complex issues involved in this case and to formulate strategies to prosecute it effectively.  Our reputation as attorneys able and unafraid to carry a meritorious case through trial and appellate levels, gave us strong leverage in the settlement negotiations with Defendants.

76.    The quality of the work performed by Plaintiffs' Counsel in attaining the Settlement may also be evaluated, in part, by the quality of the opposition.  Wilmer Hale, counsel for Defendants, are skilled and experienced in defending actions such as these.  Plaintiffs' Counsel were thus confronted with experienced and qualified opposition.  In the face of this formidable opposition, Lead Plaintiffs were able to overcome Defendants' motion to dismiss, and to develop their case sufficiently to press Defendants into a substantial settlement of this action.  The Settlement clearly reflects Defendants' awareness of Lead Counsels' ability and readiness to prosecute the case through summary judgment and trial if a fair settlement could not be achieved.

### (3)    The Complexity Of The Litigation

77.    Although this case did not present unusually complex issues for a securities class action , Defendants asserted many significant defenses that might have resulted in a finding on liability and damages in their favor.  All securities class actions are inherently complex and involve difficult issues of pleading, and proof of a false or misleading statement of material fact, made with *scienter*, reliance, causation, and damages.  As described above, there was no guarantee that Lead Plaintiffs would have succeeded in convincing a jury that Defendants acted with scienter, or that Defendants' statements amounted to more than mere puffery.  There was no restatement of Network Engines' financial statements, no admission of wrongdoing by Defendants, and no government prosecution of Defendants to buttress Lead Plaintiffs' allegations of securities fraud.  Establishing causation and damages would also present complex issues that Defendants would exploit.  Thus, this case was far more risky than other recent cases in which fraud was conceded at the outset.

### (4)    The Risks Undertaken By Counsel In Pursuing This Case

78.    As demonstrated in the accompanying Fee Memorandum, determination of a fair fee must include consideration of the contingent nature of counsel's retainer and of the extent of the difficulties and uncertainties which were overcome in obtaining the Settlement.

79.    Here, counsel undertook and prosecuted this case on a contingent-fee basis.  Our firms received no retaining fees from our clients.  Plaintiffs' Counsel knew from the outset that they might expend large sums of money and time in pursuing this action on behalf of the Class, yet receive no compensation whatsoever if the action ultimately proved unsuccessful. In addition, contingent-fee litigation also carries the risk that, even if successful, the Class might receive an amount smaller than needed to provide a fully compensatory fee to counsel.

Nonetheless, professionals in the firms representing the Class collectively expended over 1,357.15 hours pursuing the litigation, unassisted by any government investigation or prosecution, and advanced over $36,566.54 in expenses, without any assurance of success.]

80.    This declaration and the memoranda in support of the proposed Settlement and the fee application describe the substantial risks of this litigation.  Those same difficulties also constituted risks that Plaintiffs' Counsel might never be paid for their efforts.

81.    Because the fee to be awarded in this matter was contingent on a successful recovery, the only certainty from the outset was that there would be no fee without a recovery, and that such a result could be realized only after substantial efforts.

82.    Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations.  The SEC, a vital but understaffed government agency, does not have the budget or staffing to ensure complete enforcement of the securities laws.  If this important public policy is to be carried out, the courts should award fees which will adequately compensate Plaintiffs' Counsel, taking into account the enormous risks undertaken with a clear view of the economics of the situation.  Although legislation such as the PSLRA have placed greater hurdles in front of aggrieved plaintiffs generally, where, as here, Plaintiffs have overcome the greater pleading hurdles on a motion to dismiss, Plaintiffs' Counsel should be rewarded for furthering the public policy of encouraging truth in corporate disclosures.

83.    In sum, Plaintiffs' Counsel's services were provided in the face substantial risk that they would not be paid for their efforts.  Plaintiffs' Counsel overcame many risks and survived the Defendant motion to dismiss and obtained a substantial recovery for the Class.  The

risks undertaken and overcome by Plaintiffs' Counsel in pursuing these claims strongly support the fee request.

### (5)   The Amount Of Time Devoted

84.   This factor provides further strong support for the fee requested by Plaintiffs' Counsel.

85.   In assessing this factor, courts typically look at the "lodestar" of plaintiffs' counsel and determine what multiple of lodestar the requested fee represents.

86.   As reflected in the Compendium, total lodestar of all Plaintiffs' Counsel in this case is $493,615.50.  Thus, the requested fee represents a multiple of approximately 1.94 times lodestar.  As explained in the Fee Memorandum, this multiplier is well within the range of multipliers typically awarded in this type of case.

### (6)   The Reaction Of The Class

87.   The reaction of the Class to the Settlement and the requested fee has been uniformly positive.  Not one Class Member has objected to the fee and expense request.

**B.   Plaintiffs' Counsel Should Be Reimbursed For The Expenses They Have Incurred**

88.   The reimbursement of expenses to counsel who create a common fund is appropriate.  Plaintiffs' Counsel have incurred unreimbursed expenses in the amount of $36,566.54 for which they seek reimbursement.  A breakdown of the aggregate expenses incurred by category is included in the Affidavits contained in the Compendium.  Much of this amount was expended for photocopying, court reporting services, professional fees paid to Lead Plaintiffs' experts, and travel to Boston.  These expenses were essential to the successful prosecution and resolution of this action.

89.    Plaintiffs' Counsel seek interest on their incurred, unreimbursed expenses at the same rate as earned by the Settlement Fund from the date the Fund was established through the date of payment.  The Notice mailed to Class Members states that Plaintiffs' Counsel intended to apply for reimbursement of their litigation expenses in the approximate amount of $35,000, plus interest at the same rate as earned by the Settlement Fund.  No objection has been raised to Plaintiffs' Counsel's request for reimbursement of expenses and interest thereon and the expenses sought herein are significantly less than the maximum amount set forth in the Notice.

90.    The expenses incurred by Plaintiffs' Counsel are modest and were reasonable and necessary and were reasonably related to the pursuit of the interests of the Class. Accordingly, Plaintiffs' Counsel should be reimbursed for their expenses incurred in connection with this action.

## CONCLUSION

91.    In view of the substantial cash benefit conferred on the Class, the risks of this litigation, the services performed by counsel, the quality of the work performed, and the contingent nature of the fee, the complexity of the case, it is respectfully submitted that the Class should be finally certified for the purposes of the Settlement only; that the Settlement for $2,875,000 should be approved as fair, reasonable and adequate; that the Plan of Allocation has a reasonable and rational basis and fairly allocates the recovery among Class Members and should be approved; and that a fee in the amount of one-third (33 - 1/3%) of the Gross Settlement Fund should be awarded to counsel, together with reimbursement of litigation expenses in the amount of $36,566.54, with interest on expenses from the date the Settlement was funded through the date of payment at the same net rate as earned by the Gross Settlement Fund.

We declare under penalty of perjury that the foregoing is true and correct.

  /s/ George A. Bauer III            Executed on July 19, 2006
George A. Bauer III

  /s/ David A. Rosenfeld            Executed on July 19, 2006
David A. Rosenfeld

## CERTIFICATE OF SERVICE

I, Nancy Freeman Gans, hereby certify that, on July 19, 2006, a true copy of the foregoing "Joint Declaration of Plaintiffs' Counsel in Support of the Proposed Class Action Settlement and Petition for an Award of Attorneys' Fees and Reimbursement of Expenses" was served upon the attorneys of record for each party via ECF.

  /s/ Nancy Freeman Gans
Nancy Freeman Gans